# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 1619 | **DATE** | 6/25/2001 |
| **CASE TITLE** | Norfolk Southern Railway Co. vs. Gee Co., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Court denies Gee Co.'s motion (Doc. 79-1) with respect to Counts I, II, VI, and VII of Norfolk Southern's complaint. Court grants such motion with respect to Counts IV and X of Norfolk Southern's complaint. Court grants James Gee, Sr.'s motion (Doc. 80-1) with respect to Counts I, II, and III of Norfolk Southern's complaint. Court denies CFW Specialties' and Mancini's motions (101-1) with respect to Counts I, II, III, V, and VIII of Norfolk Southern's complaint as well as Gee Co.'s cross-claim. The court grants such motion with respect to Count X. Court grants CFW Specialties' motion (Doc. 83-1) as to any claim based on successor liability.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | number of notices | 5 | | Document Number |
|---|---|---|---|---|---|---|---|---|
| | No notices required. | | | | | | | 114 |
| ✓ | Notices mailed by judge's staff. | | | | | | | |
| | Notified counsel by telephone. | | | | JUN 2 6 2001 | | | |
| | Docketing to mail notices. | | | | docketing deputy initials | | | |
| | Mail AO 450 form. | | | | | | | |
| | Copy to judge/magistrate judge. | | | | 6/25/2001 | | | |
| | | | | FILED FOR DOCKETING 01 JUN 25 PM 6: 08 | date mailed notice | | | |
| ETV | courtroom deputy's initials | | | | ETV | | | |
| | | | | Date/time received in central Clerk's Office | mailing deputy initials | | | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| NORFOLK SOUTHERN RAILWAY, COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 98 C 1619 |
| GEE CO., CHICAGO FLAMEPROOF AND WOOD SPECIALTIES CORP., MAY WOOD INDUSTRIES, INC., JAMES W. GEE a/k/a JIM W. GEE, JOHN JANSSEN and VINCENT W. MANCINI, | ) ) ) ) ) ) ) ) | Rebecca R. Pallmeyer Judge |
| Defendants. | ) | |

DOCKETED

JUN 2 6 2001

## MEMORANDUM OPINION AND ORDER

Asserting federal and state law claims, Plaintiff Norfolk Southern Railway Company ("Norfolk Southern") seeks recovery against several corporate and individual defendants for environmental damage to Plaintiff's property and an adjacent high school's athletic field. Named as Defendants are Gee Company, James W. Gee, Sr. ("Gee Sr."), Chicago Flameproof and Wood Specialties ("CFW Specialties"), and Vincent Mancini, each of whom are alleged to have owned or operated a wood treatment facility that released hazardous waste on the property at times beginning in 1969 and continuing into the 1990s. In its ten-count complaint, Plaintiff seeks direct recovery, or, in the alternative, contribution, for clean-up costs under the relevant provisions of the Comprehensive Environmental Response, Compensation and Liability Act

("CERCLA"), 42 U.S.C. § 9601 *et seq.*, the Illinois Environmental Protection Act, 415 ILCS 5/22.2, and other Illinois breach of contract and tort theories.

In addition to Norfolk Southern's complaint, Gee Co. and Gee Sr. have each filed a counterclaim against Norfolk Southern and cross-claims against Defendants CFW Specialties and Mancini. CFW Specialties and Mancini have filed cross-claims against Gee Co. and Gee Sr. Norfolk Southern, Gee Co. and Gee Sr. have not moved for summary judgment on the counterclaim or cross-claims against them. CFW Specialties and Mancini, on the other hand, have moved for summary judgment on Gee Co.'s (but not Gee Sr.'s) cross-claim against them.

For the following reasons, the court (1) grants in part and denies in part the motions of Gee Co., CFW Specialties, and Mancini, and (2) grants the motion of Gee Sr.

## FACTUAL BACKGROUND[1]

---

[1]    The Gee Defendants and Norfolk Southern have both filed motions to strike. The Gee Defendants have asked the court to strike nearly every response contained in Norfolk Southern's Response to the Gee's Consolidated Statement of Facts Pursuant to Local Rule. The court has spent significant time evaluating the substance of Norfolk Southern's individual responses and has included in the Factual Background only those facts supported by the record. The Gee Defendants' motion to strike is therefore denied as moot.

Norfolk Southern's motion to strike focuses on three supplemental facts that the Gee Defendants added to their Response to Plaintiff's Additional Facts. Apparently, the focus of these supplemental facts is that the United States Environmental Protection Agency's $1.6 million estimation of cleanup costs cited by Norfolk Southern's expert, Richard Bartelt, does not apply to a situation such as this because the St. Rita property was not on the National Priority List. The Gee Defendants attempt to support these supplemental facts with the deposition testimony of its expert, Frank Rovers, who merely stated that the US EPA budgets "huge numbers" for NPL sites.
(continued...)

There is no dispute that, at some point, chromated copper arsenate ("CCA"), a toxic chemical pesticide used to protect wood from rot, decay, and termite attack, was released into or onto the property of both Norfolk Southern and St. Rita High School ("St. Rita"). The hazardous waste produced by CCA is classified under the United States Environmental Protection Agency's waste codes as D004 for arsenic and D007 for chromium. *See Everwood Treatment Co., Inc. v. United States Environmental Protection Agency*, No. Civ. A. 96-1159-RV-M, 1998 WL 1674543, *1 (S.D. Ala. Jan. 21, 1998). And, because of its toxicity, the US EPA has recently classified CCA as a "Restricted Use" pesticide, "meaning that only certified applicators, or persons under

_____

[1](...continued)
(Rovers Dep., at 206.)
        Norfolk Southern has moved to strike these supplemental facts because they are not permitted under Local Rule 56.1. The court agrees with Norfolk Southern's argument. Local Rule 56.1 could not be more clear:

> The procedure, as set forth in that rule, is as follows: (1) the moving party must submit a statement of assertedly undisputed facts that entitle it to summary judgment (LR 56.1(a)(3)); (2) the party opposing the motion must submit a statement that responds to each of the moving party's facts (LR 56.1(b)(3)(A)) and, if it wishes, a statement of any additional undisputed facts that the opposing party believes require the denial of summary judgment (LR 56.1(b)(3)(B)); (3) if the party opposing the motion submits a statement of additional facts, then the moving party must submit a reply to those additional fact statements (LR 56.1(a)(3)). No other responses or replies are required or will be considered.

*Newsome v. James*, No. 96 C 7680, 2000 WL 528475, at *7 (N.D. Ill. Apr. 26, 2000). The court, for this reason, will not consider the supplemental facts filed by the Gee Defendants in addition to their response to Norfolk Southern's additional facts, and, therefore, grants Norfolk Southern's motion to strike. (Doc. 109-1.) The court notes further that, even if it did choose to consider these supplemental facts, its ultimate decision would not have been altered in any way. The accuracy of Plaintiff's cost estimate plays no role in the evaluation of the motions for summary judgment currently before this court.

their direct supervision, can purchase and use [CCA]." (http://www.epa.gov/pesticides/citizens/1file.htm).[2]

The questions raised in this lawsuit are: When did the releases of this toxic CCA waste occur and who was responsible?

## A. The Properties

Norfolk Southern's property is located at 2622 West 79th Street, Chicago, Illinois. (Norfolk Southern's Response to Gee's Consolidated Statement of Facts Pursuant to Local Rule ("Norfolk Southern's Response to Gee Defendants' 56.1 Statement") ¶ 1.) In 1969, Norfolk Southern leased this property to Defendant Gee Co., an Illinois corporation since 1929, which had already owned approximately 7.4 acres of property abutting this leased property. Gee Co. constructed a wood treatment facility on the leased property, and, from 1969 until August 1991, operated the wood treatment facility as a separate division named Chicago Flameproof and Wood Preserving ("CFW Preserving").[3] In August 1991, Gee Co. sold the wood treatment

---

[2] For more information about the potential dangers of CCA, see Ron Matus, *Treated Wood's Risks Debated*, Gainesville Sun, Mar. 19, 2000, at 1, *available at* http://gainesvillesun.com/news/articles/03-18-00c.shtml (noting that "CCA, contains arsenic, which is toxic and a known carcinogen").

[3] For a reason it has not explained, Norfolk Southern has not provided the court with a copy of the original lease between Norfolk Southern and Gee Co. Instead, Norfolk Southern attached to its complaint a copy of a lease it entered into with R.T. Feltus Lumber Co., a division of Gee Co., on April 1, 1976 (the "R.T. Feltus Lease"). The indemnity provision at issue in this R.T. Feltus Lease is as follows:

> The Lessee shall not create nor permit to be created or to exist upon the land herein any nuisance, public or private, during the continuance of

(continued...)

facility to CFW Specialties.[4] (Consolidated Statement of Material Facts Pursuant to LR 56.1 ("Gee Defendants 56.1 Statement") ¶ 10.) Norfolk Southern first learned of CCA contamination on its property through the investigative report of one of its environmental consultants in December 1993. By the time the removal actions finally occurred in 1999, the CCA had leached onto and/or into approximately 13,000 square feet of its land. (Bowden Aff. ¶ 2.)

St. Rita High School, located to the immediate east of the wood treatment facility, has owned the affected property since the summer of 1990. Prior to that point, the property was owned by Quigley Seminary. (Angsten Aff. ¶ 1.) Father Michael O'Connor is the President of St. Rita and, as such, oversees the entire institution and its campus. (Norfolk Southern's Statement of Additional Facts Pursuant to Local Rule ("Norfolk's Additional Facts") ¶¶ 10, 11.) The CCA damaged a sodded area at St. Rita approximately 440 feet by 205 feet which included St. Rita's practice football field. (Bowden Aff. ¶ 2.)

---

[3](...continued)
this agreement and shall save and keep harmless the Lessor from any suit or claim growing out of any nuisance thereon or Lessee's violation of any applicable law . . . .
(Compl. Ex B.) Because Gee Co. has not raised an objection, the court assumes the provision at issue is identical in the earlier lease.

[4]     As will be detailed further below, CFW Specialties insists it was and is an entity entirely separate from CFW Preserving, whereas Norfolk Southern claims that CFW Specialties was and is CFW Preserving's corporate successor and, as such, succeeds to CFW Preserving's corporate liabilities.

- 5 -

Norfolk Southern has already borne the approximately $1.6 million clean-up expense and the Illinois Environmental Protection Agency ("IEPA") oversaw this process. Norfolk Southern now seeks to recover the costs of the clean-up. In order to determine which, if any, of the Defendants are responsible, the court must first recount the history of these parties and their connection to the affected property.

## B.    Gee Co.

As already noted, Gee Co. operated the wood treatment facility from 1969 until 1991 under the name CFW Preserving. (Defendants Chicago Flameproof and Wood Specialties Corp.'s and Vincent M. Mancini's Statement of Uncontested Facts Pursuant to Local Rule 56.1 ("CFW Specialties' 56.1 Statement") ¶¶ 12, 13.) In addition to its wood treatment operation, Gee Co. was in the business of selling retail lumber and general building materials. (CFW Specialties' 56.1 Statement ¶ 7.) At all times relevant to this case, Gee Sr. was the Chairman of the Board of Directors of Gee Co. (*Id.* ¶ 16.)

John Janssen, who is deceased, and was, until recently, a defendant in this case,[5] worked for Gee Co. from October 1989 until February 1990. (*Id.* ¶ 23.) Janssen was hired by Gee Co. to help increase its new home lumber sales, and worked, not in the area where the wood was treated, but in Gee Co.'s central office located nearby on the 7.4 acres of property that Gee Co. originally owned. (*Id.* ¶¶ 25, 27.) Gee Sr. escorted Janssen on two tours of the wood treatment facility during Janssen's

---

[5]    On March 23, 2001, this court, upon Norfolk Southern's motion, dismissed all claims against John Janssen and Maywood Industries, Inc. with prejudice.

employment. (*Id.* ¶ 29.) On two additional occasions, Janssen observed the wood treatment facility on his own. (Norfolk Southern's Response to CFW Specialties' 56.1 Statement ¶ 29.) Janssen voluntarily terminated his employment with Gee Co. in February 1990 because he was dissatisfied with the progress Gee Co. was making in the new home lumber sale industry. (CFW Specialties' 56.1 Statement ¶ 28.)

## C.    CFW Preserving

During the period relevant to this lawsuit, the CFW Preserving division of Gee Co. was managed by Ed Klein, Jack Hoffman, and Steven Dooley, Jr. (CFW Specialties' 56.1 Statement ¶ 19.) Norfolk Southern contends that Gee Sr. was chiefly responsible for the operations of CFW Preserving and, by extension, the wood treatment facility. (Norfolk Southern's Response to CFW Specialties' 56.1 Statement ¶ 19.) Dooley Jr., who, prior to his position as manager, worked as both a laborer and sales person for CFW Preserving, testified that Gee Sr. was aware of and, in fact, responsible for decisions to remove and replace sod on the property of Quigley Seminary. This sod, according to Dooley Jr., had been damaged by CCA waste from the wood treatment facility that had spilled over the property line. (Dooley Dep., at 70, 77.)

Gee Sr. denies both that he operated CFW Preserving and that he had any personal involvement in or responsibility for the environmental damage at issue. (Gee Defendants' 56.1 Statement ¶ 129.) He further denies that anyone at Gee Co. ever replaced the sod on the field at Quigley/St. Rita. (Gee Sr. Dep., at 104.) Gee Sr. testified that CFW Preserving managers Ed Klein and Steve Hoffman were the individuals directly responsible for wood treatment operations, tracking the wood

treatment facility's stock of CCA (although the record does not indicate how often this was done), and general environmental compliance. (Gee Sr. Dep., at 87.) Adam Jung, a former CFW Preserving laborer, testified that Gee Sr. never personally supervised the activities associated with handling of hazardous wastes and was actually not "really interested in the treating plant." (Jung Dep., at 140, 211.)

## D.   Wood Treatment Facility Operations

CFW Preserving conducted operations at the wood treatment facility as follows. Cylinders, approximately six feet in diameter and twenty-five feet long, were filled with either CCA or D-Blaze, a non-hazardous fire retardant. Relatively small, tram-like cars were loaded with wood and pushed on metal rails towards one of these two cylinders. (Norfolk Southern's Response to Gee Defendants' 56.1 Statement ¶ 2.) The cylinders were situated in concrete pits surrounded by a concrete apron. The wood was then dumped from the carts into these cylinders. After immersion, the treated wood was removed from the cylinders and placed on an open-air drip pad to dry. (Gee Defendants' 56.1 Statement ¶ 3.) The drip pad was a flat, driveway-like surface on the property border between the wood treatment facility and the Quigley/St. Rita property. (Northern Southern's Response to Gee Defendants' 56.1 Statement ¶ 3.) Gee Co. and Gee Sr. claim that the drip pad was designed with underground piping and sloped to direct any liquid back into the wood treatment system, where it was reclaimed into the working tanks. (Gee Defendants' 56.1 Statement ¶ 5.) Norfolk Southern, however, disputes that assertion and further notes that the drip pad had cracks through which

- 8 -

hazardous material was released into the ground. (Norfolk Southern's Response to Gee Defendants' 56.1 Statement ¶ 5.)

## E. The Alleged Release of CCA at the Wood Treatment Facility Prior to the Sale of CFW Preserving

The wood treatment facility was located on land approximately 3 to 4 feet higher in elevation than the surrounding ground surface of the Quigley/St. Rita property. Dooley Jr. testified that, on multiple occasions, he witnessed spillage of CCA waste onto the adjacent property and the effects of such spillage. The first spill he observed was in 1979 or 1980, and he attributed it to the fact that the curbing between the properties was too low. Dooley Jr. could not give an estimate of how many gallons of CCA waste actually spilled over the curb, but testified that it "wasn't as much" as the later spills described below. (Dooley Dep., at 72.) Dooley Jr. testified that he suggested to Gee Sr., James Gee, Jr., and Bill Hall (Gee Co.'s controller, CFW Specialties' 56.1 Statement ¶ 18) that Gee Co. construct a higher wall so as to avoid future contamination of the adjacent property.[6] (Dooley Dep., at 78.) According to Dooley Jr., Gee Sr. and Gee Jr. stated that they would "do something about it," but, besides minor patching work, the slope of the wall was not altered. (Dooley Dep., at 79.)

During the early to mid-1980s, Dooley Jr. witnessed two additional spills. Dooley Jr. testified that: (1) the first of these spills involved more than 1,000 gallons

---

[6] Dooley Jr. testified that, even while he had the title of manager of CFW Preserving, he did not have authority to repair anything. If he wished to do so, he had to clear any such repair with Gee Sr. or Gee Jr. (Dooley Jr. Dep., at 105.)

of CCA waste and damaged an approximately 15-by-40 foot area of the Quigley/St. Rita property (Dooley Dep., at 69, 73, 75); and (2) the second also involved more than 1,000 gallons of CCA waste and damaged an approximately 25-by-50 foot area of the same property. (*Id.* at 75.) Dooley Jr. attributed these spills to the low curbing as well as heavy rains that overflowed the cylinders. (Dooley Dep., at 71.) After both of these spills, Dooley Jr. watched as Gee Co. employees changed the sod on the Quigley/St. Rita property. Dooley Jr. testified that he was not involved in the decision to remove and replant the sod; he claims that Gee Sr. and Gee Jr. would have been the ones responsible for such a decision. (Dooley Dep., at 76-77.)

On March 4 and April 8 of 1988, Chet Popadzuik of Osmose Wood Preserving, Inc. (Gee Co.'s supplier of CCA) visited the wood treatment facility and met with Gee Sr. (Ex. 15 to Norfolk Southern's 56.1 Statement.) Popadzuik testified that he would visit his customers, such as Gee Co., to "look at the equipment, propose[] improvements, [and perform] any troubleshooting that [the customer] may have needed from a maintenance standpoint." (Popadzuik Dep., at 10.) On April 26, 1998, Popadzuik sent to Gee Sr. a summary of the recommended equipment and environmental improvements discussed during Popadzuik's visit. (*Id.*) In Paragraph 13 of this summary, Popadzuik wrote:

> We have also discussed the need to ensure that proper housekeeping measures are maintained in the treating process and plant area. As I mentioned to you and Jack Hoffman, any contaminated soil and contaminated dirt around the cylinders, tank farm, and plant area must be removed and placed in a properly maintained 17H drum for proper handling as a hazardous waste. As discussed, it is important that proper housekeeping measures be maintained.

(*Id.*) Then, in Paragraph 15, Popadzuik wrote: "We then discussed the installation of a concrete retaining wall around the storage tanks and plant area to contain any accidental spills." (*Id.*) There is no evidence that Gee Co., or Gee Sr. in particular, responded to any of Popadzuik's suggestions.

Sometime between October 1989 and February 1990, Janssen observed green residue on the tram tracks leading to the pit area and in the pit area itself during one of his tours of the wood treatment facility. (Janssen Dep., at 40.) Finally, James Angsten, Athletic Director at St. Rita's, worked alongside the wood treatment facility on a daily basis beginning in the summer of 1990, when St. Rita moved onto the property. From that time until September 1992, Angsten observed large piles of green-stained lumber stacked along the eastern border of the wood treatment facility. (Angsten Aff. ¶ 2.) During heavy rains, Angsten testified, the wood treatment facility lot would flood in the area where the green-stained lumber was stacked. Greenish liquid would then drain onto St. Rita's practice field, collect in puddles, and kill the grass. (Angsten Aff. ¶ 4.) Angsten observed employees from the wood treatment facility replace sod in the affected areas, but never saw these employees remove or replace the green-stained dirt. (Angsten Aff. ¶ 5.)

In addition to this eyewitness testimony, Wayne Grip, Norfolk Southern's aerial photography expert, studied numerous aerial photographs taken between 1963 and 1995 and obtained by Grip from both public (e.g., United States Geological Survey) and private (e.g., Chicago Aerial Photo Services, Inc.) sources. (Ex. 22 to Norfolk Southern's 56.1 Statement.) In a November 2000 report, Grip concluded that there

was stressed vegetation consistent with the release of materials toxic to plant growth on the Quigley/St. Rita property on March 24, 1981, April 1, 1984, April 21, 1985, March 6, 1988, April 12, 1988, March 20, 1990, and May 5, 1992. (*Id.*) In those same photographs, Grip also noticed stacked materials stored on the property line between the wood treatment facility and Quigley/St. Rita. (*Id.*)

## F.    Negotiation and Sale of CFW Preserving's Assets

In or around March 1990, soon after he left Gee Co.'s employment, Janssen began working for Allied Building Products ("Allied"). (CFW Specialties' 56.1 Statement ¶ 31.) While working at Allied, Janssen met Vincent Mancini, Vice President of Allied. (*Id.* ¶ 32.) In August or September of 1990, Gee Sr. advised Janssen that Gee Co. was considering a sale of the business assets of CFW Preserving. (*Id.* ¶ 33.) Gee Sr. had not informed Janssen of this intention prior to August or September of 1990. (*Id.* ¶ 34.) Janssen approached Mancini about the proposal, and the two met with Gee Sr. in November 1990. (*Id.* ¶ 37.) Gee Sr. described CFW Preserving as a flame retardant lumber treatment business and stated that while CFW Preserving had also manufactured CCA treated lumber in the past, it had since ceased such operations. (*Id.* ¶¶ 38, 39.) Mancini testified that he and Janssen were only interested in running the wood treatment facility as a flame retardant operation. (*Id.* ¶ 40.)

According to Mancini, Gee Sr. made the following representations and warranties to Janssen and Mancini during the negotiations to purchase CFW

Preserving: (a) CFW Preserving had always operated the wood treatment facility according to and in compliance with EPA standards; and (b) CFW Preserving had no environmental "problems." (*Id.* ¶ 41.) Mancini testified that Gee Sr. never told him or Janssen that: (a) there had ever been any spills or releases of hazardous substances at the wood treatment facility; or (b) there had ever been any spills or releases of hazardous substances onto the adjacent property. (*Id.* ¶ 42.)

On June 4, 1991, Janssen and Mancini, in preparation for the purchase of CFW Preserving, incorporated under the name "Chicago Flameproofing & Wood Preserving Corporation."[7] (*Id.* ¶ 44.) On June 14, 1991, Mancini, Janssen, and Thomas Schude were elected as members of the Chicago Flameproofing & Wood Preserving Corporation Board of Directors. On June 23, 1991, Mancini (Chairman and CEO), Janssen (President), and Schude (Secretary and Treasurer) were elected as officers as well. (*Id.* ¶¶ 46, 47.) That same day, Chicago Flameproofing & Wood Preserving Corporation executed a Purchase Agreement with Gee Co. to purchase the assets of CFW Preserving. (*Id.* ¶ 51.) The primary terms of the deal were that Chicago Flameproofing & Wood Preserving Corporation would purchase the inventory (including 10,000 gallons of CCA), buildings, and equipment of CFW Preserving for the sum of $1,140,000 plus 3% of Chicago Flameproofing & Wood Preserving Corporation's

---

[7]    Just prior to closing, the Chicago Flameproofing & Wood Preserving Corporation submitted Articles of Amendment to the Illinois Secretary of State seeking to officially change its name to "Chicago Flameproof & Wood Specialties Corp." ("CFW Specialties"). (CFW Specialties' 56.1 Statement ¶ 45.) The Articles of Amendment were accepted and processed by the Illinois Secretary of State on August 5, 1991. (*Id.*)

gross sales for the first 36 months of its operation. (*Id.* ¶ 55.) In addition, Gee Co. (1) agreed that Chicago Flameproofing & Wood Preserving Corporation would receive all of Gee Co.'s rights to use the business name "Chicago Flameproofing and Wood Preserving"; (2) agreed to permit Chicago Flameproofing & Wood Preserving Corporation to operate under its pesticide license (for use of CCA) "for a reasonable period of time, until [Chicago Flameproofing & Wood Preserving Corporation] applies for and is permitted to operate under its own Pesticide License;" (3) made "no representation or warranty regarding any environmental matter, including . . . transportation, release, use, disposal or other dispositions of wastes or hazardous or toxic substances" and agreed that "prior to closing, [Chicago Flameproofing & Wood Preserving Corporation] may obtain Gee Company's records regarding environmental compliance;" and (4) agreed to have Chicago Flameproofing & Wood Preserving Corporation sublet the premises from Gee Co. until an assignment or new lease could be obtained from Norfolk Southern. (Exhibit 4 to CFW Specialties' 56.1 Statement.)

On July 23, 1991, Gee Co. advised Norfolk Southern of its desire to have the lease for the wood treatment facility transferred to the new corporation, by then known, albeit still informally, as CFW Specialties. (CFW Specialties' 56.1 Statement ¶¶ 61, 62.) The transaction finally closed on August 8, 1991. (*Id.* ¶ 66.) According to their deposition testimony, at the time of the closing, Janssen and Mancini were not aware of any CCA contamination at either the wood treatment facility or the adjacent property occupied by St. Rita. (*Id.* ¶ 67.)

Gee Co. claims, and CFW Specialties and Mancini agree, that, after the closing, Gee Co. had no further involvement with either CFW Specialties or the wood treatment facility. (*Id.* ¶ 69.) There was, however, some overlap in employment. James Tsingos (an hourly laborer) and Bob Jackson (a salesperson), who the day prior to closing had been working for CFW Preserving, became, on the day of closing, employees of CFW Specialties. (*Id.* ¶ 71.) Furthermore, CFW Specialties hired Shaun Seban as a general office clerk. Seban also had been employed at CFW Preserving, but voluntarily terminated her employment there three or four months prior to closing. (*Id.* ¶ 72.)

As Norfolk Southern points out, there were some other operational commonalties between CFW Preserving and CFW Specialties. For the first four weeks after closing, for example, CFW Specialties housed its salespersons at Gee Co.'s facility. (Janssen Dep., at 173.) CFW Specialties also, for a short time, used the phone lines and phone book advertising used by CFW Preserving. (CFW Specialties' 56.1 Statement ¶ 77.) And, finally, CFW Specialties had the same customer base as CFW Preserving. (Norfolk Southern's Response to CFW Specialties' 56.1 Statement ¶ 70.)

As for its business model, CFW Specialties admits that it sold CCA-treated lumber provided to it by suppliers. (CFW Specialties' 56.1 Statement ¶ 87.) It nevertheless insists that it never treated wood with CCA, and only used D-Blaze, the non-hazardous flame retardant chemical. (*Id.* ¶¶ 83, 84, 86.) CFW Specialties further states that it never: (a) generated any hazardous waste; (b) purchased any hazardous waste, including waste from the treatment with CCA, from Gee Co.; (c) stored any hazardous waste at the wood treatment facility; (d) used hazardous waste drums at the

- 15 -

wood treatment facility; or (e) had a release or spill of hazardous substances or hazardous waste at the wood treatment facility. (*Id.* ¶¶ 88-94.) Norfolk Southern claims that CFW Specialties did treat wood with CCA. In support of this assertion, Norfolk Southern cites the testimony of James Tsingos, who stated that, for a period of two months after closing, CFW Specialties conducted CCA treatment. (Norfolk Southern's Response to CFW Specialties' 56.1 Statement ¶ 39, 83-84; Tsingos Dep., at 37.)

On April 8, 1992, eight months after the closing, CFW Specialties retained Dombrowski & Holmes, Inc. to clean out the cylinders and piping that CFW Preserving had used to administer CCA. Dombrowski & Holmes transferred the contents of the cylinders and piping to Montgomery Tank Lines along with, Janssen testified, the 10,000 gallons of CCA that CFW Specialties had purchased in the transaction with Gee Co. (Janssen Dep., at 119.) Janssen claimed that, between the time of the closing and this transfer, the CCA was "just sitting in [a] concentrate tank." (*Id.*) Montgomery Tank Lines then delivered the CCA waste and the 10,000 gallons of CCA to CFW Specialties' Faye Plant located in Montgomery, Illinois (where CFW Specialties *did* treat wood with CCA). Mancini acknowledged that, during this removal, he "may have" seen some sludge at the bottom of the cylinders. (Mancini Dep., at 362.) Mancini nevertheless insists any such sludge was removed from the tank by Dombrowski, and that there was no release or spill of CCA during this removal process or at any point during which CFW Specialties occupied the premises. (CFW Specialties' 56.1 Statement ¶ 99; Mancini Dep., at 143-44, 362.)

On or about July 1, 1992, almost one year after it purchased CFW Preserving, CFW Specialties entered into a lease with Norfolk Southern (the "CFW Specialties Lease"). Pursuant to Article 18(b) of the CFW Specialties Lease, "the responsibility of [CFW Specialties] to remove any contamination of the Premises, including subsurface and/or groundwater, under this paragraph, is limited to any contamination that has been caused by [CFW Specialties] or which arises, in whole or in part, by [CFW Specialties'] use and occupancy of or presence on said Premises." (Norfolk Southern's Response to CFW Specialties' 56.1 Statement ¶ 82.) Norfolk Southern has not suggested that this language is anything other than a boilerplate reference to environmental damage, nor that the parties' inclusion of this language reflects their specific awareness of contamination at the site.

## G. Fire at the Wood Treatment Facility

On Sunday, September 27, 1992, a fire destroyed the operations at the wood treatment facility. (CFW Specialties' 56.1 Statement ¶ 100; Norfolk Southern Response to Gee Defendants' 56.1 Statement ¶ 12.) Janssen testified that at least three fire engines sprayed substantial amounts of water on the facility. (Norfolk Southern's Response to Gee Defendants' 56.1 Statement ¶ 13.) Because the land was sloped towards St. Rita, much of the water used to extinguish the fire flowed onto St. Rita's practice field. (Gee Defendants' 56.1 Statement ¶ 14.) Gee Co. and CFW Specialties nevertheless claim that no hazardous substances were released during the fire. (Id. ¶ 14; CFW Specialties' 56.1 Statement ¶ 101.) CFW Specialties claims that the flame-resistant lumber located in the treating cylinders and drying kilns was

- 17 -

destroyed by the fire, but that the CCA-treated lumber purchased from suppliers was not burned because it was located in a portion of the yard remote from the fire. (CFW Specialties' 56.1 Statement ¶ 102.)

When Angsten, St. Rita's Athletic Director, returned to work on the morning after the fire, he observed the debris from the wood treatment facility that had washed onto the practice field. (Angsten Aff. ¶ 7.) Immediately thereafter, St. Rita temporarily roped off the practice field and prohibited students and faculty from using the field until it had dried. According to Angsten, no one from the wood treatment facility took any action or responsibility for the damage to the field, or offered to investigate the resultant environmental conditions. (Angsten Aff. ¶ 8.) Moreover, Angsten testified, after the September 1992 fire, operations at the wood treatment facility ceased and there were no subsequent incidents of green staining of the soil or green puddling on the practice field. (Angsten Aff. ¶ 9.)

Just days after the fire, in early October 1992, CFW Specialties claims to have retained Heneghan Wrecking & Excavating Co. to clean up the premises and transfer any remaining materials, including pre-treated CCA lumber, to the Faye Plant.[8]

---

[8]     CFW Specialties has appended to its Statement of Facts a proposal signed by Rita Joan Heneghan, dated October 1, 1992, which states that Heneghan Wrecking & Excavating Co. was to "furnish the labor and equipment for investigative and cleanup work after the fire at 2622 W. 79th Street; haul all debris from site; clean around the tanks as discussed leaving the tanks in place." (Ex. 34 to CFW Specialties' 56.1 Statement.) The proposal further states that: "We [Heneghan] do not include the removal of asbestos, contaminated soil or any hazardous wastes." (*Id.*) Norfolk Southern argues that this proposal has not been authenticated, is hearsay, and that, because it expressly excluded the removal of hazardous wastes, is irrelevant. The court (continued...)

(CFW Specialties' 56.1 Statement ¶¶ 105-06.) Mancini testified that from October 1992 until May 1993, he visited the wood treatment facility on a daily and then weekly basis to supervise this cleanup. (Mancini Aff. ¶ 5) CFW Specialties claims to have ultimately vacated the wood treatment facility in May 1993. (CFW Specialties' 56.1 Statement ¶ 107.) Norfolk Southern denies that CFW Specialties vacated the premises in May 1993 and notes that CFW Specialties has not produced any operational records to support such an assertion.[9] (Norfolk Southern's Response to CFW Specialties' 56.1 Statement ¶ 107.)

Mancini further testified that when CFW Specialties vacated the facility, no CCA liquid or drums of any kind remained in the wood treatment facility's concrete pits. (Mancini Aff. ¶¶ 7, 9.) Nor were there any green stains or green streaks on the concrete apron above or surrounding any sunken pit. (Mancini Aff. ¶ 10.) According to Mancini, all that CFW Specialties left on the premises in May 1993 was a stainless steel tanker trailer. (Ex. 36 to CFW Specialties' 56.1 Statement.) He notes that Norfolk Southern at first demanded that Mancini have the trailer removed, but then

---

[8](...continued)
agrees with Norfolk Southern and, for purposes of the motions before the court, will not assume that Heneghan performed any cleanup of the relevant property.

[9]     Gee Co.'s and CFW Specialties' lack of records is a theme that Norfolk Southern stresses throughout its responses to Defendants' statements of facts. (Response to CWF at 19, 22, 23.) Janssen testified that CFW Specialties lost all of its records, including invoices and payroll records, in the September 1992 fire. (Janssen Dep., at 21.) Mancini, on the other hand, testified that records survived the September 1992 fire and were transferred to CFW Specialties' Faye Plant. According to Mancini, virtually all of these documents were then destroyed in a July 1996 flood of the Faye Plant. (Mancini Dep., at 190.)

directed Mancini to leave the trailer behind until further notice. Norfolk Southern claims that the tanker trailer contained hazardous waste with impermissible levels of arsenic but cites only vague testimony to support this assertion. (Falvey Dep., at 69-70.) Effective June 1, 1993, Norfolk Southern terminated the CFW Specialties Lease. (CFW Specialties' 56.1 Statement ¶ 112.)

## H.    Environmental Assessments of the Properties

On September 11, 1992, a few weeks prior to the fire, St. Rita had retained Harza Environmental Services, Inc. "to evaluate possible impacts of runoff from an adjacent wood-treating facility on portions of the High School's football practice field." (Id. ¶ 103.) On October 1, 1992, just four days after the fire, John Pyrich of Harza undertook a walk-through of the potentially affected property and took samples from surface soils for chemical analysis. (Gee Defendants' 56.1 Statement ¶¶ 17-18; Exhibit 33 to CFW Specialties' 56.1 Statement.) The samples were then analyzed by DTC Laboratories, Inc. According to Robert Kewer, the Harza Project Manager in charge of the St. Rita account, DTC Laboratories employed US EPA methods for "selected parameters which might be related to wood-treating operations." (Ex. 33 to CFW Specialties' 56.1 Statement.) Kewer noted in an October 23, 1992 letter to St. Rita that "visual observation indicated apparent discoloration of grass and soils on the practice field along surface drainage paths." He concluded, however, that:

> concentrations of analyzed parameters were below the method detection limits for all samples. This suggests no apparent impact, to date, on site soils. Based on these results, soils present at the sample locations do not pose health hazards with respect to analyzed constituents.

(*Id.*)

According to Norfolk Southern, Defendants retained two experts, Kewer, the Project Manager, and Richard Baldino, a chemist at Harza, to support the findings discussed in Kewer's letter to St. Rita–namely that the samples gathered by John Pyrich and analyzed by DTC Laboratories indicated that the soil was not contaminated.[10] Baldino admitted, however, that he formed his opinion based on only one page of raw data from the laboratory whereas a typical "data package" consists of hundreds of pages of logs and technician notes. (*Id.*, at 219.) Norfolk Southern suggests that only one page of raw data was available because Pyrich, Harza's investigator, took no field notes during his investigation. (Norfolk Southern's Response to the Gee Defendants' 56.1 Statement ¶ 17.) Baldino also admitted that he did not apply US EPA data validation techniques. (Baldino Dep., at 197.)

Norfolk Southern contends that Baldino's admissions, and Rule 702 of the Federal Rules of Evidence, require the exclusion of Harza's report. The court acknowledges its *Daubert* "gatekeeping obligation," *see Goodwin v. MTD Prods., Inc.*, 232 F.3d 600, 608 (7th Cir. 2001), but concludes that Norfolk Southern's objections to the Harza report go to its weight and not its admissibility. The court will therefore consider the results of Harza's investigation as it proceeds with this opinion.

---

[10]     The court notes that no Defendant has appended to its respective 56.1 Statement any deposition testimony, affidavit or expert report of Robert Kewer, Richard Baldino or John Pyrich.

By the summer of 1993, Pinnacle Bank of Harvey had acquired Gee Co's 7.4 acres of property in a foreclosure action. In order to properly appraise the value of this property, Pinnacle commissioned an environmental site assessment. According to Eric Hasman, an investigator with the environmental consulting firm of Laicon Inc., an environmental site assessment is comprised of up to three phases. (Hasman Dep., at 6; *see also* http://www.nstengineers.com/ESAs.htm.) During Phase I, an investigator visits the property, checks for obvious environmental hazards such as underground storage tanks, open dumping, or contaminated soils, and prepares a comprehensive written report. (*Id.*) If the investigator finds anything suspicious during this Phase I investigation, he or she recommends a Phase II investigation which involves physical sampling and chemical testing. When this process is completed, the investigator prepares another written report setting forth his or her conclusions, and if necessary, a description of the recommended remedial action needed to restore the site to the appropriate condition for its intended use. (*Id.*) Phase III then consists of a report outlining the design and implementation of the remediation of the site. (*Id.*)

Pinnacle Bank hired Laicon Inc. to perform a Phase I assessment of the property and "look for [any] environmental problems." (Gee Defendants' 56.1 Statement ¶ 36; Hasman Dep., at 9.) On August 16, 1993, Laicon's investigator, Eric Hasman, "walked the property" and did not see any evidence of stressed vegetation, stained soil, leaking containers, or any other evidence of hazardous conditions during this inspection. (Hasman Dep., at 48.) There is no evidence that Hasman took any soil samples.

Laicon documented Hasman's findings in an August 30, 1993 report to Pinnacle. (Ex. 22 to Gee Defendants' 56.1 Statement.) That same summer, Norfolk Southern became interested in purchasing the 7.4 acres. Norfolk Southern engaged two environmental consulting companies, Radian International, Inc. and Patrick Engineering, Inc., to perform evaluations of the Gee Co. property. (Ex. 24 to Gee Defendants' 56.1 Statement.)

In addition to the 7.4 acres, both Radian and Patrick also investigated the wood treatment facility. Anthony Mellini, the Radian consultant, visited the site (the record does not indicate the precise date), took photographs, and testified that he does not recall seeing any drums in the concrete pits. (Mellini Dep., at 27.) Patrick performed a combined Phase I and Phase II investigation at the request of Norfolk Southern. Its findings were far different from those of Laicon and Radian. Jeffrey Schuh, Patrick's investigator, observed green-colored liquid and a 55-gallon drum in one of the pits during his visit to the wood treatment facility on June 9, 1993. During his deposition, Jerry Bowden, Patrick's Project Manager, characterized Schuh's discovery of green liquid in the pits as a "red flag." (Bowden Dep., at 108.) Patrick then performed the following work: (a) drilling soil borings at depths ranging from 15 to 19 feet; (b) preparing composite samples for each 5-foot interval; (c) constructing five monitoring wells in the soil borings; and (d) collecting groundwater samples and submitting them for analysis. (Bowden Aff. ¶ 5.) In its December 1993 investigative report, Patrick concluded that "the wood treatment area which is located northeast of the [Pinnacle Bank] property has impacted soil and groundwater conditions. The impact appears to

extend onto the [property owned by Pinnacle Bank] and could possibly extend to the east onto school property." (Ex. 24 to Gee Defendants' 56.1 Statement.) Patrick recommended that "a comprehensive subsurface investigation be performed . . . to determine the extent of soil and groundwater contamination on the Gee site." (*Id.*) In response to Patrick's site assessment, Norfolk Southern installed a cyclone fence around the pits. (Bowden Aff. ¶ 9.)

## I.    The Alleged Exposure of the Concrete Pits from 1993-1996

Gee Co. and Gee Sr. claim that, despite Patrick's report and recommendations, Norfolk Southern took no action with respect to the wood treatment facility (which was, at all relevant times, property owned by Norfolk Southern) save the installation of the cyclone fence. The Gee Defendants argue that it was thus under Norfolk Southern's guard, and not its own or CFW Specialties', that the damage at issue here occurred.

In particular, Gee Co. claims that, during the period between December 1993, when Patrick issued its Phase I/II report and September 1996 (the month during which Norfolk Southern finally removed the hazardous waste from the pits, Norfolk Southern's Response to Gee Defendants' 56.1 Statement ¶ 49), the concrete pits were exposed to rainwater and snow. According to Gee Co.'s expert, Frank Rovers, approximately 150,000 gallons of water would have fallen on the area of the drip pad and have been directed back into the pits during this time. (Gee Defendants' 56.1 Statement ¶ 48.) Rovers claims that the contamination on the property of St. Rita was the result of overflow of the 55-gallon drum identified by Patrick due to precipitation.

(Rovers Dep., at 211.) Jeffrey Schuh of Patrick testified that any overflow due to rain was unlikely. Because evaporation would effectively cancel out precipitation, he opined, the drum would not have overflowed. (Schuh Dep., at 480.)

Norfolk Southern did not assume possession of the wood treatment facility until January 1, 1995. (Norfolk Southern's Response to Gee Defendants' 56.1 Statement ¶ 26.) Once in possession, Norfolk Southern employees noticed green streaks on the concrete near the treatment pits, extending towards the St. Rita property. Norfolk Southern again retained Patrick to further investigate the wood treatment facility and St. Rita. (Bowden Aff. ¶ 9.) From May through November of 1995, Patrick performed a more comprehensive subsurface investigation to determine the extent of soil and groundwater impacted by CCA. (Bowden Aff. ¶ 10.) Although the investigation was still a month away from completion, Patrick forwarded to Norfolk Southern the results of analytical testing of soil samples in September 1995. (Bowden Aff. ¶ 12.) These results indicated that elevated levels of CCA were present in soil and groundwater at the wood treatment facility, and that contamination was possibly present on St. Rita's practice field as well. (Bowden Aff. ¶ 13.) Norfolk Southern reported the results of Patrick's investigation to the Illinois Environmental Protection Agency (IEPA) and St. Rita.

Until that point, students at St. Rita were using the practice field. (O'Connor Dep., at 14.) As soon as it received the results from Patrick, Norfolk Southern requested St. Rita's permission for Patrick to build a wooden fence in between the former wood treatment facility and the practice field and to perform testing on the

field. (Bowden Aff. ¶ 16.) Father O'Connor, President of St. Rita, assented to both requests on the condition that Norfolk Southern correct the contamination on the practice field to a level that would trigger the IEPA issuance of a No Further Remediation Letter ("NFR Letter").[11] (O'Connor Dep., at 32.) Because he wanted to explain the installation of the fence, but did not know for certain whether the practice field was contaminated, on September 15, 1995, O'Connor wrote a memorandum to St. Rita faculty and staff members which included the following language: "In preparing the site [for the storage of railroad cars], [Norfolk Southern] immediately came across a utility easement problem. In order to correct the problem, they need to rope off and do some digging on the present practice football field immediately. This may cause us an inconvenience for a while." (Ex. 35 to Gee Defendants' 56.1 Statement.) At his deposition, O'Connor acknowledged that Norfolk Southern had never mentioned a utility easement problem. (O'Connor Dep., at 83.) Upon seeing this memorandum in September 1995, William Harris, Norfolk Southern's Director of Environmental Protection, told O'Connor that he should correct this communication so as to avoid any misunderstanding. (Harris Dep., at 509.) O'Connor testified that "within a week or two [of writing the memorandum], [he] had met with all kinds of people to give them more of an outlay of what was happening." (O'Connor Dep., at 85.) O'Connor further

---

[11]    An NFR Letter "signifies a release from further responsibilities under [the Illinois Environmental Protection Act] in performing the approved remedial action and shall be considered prima facie evidence that the site does not constitute a threat to human health and the environment and does not require further remediation under [the IEPA], so long as the site is utilized in accordance with the terms of the No Further Remediation Letter." (415 ILCS 5/58.10(a).)

claims that it was not until around September 1996 that he became aware that CCA waste had, in fact, contaminated the practice field. (*Id.*)

## J.    IEPA Involvement and Remediation Efforts

In the fall of 1995, after Patrick completed its subsurface investigation, Norfolk Southern instructed Patrick to prepare an application to enroll the affected property, both its own and St. Rita's, into IEPA's Pre-Notice Site Cleanup Program. (Bowden Aff. ¶ 19.) On November 29, 1995, Harris wrote to O'Connor, informing him that Norfolk Southern had prepared such an application. Harris further noted that (1) once accepted into the Program, the projected duration of the cleanup at St. Rita would be between 6 to 12 months and (2) "the IEPA has a community relations group should their help be needed to effectively address any public concerns."[12] (Ex. 55 to Gee

---

[12]    Defendants contend that the "community relations" undertaken by Norfolk Southern and St. Rita were deficient. "Community relations" are required by 40 C.F.R. 300.415(n), which provides, in pertinent part:

> In the case of all CERCLA removal actions taken pursuant to § 300.415 or CERCLA enforcement actions to compel removal response, a spokesperson shall be designated by the lead agency. The spokesperson shall inform the community of actions taken, respond to inquiries, and provide information concerning the release. All news releases or statements made by participating agencies shall be coordinated with the OSC/RPM. The spokesperson shall notify, at a minimum, immediately affected citizens, state and local officials, and, when appropriate, civil defense or emergency management agencies.

O'Connor initially testified that the faculty, the staff, maintenance engineer, parents, board of advisers, the Provincial and his council, finance committee, parents' clubs and education commission were informed of hazardous waste on the practice field. (O'Connor Dep., at 27.) Later in his deposition, O'Connor acknowledged that neither the parents nor the students were in fact told there was hazardous waste on the practice field. Instead, O'Connor told parents only that "Norfolk Southern, our new neighbors, were coming in and that there was some

(continued...)

Defendants' 56.1 Statement.) The IEPA acknowledged receipt of Norfolk Southern's application on December 19, 1995. (Bowden Aff. ¶ 20.) Between December 1995 and March 1996, Patrick prepared a Site Investigation Work Plan for both the wood treatment facility and St. Rita. On behalf of Norfolk Southern, Patrick submitted the Plan to IEPA for review. (Bowden Aff. ¶ 22.) On April 9, Norfolk Southern, Patrick, and IEPA project managers met and discussed the Site IWP and remediation requirements. (Bowden Aff. ¶ 29; Ex. 53 to Gee Defendants' 56.1 Statement.) While not providing the court with exact dates, Harris testified that Norfolk Southern had

---

[12](...continued)
work and some construction being done and testing being taken to refurbish and to fix up that area . . . ." (O'Connor Dep., at 55-56.) The efforts of Norfolk Southern were no better. Despite recommendations otherwise from IEPA (Exs. 36 and 37 to Gee Defendants' 56.1 Statement), Norfolk Southern did not provide community-wide notice; in fact, IEPA and St. Rita were the sole participants in Norfolk Southern's "community relations" effort. And with regard to St. Rita, O'Connor testified that Norfolk Southern never asked for St. Rita's input regarding costs or alternative remedies. (O'Connor Dep., at 31.)

In an April 15, 1997 letter from Patrick Engineering to O'Connor, Patrick informed O'Connor that IEPA recommended that Norfolk Southern and/or St. Rita:

> (a) prepare a fact sheet for distribution to students, parents, neighbors, and staff of St. Rita's; (b) notify local newspapers in advance of any restoration activities; (c) notify local officials, including aldermen, the mayor and emergency response personnel; (d) personally visit the residents located immediately north of the practice football field prior to performing any prolonged restoration activities; and (e) establish a local repository (e.g., library) at which all technical reports and fact sheets can be reviewed by interested parties.

(Ex. 39 to Gee Defendants' 56.1 Statement.) It does not appear from the record that either Norfolk Southern or O'Connor followed through with any of these suggestions.

on-going discussions with St. Rita staff and Catholic church officials about the remediation effort. (Harris Dep., at 429.)

On May 10, 1996, Norfolk Southern sent letters to Janssen, CFW Specialties, Gee Co., and Gee Sr. informing them of the need for response actions and demanding reimbursement for costs incurred during the remediation of the contaminated property. (Ex. 32 to Norfolk Southern's 56.1 Statement; Norfolk Southern's Additional Facts ¶ 9.) The letters indicated that the estimated remediation cost was $1.5 million. (Ex. 32 to Norfolk Southern's 56.1 Statement.) The record does not indicate that these Defendants ever responded to Norfolk Southern's letter.

On January 22, 1997, Jerry Bowden, the Patrick Project Manager working with Norfolk Southern, wrote O'Connor, updating him on the status of the environmental work at St. Rita. (Ex. 57 to Gee Defendants' 56.1 Statement.) In this letter, Bowden noted that Norfolk Southern was in the process of preparing an investigation report for submission to the IEPA. (*Id.*) On February 10, 1997, Patrick submitted to IEPA a Property B Restoration Work Plan and Phase III Investigation Report limited to the St. Rita property ("Property B Plan"). (Bowden Aff. ¶ 34.) On March 18, 1997, IEPA rejected the Property B Plan pending the receipt of additional information. Norfolk Southern submitted a response to IEPA on June 12, 1997, and, on July 3, 1997, IEPA issued its approval letter for the Property B Plan. (Bowden Aff. ¶ 46.)

The clean-up process at St. Rita, which involved excavation of soil, installation of sewers and an in-ground irrigation system, and the replacement of trees, eventually took place between July 1997 and October 1997. (Bowden Aff. ¶ 48.) In January 1998,

Norfolk Southern submitted a Completion Report to IEPA, and then, in consultation with St. Rita, prepared an application to IEPA for issuance of an NFR Letter. (Bowden Aff. ¶ 50.) On July 21, 1998, IEPA sent Charles J. Wehrmeister, Norfolk Southern's Assistant Vice President Safety and Environmental, an NFR Letter, signifying "a release from further responsibilities under the [Illinois Environmental Protection Act]." (Ex. 54 to Gee Defendants' 56.1 Statement.)

During the clean-up at St. Rita, Norfolk Southern completed its investigation of the former wood treatment facility. (Bowden Aff. ¶ 52.) Norfolk Southern then submitted an Investigation Completion Report to IEPA which documented the plan to remove impacted soils at that facility. (Bowden Aff. ¶ 53.) On December 24, 1997, IEPA approved this Report and the corrective-action objectives included therein. (Bowden Aff. ¶ 60.) Norfolk Southern completed the clean-up at the wood treatment facility in 1999, and submitted a Corrective Action Report to IEPA documenting this work. (Gee Defendants' 56.1 Statement ¶ 114.) Soon thereafter, IEPA issued an NFR letter with respect to the former wood treatment facility. (Bowden Aff. ¶ 64.)

## K.    Procedural History

On March 18, 1998, Norfolk Southern filed its ten-count complaint. The claims were as follows: (1) a request of full recovery from all Defendants under § 107(a) of CERCLA; (2) contribution from all Defendants, under § 113(f) of CERCLA; (3) declaratory judgment against all Defendants under § 113(g)(2) of CERCLA; (4) cost recovery from all Defendants under § 22.2 of the Illinois Environmental Protection Act, 415 ILCS 5/22.2; (5) indemnity for removal costs from CFW Specialties pursuant to an

April 7, 1992 lease agreement; (6) removal costs from Gee Co. pursuant to an April 1, 1976 lease agreement between Norfolk Southern and R.T. Feltus Lumber Co., a company which at the time, and until August 1, 1991, was operated by Gee Co.; (7) waste against Gee Co. for its alleged misuse and/or neglect of Norfolk Southern's property; (8) waste against CFW Specialties for its alleged misuse and/or neglect of Norfolk Southern's property; (9) trespass against CFW Specialties for leaving behind equipment and contamination upon the termination of its lease with Norfolk Southern; and (10) trespass against Gee Co. for leaving behind equipment and contamination upon the termination of its lease with Norfolk Southern. Defendants have each moved for summary judgment as to all claims against them.

Norfolk's complaint generated a number of additional claims. On July 14, 1998, James Gee, Sr. filed a counterclaim against Norfolk Southern and cross-claims against Defendants CFW Specialties and Mancini. On July 20, 1998, CFW Specialties and Mancini filed a cross-claim against James Gee. Then, on November 25, 1998, Gee Co. filed a cross-claim against CFW Specialties and Mancini. Finally, on December 2, 1998, CFW Specialties and Mancini filed a cross-claim against Gee Co. The counterclaim and each of the cross-claims sought contribution pursuant to CERCLA § 113(f) for any removal costs deemed owed to Norfolk Southern as a result of this lawsuit.

On February 5, 2001, Gee Co. and Gee Sr. moved for summary judgment only on Norfolk Southern's complaint. The following day, CFW Specialties and Mancini

moved for summary judgment on Norfolk Southern's complaint and on Gee Co.'s cross-claim.

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "Factual disputes are 'material' only when they 'might affect the outcome of the suit under governing law.'" *Oest v. Illinois Dep't of Corr.*, 240 F.3d 605, 610 (7th Cir. 2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Thomas & Betts Corp.*, 138 F.3d at 291).

### B. Defendant Gee Co.'s Motion for Summary Judgment

Defendant Gee Co. asks the court to grant it summary judgment on Counts I, II, IV, VI, VII, and X of Norfolk Southern's complaint. The court addresses each of these counts, and corresponding arguments, in turn.

#### 1. Counts I and II–CERCLA § 107(a) and § 113(f)(1)

Norfolk Southern has brought Count I pursuant to § 107(a) of CERCLA. Section 107(a) holds an owner of land strictly liable for hazardous wastes that are contaminating its property. *See Nutrasweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 783

(7th Cir. 2000). According to the Seventh Circuit's decision in *Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761 (7th Cir. 1994), however, while technically strictly liable for hazardous wastes on its property, a landowner itself may bring a direct cost recovery action under § 107(a), if "(1) the defendant is a covered person under § 107(a); (2) there is a release or threatened release of a hazardous substance from a 'facility' as defined by § 101(9); (3) the release caused the plaintiff to incur response costs that are consistent with the national contingency plan ("NCP"),[13] and (4) the plaintiff did not pollute the site in any way." *Nutrasweet*, 227 F.3d at 784 (citations omitted). *See also*

---

[13]    The Defendants, in their respective memoranda in support of their motions for summary judgment, each adopted the memorandum in support of summary judgment submitted by Maywood Industries, a prior defendant in this case, *see supra* note 5. In that memorandum, Maywood Industries argues that Norfolk Southern's response costs were not consistent with the NCP. In *Estes v. Scotsman Group, Inc.*, 16 F. Supp. 2d 983 (C.D. Ill. 1998), cited by Maywood, the court held that the plaintiff was barred from recovery under both § 107 and § 113 because his response costs were not consistent with the NCP. *Id.* at 990. Specifically, the court held that (1) the plaintiff's failure to comply with the "community relations" requirement of the NCP was a material departure from the NCP and (2) the approval of a public agency, such as the IEPA, could not substitute for this "community relations" requirement. *Id.* at 990-92.

The court recognizes the lackluster quality of Norfolk Southern's "community relations" effort; however, the Seventh Circuit's recent decision in *Nutrasweet* suggests that public agency approval may qualify as an adequate substitute to any apparent NCP deficiency. *See Nutrasweet*, 227 F.3d at 790-91. In *Nutrasweet*, the Seventh Circuit noted that the plaintiff complied with the NCP because the IEPA approved the clean-up plan, monitored the progress of the remediation, and then advised the plaintiff that it could stop the remediation because its efforts had succeeded to the maximum extent possible. *See Nutrasweet*, 227 F.3d at 791. The court made no reference to "community relations" or any other regulatory requirement. Here, the IEPA was similarly involved in approval of remediation plans and the remediation process. Moreover, the IEPA supplied its final stamp of approval by way of two separate NFR Letters. Consequently, the court respectfully disagrees with the conclusion in *Estes* that a plaintiff's failure to comply fully with the NCP constitutes a complete bar to CERCLA recovery.

*Rumpke of Indiana, Inc. v. Cummins Engine Co.*, 107 F.3d 1235, 1240 (7th Cir. 1997) ("[L]andowners who allege that they did not pollute the Site in any way may sue for direct response costs under § 107(a)."). This has come to be known as the *"Akzo* exception."

A plaintiff claiming to be an "innocent landowner" by way of the *"Akzo* exception" may concurrently, and for safe measure, bring a claim under § 113(f)(1) of CERCLA for contribution costs in case it is later found to be responsible for part of the response costs. *See Rumpke*, 107 F.3d at 1240; *Continental Title*, No. 96 C 3257, 1999 WL 1250666, at *3 (N.D. Ill. Mar. 18, 1999); *Soo Line R.R. Co. v. Tang Indus., Inc.*, 998 F. Supp. 889, 893-94 (N.D. Ill. 1998). Norfolk Southern has chosen to do so here. In such a case, as the court noted in *Soo Line*, there are two possible outcomes: "(1) the facts will demonstrate that the landowner was truly 'blameless'; or (2) the facts will reveal that the landowner was partially responsible, in which case, the landowner would not be eligible for recovery under § 107 and would proceed with its § 113 claim." *Soo Line*, 998 F. Supp. at 894 (citing *Rumpke*, 107 F.3d at 1240).

The Gee Defendants contend that Norfolk Southern cannot make use of § 107(a) because the facts demonstrate that a release (or releases) of CCA resulting from its own inaction renders Norfolk Southern a potentially responsible party ("PRP"). In particular, Gee Co. claims that Norfolk Southern is a PRP because it (1) failed to secure the premises in 1993, thus allowing hazardous wastes to be dumped into the concrete pits after all of the Defendants vacated the premises; (2) ignored

recommendations to remedy the facility after being informed by Patrick Engineering that there was hazardous waste in the concrete pits; and (3) took no steps to prevent the overflow of hazardous wastes.

In support of these assertions, the Gee Defendants cite the following string of evidence: Gee Co. had sold CFW Preserving, and thus vacated the wood treatment facility in the summer of 1991; in the summer of 1993, both Eric Hasman of Laicon and Anthony Mellini of Radian investigated the wood treatment facility and did not observe any leaking containers or other signs of contamination; when Norfolk Southern finally discovered CCA waste in the pits at the wood treatment facility, it waited almost three years to contain and/or dispose of such waste; and, during this three year period, the concrete pits filled with CCA waste were exposed to and likely overflowed because of significant amounts of rainwater. In fact, Gee Co.'s expert, Frank Rovers, claims that the overflow caused by rainfall during this period was the primary source of CCA contamination to St. Rita's property.

Disputes of fact still exist, though, as to whether Norfolk Southern caused any of the contamination on the relevant properties. First, no party suggests Norfolk Southern itself operated the wood treatment facility or ever used CCA. With respect to Defendants' suggestions that Norfolk Southern was guilty of failing to correct or prevent further contamination, Norfolk Southern points, first, to testimony from James Angsten, St. Rita's Athletic Director, that, after the September 1992 fire, he saw no subsequent incidents of green staining of the soil or green puddling on the practice

field. Nor is there any hard evidence that, between 1993 and 1996, rainfall overflowed the pits; in fact, Jeffrey Schuh of Patrick has cast doubt on this assertion.

The court realizes that it may be difficult for a jury to determine by a preponderance of the evidence the central questions of this case—who caused the CCA contamination and when? The court, nevertheless, must allow a jury to hear the multitude of evidence because, as the foregoing illustrates, disputes of fact abound. Because Norfolk Southern may ultimately be found entirely "innocent" (i.e., if a jury finds that there was no leaching of CCA into either Norfolk Southern's or St. Rita's property after the point at which CFW Specialties vacated the wood treatment facility), its § 107(a) claim must go forward. Gee Co.'s motion for summary judgment on Count I is therefore denied. On a similar note, the court cannot grant Gee Co.'s motion for summary judgment on Count II—the claim pursuant to § 113(f). If the jury concludes that Norfolk Southern was partly responsible, Norfolk Southern would not be eligible for recovery under § 107(a), but could nevertheless proceed with its § 113(f) contribution claim.

## 2. Count III—CERCLA § 113(g)(2)[14]

In Count III, Norfolk Southern seeks a declaration of liability as to future response costs. The Declaratory Judgment Act allows federal courts, in their

---

[14]     Gee Co. does not actually move for summary judgment on Count III, but it adopts the arguments of Defendant Gee Sr. Gee Sr., in addition to claiming not to be a CERCLA "operator," *see infra* Discussion, Section C, argues that Norfolk Southern cannot prevail on its declaratory judgment claim because such claims are limited to cases brought under § 107. The court addresses this argument here.

discretion, to render declaratory judgments where there exists an actual controversy. *See* 28 U.S.C. § 2201(a). Moreover, Section 113(g)(2) provides that in a cost recovery action under CERCLA, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2). "In providing for the recovery of response costs, Congress included language to insure that a responsible party's liability, once established, would not have to be relitigated." *American Nat'l Bank & Trust Co. v. Harcros Chems., Inc.*, No. 95 C 3750, 1997 WL 281295, at *12 (N.D. Ill. May 20, 1997).

Gee Co. argues that summary judgment must be granted on this claim because § 113(g)(2) allows for declaratory judgments only in cases brought under § 107 and, because Norfolk Southern is a PRP and cannot maintain an action under § 107, it is not entitled to a declaratory judgment. As the court has already discussed, however, Norfolk Southern's status as a PRP is debatable and will have to be determined by the jury; therefore, the court cannot, at this juncture, dismiss Norfolk Southern's § 113(g)(2) action for this reason. Gee Co. further argues that a declaratory judgment for future costs is unnecessary here because the remediation at issue is complete. The court recognizes that Norfolk Southern has received NFR Letters for both its own property as well as St. Rita's; nevertheless, "case law is clear that the fact that future costs are speculative is no bar to a present declaration of liability." *Harcros*, 1997 WL 281295, at *12 (citing *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 530 (2d Cir. 1996);

*United States v. USX Corp.*, 68 F.3d 811, 819 (3d Cir. 1995); *Kelley v. E.I. Dupont de Nemours & Co.*, 17 F.3d 836, 844-45 (6th Cir. 1994)). For these reasons, the court denies Gee Co.'s motion for summary judgment on this claim.

### 3.    Count IV–Illinois Environmental Protection Act

Next, Gee Co. contends that Norfolk Southern cannot prevail on its IEPA claim because (i) § 22.2 does not provide a private action for cost recovery; (ii) any private action under the IEPA must first be brought before the Pollution Control Board; and, (iii) the reimbursed costs do not fit the definitions of costs of "removal or remedial action" under § 22.2(f). Because the court agrees with Gee Co.'s first argument, it need not address the other two.

Section 22.2(f) of the IEPA states that "the following persons shall be liable for all costs of removal or remedial action *incurred by the State of Illinois or any unit of local government* as a result of a release or substantial threat of a release of a hazardous substance or pesticide . . . ." 415 ILCS 5/22.2(f) (emphasis added). Nowhere in the statute is a private actor given the express right to sue; enforcement of the statute has been left to the Attorney General or State's Attorney. *See Chrysler Realty Corp. v. Thomas Indus., Inc.*, 97 F. Supp. 2d 877, 878 (N.D. Ill. 2000) (Gettleman, J.). Norfolk Southern can maintain this claim, then, only if it can demonstrate that the IEPA contains within it an implied private right of action to recover costs. *See id.*

Three courts in this district have found such an implied right to exist. *See Krempel v. Martin Oil Marketing, Ltd.*, No. 95 C 1348, 1995 WL 733439 (N.D. Ill. Dec.

8, 1995) (Grady, J.); *Midland Life Ins. Co. v. Regent Partners I Gen. P'ship*, No. 96 C

3235, 1996 WL 604038 (N.D. Ill. Oct. 17, 1996) (Marovich, J.); *Singer v. Bulk Petroleum

Corp.*, 9 F. Supp. 2d 916 (N.D. Ill. 1998) (Alesia, J.). Last year, however, Judge Robert

Gettleman, another judge of this court, concluded that there is no private right of

action under the IEPA. *See Chrysler Realty*, 97 F. Supp. 2d at 881. Judge Gettleman

based this decision on the Illinois Supreme Court's reluctance to imply private causes

of action as illustrated by *Fisher v. Lexington Health Care Inc.*, 188 Ill. 2d 455, 722

N.E.2d 1115 (1999). In *Fisher*, the Illinois Supreme Court addressed the question of

whether a private right of action exists under the anti-retaliation provisions of the

Nursing Home Care Act, 210 ILCS 45/3-608. The court observed there that it would

imply a private right of action under a statute only in cases where, unless such an

action were implied, a statute would be ineffective. *See Fisher*, 188 Ill. 2d at 464, 722

N.E.2d at 1115; *see also Rekosh v. Parks*, 316 Ill. App. 3d 58, 73, 735 N.E.2d 765, 779

(2d Dist. 2000) (citing *Fisher*, 188 Ill. 2d at 464, 722 N.E.2d at 1115) ("Our supreme

court has implied a right of action under a statute only where the statute would be

ineffective, as a practical matter, unless a private right of action were implied.").

In order to determine the practical purpose of the IEPA, Judge Gettleman then

turned to an Illinois appellate opinion, *NBD Bank v. Krueger Ringier, Inc.*, 292 Ill. App.

3d 691, 686 N.E.2d 704 (1st Dist. 1997). In *NBD Bank*, a lawsuit actually involving

tort, not statutory, claims, the court noted that a private right of action under the IEPA

does not exist because, *inter alia*, "there is no clear need for civil actions under the

statute; the existing legislative scheme which provides for prosecution by the State of Illinois and allows contribution claims against third-party violators more than adequately serves the purpose of the statute, which is to protect the environment and minimize environmental change."

Applying *Fisher*, Judge Gettleman predicted that "if faced with the question, the Illinois Supreme Court, like the *NBD Bank* court, would conclude that the existing legislative scheme, which provides for enforcement by the state as well as citizen's suits before the board, more than adequately serves the purpose of the statute, and that the statute is not ineffective absent an implied right of action." *Chrysler Realty*, 97 F. Supp. 2d at 881.

This court finds Judge Gettleman's rationale persuasive. Summary judgment is granted in favor of Gee Co. on Count IV of Norfolk Southern's complaint.

### 4. Count VI–Indemnity Under the R.T. Feltus Lease

Norfolk Southern claims that Gee Co. is liable for removal and response costs based on the R.T. Feltus Lease. Paragraph 13 of the R.T. Feltus Lease states, in pertinent part: "The Lessee shall not create nor permit to be created or to exist upon the land herein any nuisance, public or private, during the continuance of this agreement and shall save and keep harmless the Lessor from any suit or claim growing out of any nuisance thereon or Lessee's violation of any applicable law . . . ." Gee Co. does not dispute its obligation to indemnify Norfolk Southern for any contamination it caused, but contends that Norfolk Southern cannot recover from it on this claim

because it was Norfolk Southern's actions, and inaction, that caused the contamination of its property and the migration of contamination onto St. Rita.

The court has already discussed the disputes of fact regarding Norfolk Southern's potential responsibility, due to its alleged inaction, for the contamination. Given these disputes of fact, Gee Co.'s argument is not sufficient at this stage of the litigation. Similar disputes surround the alleged responsibility of Gee Co. More importantly for purposes of this claim, though, Norfolk Southern has provided the court with evidence of contamination on the properties predating Gee Co.'s sale of the property to CFW Preserving in 1991. For example, Dooley Jr. testified that he observed CCA spills in the late-1970s and mid-1980s, and that he informed Gee Co. management that the lack of proper curbing was causing environmental contamination. The letter from Popadzuik of Osmose to Gee Sr. in April 1988 corroborates Dooley Jr.'s testimony that the wood treatment facility's infrastructure needed improvement. Angsten testified that, in the early 1990s (both before and after Gee Co. sold CFW Preserving to CFW Specialties), he observed green-stained lumber stacked in the wood treatment facility parking lot along the border of St. Rita. Heavy rains, Angsten noted, would cause flooding in the parking lot, which would result in green liquid draining onto the St. Rita practice field and collecting in puddles. And, finally, Grip, Norfolk Southern's aerial photography expert, noted stressed vegetation which he attributed to toxic waste on the Quigley/St. Rita property in 1981, 1984, 1985, 1988, 1990 and May 1992.

### 5.　　Count VII–Waste

In Count VII, Norfolk Southern claims that Gee Co. breached a duty owed to Norfolk Southern by contaminating Norfolk Southern's property and thereby reducing its value. The parties are in agreement on the law: "Waste occurs when someone who lawfully has possession of real estate destroys it, misuses it, alters it or neglects it so that the interest of persons having a subsequent right to possession is prejudiced in some way or there is a diminution in the value of the land being wasted." *Harcros*, 1997 WL 281295, at *22 (quoting *Pasulka v. Koob*, 170 Ill. App. 3d 191, 209; 524 N.E.2d 1227, 1239 (3d Dist. 1988)).

To the extent that Norfolk Southern's claim of waste is based on contamination of St. Rita's property, the claim obviously fails. Gee Co. was never a tenant of the property which St. Rita now owns and Norfolk Southern did not have any prior or subsequent right to possess such property. *See Harcros*, 1997 WL 281295, at *22. The claim of waste as to Norfolk Southern's property, however, must go forward. Gee Co.'s only response to this claim is that Norfolk Southern failed to include the diminution in value of its property in the lengthy list of response costs it produced to Gee Co. during discovery (Exhibit 41 to Gee Defendants' 56.1 Statement). This argument does not sway the court. Norfolk Southern has submitted evidence that it expended certain sums of money to clean up CCA contamination on its property. If it is determined that Gee Co. was responsible for such contamination, it will also be liable for waste. The precise amount of damages resulting from such waste can be determined after liability is established.

## 6.    Count X–Trespass

In Count X, Norfolk Southern alleges that Gee Co. intentionally trespassed on its property when, after the termination of its lease, it left behind contamination. Again, the parties do not dispute the law. Trespass is "an invasion in the exclusive possession and physical condition of land. In Illinois, one may be liable in trespass for causing a thing or a third person to enter the land of another either through a negligent act or an intentional act." *Millers Mut. Ins. Ass'n v. Graham Oil Co.*, 282 Ill. App. 3d 129, 139, 668 N.E.2d 223, 230 (2d Dist. 1996). Norfolk Southern emphasizes that, based on this legal definition, one may be liable for trespass for "invading" property with a substance such as CCA. This is no doubt true, but cannot change the fact that Gee Co. was legally in possession of Norfolk Southern's property pursuant to a lease agreement. Thus no "invasion" occurred. Accordingly, the court grants summary judgment to Gee Co. on this claim.[15]

---

[15]    Interestingly enough, Gee Co., but not Norfolk Southern, has pointed the court to a few cases that rejected the "continuing trespass" theory under circumstances similar to those presented here. *See, e.g., Triffler v. Hopf*, No. 92 C 7193, 1994 WL 643237, *7 (N.D. Ill. Nov. 4, 1994) (no continuing trespass where current owner of commercial property claimed that prior owners were responsible for leaking underground storage tanks found on such property); *Rosenblatt v. Exxon Co.*, 642 A.2d 180, 188 (Md. Ct. Spec. App. 1994) (no continuing trespass where current tenant of commercial property claimed that former tenant contaminated such property with toxic chemicals). The tort of continuing trespass is grounded in Restatement (Second) Torts § 161 which states that "a trespass may be committed by the continuing presence on the land of a structure, chattel, or other thing which the actor has tortiously placed there." Not surprisingly, however, courts have found that the tort of continuing trespass is inapplicable where the original "intrusion," during the period when the defendant legally occupied the property, was not tortious. *See Triffler*, 1994 WL 643237, at *6; *Rosenblatt*, 335 Md. at 78-79, 642 A.2d at 190; *see also B&D Molded*
(continued...)

## C. Defendant James Gee Sr.'s Motion for Summary Judgment

The only counts of Norfolk Southern's complaint directed at Gee Sr. are I (CERCLA § 107(a)), II (CERCLA § 113(f)), and III (CERCLA § 113(g)(2)). Gee Sr. has moved for summary judgment on all three of these counts. In addition to adopting the arguments of Gee Co., Gee Sr. argues that he cannot be considered a "responsible person," as such term is defined by CERCLA. Because the court denied summary judgment to Gee Co. based on its arguments in response to Counts I, II and III, the court here focuses on Gee Sr.'s personal liability argument.

According to § 107(a), persons liable under CERCLA include "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a). Norfolk Southern contends that Gee Sr. was the "mastermind" of the wood treatment facility, and thus should be considered an "operator" of the wood treatment facility for CERCLA purposes. While the terms "owner" and "operator" are not easily defined, "it is well established that under CERCLA, corporate officials may be held liable as operators." *Deby Inc. v. Cooper Ind.*, No. 99 C 2464, 2000 WL 263985 (N.D. Ill. Feb. 29, 2000)

---

[15](...continued)

*Prods., Inc. v. Vitek Research Corp.*, No. CV 970060362S, 1998 WL 551943, at *6 (Conn. Super. Ct. Aug. 17, 1998) ("All of these cases in fact explicitly rely on the proposition that a basic trespass claim does not lie because trespass requires interference or intrusion on the land of another and as noted the defendant would not have done so in a situation where the contamination sought to be blamed on it occurred when it was in lawful possession as a tenant of the very land in question.") (citing, *inter alia, Rosenblatt*).

(citing *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund*, 25 F.3d 417, 420 (7th Cir. 1994)).

The court has actually already examined Gee Sr.'s personal liability as an "operator" once in this case, denying his motion for judgment on the pleadings. *See Norfolk Southern Railway Co. v. Gee Co.*, No. 98 C 1619, 1999 WL 286287 (N.D. Ill. Apr. 23, 1999). This court relied on *United States v. Bestfoods*, 524 U.S. 51 (1998), where the Supreme Court held that an individual within a corporation may be found directly liable under § 107(a) if he or she exhibited sufficiently active participation and/or control. *See Norfolk Southern*, 1999 WL 286287, at *4 ("Under the language of *Bestfoods*, Norfolk Southern has alleged that Defendant has 'exercised direction over the facility's activities.'"). It then denied Gee Sr.'s motion because the complaint "contain[ed] specific allegations that Defendant Gee was an active participant in the running of the facility." *Id.*

Approximately six months after this court's denial of Gee Sr.'s motion, the Seventh Circuit further explored the issue of an individual's direct liability. *See Browning-Ferris Indus. of Illinois, Inc. v. Ter Maat*, 195 F.3d 953 (7th Cir. 1999). The district court in *Browning-Ferris* had concluded that the president and principal shareholder of the corporate defendant was not himself a potentially liable person. *Browning-Ferris Indus. of Illinois, Inc. v. Ter Maat*, 13 F. Supp. 2d 756 (N.D. Ill. 1998). The Seventh Circuit reversed and remanded the case, instructing the district court that

the corporate officer in question could in fact be found liable as an "operator" under

CERCLA if he

> did not merely direct the general operations of [the facilities in question],
> as in *Riverside Market Dev. Corp. v. International Bldg. Prods., Inc.*, 931
> F.2d 327, 330 [(shareholder was not an "operator" for CERCLA purposes
> because he only visited the plant two to four times a year and, when he
> did, primarily reviewed financial statements)] or specific operations
> unrelated to pollution, but [instead] supervised the day-to-day operations
> of the landfill—for example, negotiating waste-dumping contracts with the
> owners of the wastes or directing where the wastes were to be dumped or
> designing or directing measures for preventing toxic substances in the
> wastes from leeching into the ground and thence into the groundwater .
> . . .

*Browning-Ferris*, 195 F.3d at 956 (citations omitted). On remand, the district court

determined that the officer in question was an "operator" because, among other

activities, he

> personally handled the special waste disposal process: he personally saw
> or inspected (or at least tried to) every waste stream that was permitted
> as special waste and took waste samples from each special waste
> generator, arranged for the testing with the laboratories to analyze each
> special waste sample, applied to IEPA for each special waste permit,
> signed each IEPA special waste application as the owner and operator of
> the site, and negotiated with IEPA over the special waste approval
> process for each special waste.

*Browning-Ferris Industries of Illinois, Inc. v. Ter Maat*, 2000 WL 1716330, *2 (N.D. Ill.

Nov. 8, 2000) (Reinhard, J.). *See also Witco Corp. v. Beekhuis*, 38 F.3d 682, 692 (3d

Cir.1994) (former director and officer of polluting company found liable as a CERCLA

"operator" because he personally designed the manufacturing and disposal processes

and directed construction of drainage ditch into which chemicals were disposed);

*United States v. Meyer*, 120 F. Supp. 2d 635 (W.D. Mich. 1999) (defendant officer and

shareholder of company found liable as a CERCLA "operator" because he supervised and assisted in the construction of a perimeter sewer line which routinely leaked hazardous substances into the ground and was aware that such leaking would occur).

The court turns then to the evidence submitted by the parties in order to determine whether Gee Sr. sufficiently participated in or exercised control over the operations of the wood treatment facility. Gee Sr. argues that it was Ed Klein and Jack Hoffman, his plant managers, who were responsible for the inventorying of CCA, environmental compliance, and other day-to-day operations of the wood treatment facility. Norfolk Southern disagrees, primarily citing the following evidence: (1) Gee Sr.'s answer to Paragraph 25(c) of Norfolk Southern's complaint; (2) Chet Popadzuik's April 26, 1988 letter; and (3) Stephen Dooley Jr.'s deposition. In Paragraph 25(c) of his Answer, Gee Sr. admitted that "from the time the facilities were put into operation until operation of the facilities discontinued, [Gee Sr.] personally inspected and participated in directing, controlling and supervising the labor force which conducted the operations of the facilities at the Site." With this answer, however, Gee Sr. does not admit that he participated in the day-to-day operations of the wood treatment facility; to the contrary, it demonstrates that Gee Sr. "merely direct[ed] the general operations of [the facilities in question]." *Browning-Ferris*, 195 F.3d at 956. The Popadzuik letter and Dooley's deposition testimony are a bit more helpful to Norfolk Southern. Popadziuk, Osmose's technical engineer, met with Gee Sr. on March 4, 1988 and April 8, 1988, and, in an April 26, 1988 letter, recommended equipment and

environmental improvements for the wood treatment facility.  In Paragraph 13 of this letter, Popadzuik wrote:

> We have also discussed the need to ensure that proper housekeeping measures are maintained in the treating process and plant area.  As I mentioned to you and Jack Hoffman, any contaminated soil and contaminated dirt around the cylinders, tank farm, and plant area must be removed and placed in a properly maintained 17H drum for proper handling as a hazardous waste.  As discussed, it is important that proper housekeeping measures be maintained.

Then, in Paragraph 15, Popadzuik wrote: "We then discussed the installation of a concrete retaining wall around the storage tanks and plant area to contain any accidental spills."  The letter indicates that Gee Sr., who had met with Popadzuik and was the addressee of the letter, knew that, as of September 1988, the environmental conditions at the wood treatment facility needed improvement.  Moreover, Dooley Jr. testified that Gee Sr. knew that after large rains, CCA, a hazardous chemical, would spill over onto the adjacent property.  In fact, Dooley Jr. testified that Gee Sr. was responsible for decisions to remove and replace the sod on this property.  Dooley Jr. further testified that he asked Gee Sr. to improve the curbing between the wood treatment facility and St. Rita so as to prevent the type of spillage that had occurred.

In *Browning-Ferris*, the court noted that "the line between a personal act and an act that is purely an act of the corporation (or of some other employee) and so not imputed to the president or to other corporate officers is sometimes a fine one." *Browning-Ferris*, 195 F.3d at 956.  Assuming, as this court must, the facts in the light most favorable to the non-moving party, this case provides one such example.  The court nevertheless must decide whether there is a genuine dispute concerning on which

side of the line Gee Sr. falls. Gee Sr. was more involved in the operations of the facility than the absentee director in *Riverside Market*; but, his involvement was not nearly as great as the defendants in *Browning-Ferris, Witco,* or *Meyer*. There is no evidence that Gee Sr. was "heavily and personally involved in the construction and maintenance" of the facility. *Meyer*, 120 F. Supp. 2d at 640. Instead, so far as this record shows, his role was the standard one for someone in his position: to authorize any capital expenditure, whether it be related to environmental improvements or not. Accordingly, the court finds that Gee Sr. is not a CERCLA "operator," and therefore grants Gee Sr.'s motion for summary judgment on Counts I, II, and III.

**D.    Defendant CFW Specialties' and Mancini's Motions for Summary Judgment**

CFW Specialties and Mancini filed a joint motion for summary judgment on Counts I (CERCLA § 107(a)), II (CERCLA § 113(f)(1)), III (CERCLA § 113(g)(2)), IV (IEPA § 22.2(f)), V (Breach of Lease), VIII (Common Law Waste), IX (Common Law Trespass) and Gee Co.'s cross-complaint under § 113(f). CFW Specialties then filed an additional motion for summary judgment as to its alleged status as corporate successor to Gee Co. The court addresses these motions in turn.

**1.    The Joint Motion**

**a.    Counts I through V of Norfolk Southern's Complaint and Gee Co.'s Cross-Complaint**

CFW Specialties' and Mancini's primary argument in response to Counts I through IV of Norfolk Southern's complaint, and Gee Co.'s cross-complaint, is that they

were not "responsible" for any "release" of a "hazardous substance."[16] CFW Specialties and Mancini are correct that, in order to make out a prima facie case on either a § 107 or a § 113 claim, a plaintiff must, *inter alia*, demonstrate that "a release or threatened release of a hazardous substance has occurred on the site" and "that the defendant is a responsible person under 42 U.S.C. § 9607(a)." *Harcros*, 1997 WL 281295, at *7 (citing *Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 326 (7th Cir. 1994)). A "release" is defined by CERCLA as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." 42 U.S.C. § 9601(22). Because there is no dispute that CCA is a hazardous substance for CERCLA purposes, and that, at some point, there was a "release" of CCA into the environment, the court focuses on whether CFW Specialties or Mancini were "responsible persons."

A "responsible person" includes, *inter alia*, "any person who at the time of the disposal owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). CFW Specialties and Mancini[17] contend that,

---

[16]    In addition to this argument, Defendants CFW Specialties and Mancini also adopt Gee Co.'s motion for summary judgment as it applies to Counts I through IV of Norfolk Southern's complaint. The court applies its conclusions on these counts and corresponding rationales, *see supra* Discussion, Sections B.1-6, to CFW Specialties and Mancini. Therefore, for example, the court grants summary judgment to CFW Specialties on Count IV of Norfolk Southern's complaint because it finds there is no private cause of action under the IEPA.

[17]    The court notes that, unlike Gee Sr., Mancini does not claim in his submissions to the court that he was not an "operator" of the wood treatment facility for CERCLA purposes.

- 50 -

while CCA may have contaminated the relevant property, such contamination occurred either before or after, but not during, their occupancy. CFW Specialties and Mancini support this assertion with the following evidence: (1) CFW Specialties never manufactured or treated lumber or any other product with CCA; (2) all of the CCA that CFW Specialties purchased from Gee Co. was transferred by Dombrowski & Holmes to Montgomery Tank Lines for delivery to CFW Specialties' Faye Plant; (3) while CFW Specialties sold CCA-treated lumber delivered to them by suppliers, this lumber was positioned in a portion of the wood treatment facility that was unaffected by the September 1992 fire, and was then transported to the Faye Plant after the fire; (4) the September 1992 fire did not contaminate either Norfolk Southern's or St. Rita's property as evidenced by the lack of contamination found by Harza in October 1992; and (5) at the time it vacated the facility, according to the testimony of Mancini and the investigations of Radian and Laicon, there was no CCA liquid or residue in the wood treatment facility's pits or green stains on or around the concrete apron of the pits.[18]

Norfolk Southern, which admittedly cannot determine exactly who caused the CCA contamination or when it occurred, insists that CFW Specialties' and Mancini's innocence is in dispute. Plaintiff notes the following: (a) according to James Tsingos, who worked as a laborer for CFW Preserving and then, in the same position, for CFW

---

[18]    CFW Specialties and Mancini also claim that, after the fire, CFW Specialties retained Heneghan to haul away any debris caused by the fire. For the reasons discussed in note 8 of this opinion, however, the court will not consider any evidence of this arrangement at this time.

Specialties, CFW Specialties continued to use CCA for approximately two months after its purchase of CFW Preserving; (b) CFW Specialties chose to purchase 10,000 gallons of CCA from Gee Co.; (c) according to Angsten and Grip, green-stained lumber was stored along the border of St. Rita during the period when CFW Specialties was in possession of the wood treatment facility; (d) Angsten further testified that the September 1992 fire caused debris to be released onto St. Rita's property and that no one from CFW Specialties cleaned up St. Rita's property after the fire; (e) Baldino's and Kewer's testimony casts doubt on Harza's findings of no CCA contamination in October 1992; and (f) any evidence that the pits were free of green stains in late May 1993 is contradicted by the testimony of Jeff Schuh of Patrick that he observed green liquid in the pits in June 1993.

The foregoing paragraphs underscore the factual disputes that contaminate this controversy. Because of these disputes, the court must deny CFW Specialties' and Mancini's motion for summary judgment on Counts I through III and V of Norfolk Southern's complaint and Gee Co.'s cross-claim. The court, as noted in footnote 18, grants CFW Specialties summary judgment on Count IV.

### b.   Counts VIII and IX of Norfolk Southern's Complaint

With respect to Counts VIII (Waste) and IX (Trespass), the court denies CFW Specialties' and Mancini's motion with respect to waste to Norfolk Southern's property and grants CFW Specialties' and Mancini's motion with respect to trespass to Norfolk Southern's property. Because the rationale for these rulings is identical to that

employed with respect to Counts VII and IX of Norfolk Southern's complaint, *see supra* Discussion, Section B.5-6, the court finds it unnecessary to repeat the analysis here.

## 2. Successor Liability

In addition, CFW Specialties asks the court to reject Norfolk Southern's attempt to brand CFW Specialties as corporate successor to Gee Co. Following the majority of circuits throughout the country, the Seventh Circuit has determined that Congress intended successor liability to apply in the context of CERCLA. *See North Shore Gas Co. v. Salomon*, 152 F.3d 642, 649 (7th Cir. 1998). In order to determine successor liability in this context, courts have relied on federal common law. *Id.* at 651. According to federal common law, an asset purchaser, as a general rule, does not acquire the liabilities of the seller. *Id.* There are, however, four exceptions: (1) the purchaser expressly or impliedly agrees to assume the seller's liabilities; (2) the transaction is a *de facto* merger or consolidation; (3) the purchaser is the "mere continuation" of the business of the seller; and (4) the transaction is an effort to fraudulently escape CERCLA liability. *Id.*

Norfolk Southern claims that CFW Specialties falls into the third of these exceptions. The "mere continuation" exception is available "when the purchasing corporation maintains the same or similar management and ownership but wears a different hat." *Id.* at 654 (internal quotation marks omitted). Courts have looked to the following factors to determine whether the seller's corporate entity has continued on after the sale of assets: (1) "an identity of officers, directors and stock between the

selling and purchasing corporations," *id.* (citing *United States v. Mexico Feed & Seed Co.*, 980 F.2d 478, 487 (8th Cir. 1992)); (2) a continuity of ownership and control, *North Shore Gas Co.*, 152 F.3d at 654 (citing *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1084 (7th Cir. 1997); (3) whether only one corporation exists after the transfer of assets, *North Shore Gas Co.*, 152 F.3d at 654 (citing *Carolina Transformer*, 978 F.2d 832, 838 (4th Cir. 1992); and (4) whether the purchaser paid adequate consideration for the assets, *see North Shore Gas Co.*, 152 F.3d at 654 (citing *Allied Corp. v. Acme Solvents Reclaiming, Inc.*, 812 F. Supp. 124, 129 (N.D. Ill. 1993)).

Applying these factors to this case, the court easily concludes that CFW Specialties does not fall within the "mere continuation" exception. First, there was no overlap between the officers, directors, and stock of Gee Co. (or CFW Preserving) and CFW Specialties. The Board of Directors of CFW Specialties, elected on June 14, 1991, was comprised of Mancini, Janssen, and Thomas Schude. At that time, the Board of Directors of Gee Co. was comprised of Gee Sr., Nancy Gee, Donald Gee, Kate Evers, and George Gee. The officers of CFW Specialties, elected on June 23, 1991, were Mancini, Janssen, and Schude. At that time, the officers of Gee Co. were Gee Sr., Brian Anderson, Jack Hoffman, Raymond Kolodziej, Nancy Gee and Donald Gee. And, initial shares of CFW Specialties, issued on June 24, 1991, were distributed as follows: (a) 100 shares to Janssen; (b) 370 shares to Mancini; (c) 370 shares to Schude; and (d) 160 shares to David Vanco. Norfolk Southern has offered no evidence that these individuals were also shareholders of Gee Co. Second, there is no evidence that Gee

Co. exercised any control over CFW Specialties after the sale of CFW Preserving. Third, Gee Co. continued in existence after the sale. And, finally, CFW Specialties paid $1,140,000 to purchase the inventory, buildings, and equipment of CFW Preserving, an amount that appears on its face to be quite adequate.

Norfolk Southern, however, asks this court to apply the more expansive "substantial continuity," as opposed to the "mere continuation," exception. *See Ninth Avenue Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716, 724 (N.D. Ind. 1996). In addition to the factors already identified, the "substantial continuity" exception involves consideration of the following factors: (1) retention of the same employees; (2) retention of the same supervisory personnel; (3) retention of the same production facilities in the same location; (4) production of the same product; (5) retention of the same name; (6) continuity of assets; (7) continuity of general business operations; and (8) whether the successor holds itself out as a continuation of the previous enterprise. *Id.* (citing *Mexico Feed*, 980 F.2d at 488 n.10; *Carolina Transformer, Co.*, 978 F.2d at 838; *Hunt's Generator Comm. v. Babcock & Wilcox Co.*, 863 F. Supp. 879, 883 (E.D. Wis. 1994); *Kleen Laundry & Dry Cleaning Servs. v. Total Waste Mgmt. Corp.*, 817 F. Supp. 225, 231 (D.N.H. 1993)).

The Seventh Circuit has not yet recognized the "substantial continuity" exception in the CERCLA context.[19] It has, however, employed the concept in the

---

[19] In *North Shore Gas Co.*, the court, in a footnote, labeled the "substantial continuity" exception the "fifth exception—which is not as widely accepted as the four others that we outlined . . . ." *North Shore Gas Co.*, 152 F.3d at 654 n.8. The court
(continued...)

context of other federal statutes. *See, e.g., Chicago Truck Drivers, Helpers & Warehouse Workers Union Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48 (7th Cir. 1995) (Employee Retirement Income Security Act); *EEOC v. G-K-G, Inc.*, 39 F.3d 740, 748 (7th Cir. 1994) (Age Discrimination in Employment Act). According to these two cases, an alleged successor will only be found liable under the "substantial continuity" exception if "(1) the successor knew or had notice of the claim before the acquisition; and (2) there was substantial continuity in the operation of the business before and after the sale." *Ninth Avenue*, 195 B.R. at 726 (finding that material questions existed on both the "mere continuation" and "substantial continuity" exceptions so as to preclude summary judgment on plaintiff's successor liability claim) (citing *Tasemkin*, 59 F.3d at 49; *G-K-G*, 39 F.3d at 747-48). Applying the rationale of *Tasemkin* and *G-K-G* to the CERCLA context, the court in *Ninth Avenue* determined that an alleged successor "would be liable for CERCLA claims under the broader substantial continuity exception if the successor knew or had notice of the potential CERCLA liability and there was substantial continuity in the operation of the business before and after the

---

[19](...continued)
noted that this exception considers:

> an identity of stock, stockholders, and officers, but not determinatively. It also considers whether the purchasers retained the same facilities, same employees, same name, same production facilities in the same location, same supervisory personnel; and produced the same product; maintained a continuity of assets; continued the same general business operations; and held itself out to the public as a continuation of the previous enterprise. The exception also requires that the purchaser have knowledge of the seller's wrongdoing.

*Id.* The court did not find it necessary to "explore" this "fifth exception" because the defendant had not raised it in the district court. *Id.*

sale." *Ninth Avenue*, 195 B.R. at 726. The Seventh Circuit's footnote in *North Shore Gas Co.*, *see supra note* 16, suggests that it would agree with the *Ninth Avenue* court's determination.

An analysis of the eight factors listed above demonstrates that Norfolk Southern may well meet the second prong of this "substantial continuity" exception standard. First, two of CFW Preserving's employees, James Tsingos and Bob Jackson, came over from CFW Specialties on the day of the closing. In addition to Tsingos and Jackson, CFW Specialties hired Shaun Seban, who, up until four months prior to closing, had worked at CFW Preserving. Second, CFW Specialties did business at the same location as CFW Preserving and, there is at least some evidence that CFW Specialties continued to perform the same type of work. And, third, for at least a short while after closing, CFW Specialties held itself out as CFW Preserving, using the same phone lines, advertising and customer base as CFW Preserving had.

Where Norfolk Southern's "substantial continuity" theory falters is on the first prong of the test: notice. In *G-K-G*, the president of the alleged successor admittedly knew of the ADEA claim before the acquisition at issue. Here, in contrast, Norfolk Southern has not demonstrated that either CFW Specialties or Mancini knew or had notice of any potential CERCLA liability on the part of Gee Co. at the time of closing in August 1991. Both Janssen and Mancini testified that, at the time of closing, they were not aware of any CCA contamination at either the wood treatment facility or St. Rita. Norfolk Southern offers nothing to rebut that testimony.

Because Norfolk Southern does not fall within either the "mere continuation" or the broader "substantial continuity" exception, the court grants CFW Specialties' motion for summary judgment as to successor liability.

## CONCLUSION

The court rules on the motions for summary judgment as follows. The court denies Gee Co.'s motion (Doc. 79-1) with respect to Counts I (CERCLA § 107(a)), II (CERCLA § 113(f)), VI (Indemnity) and VII (Waste) of Norfolk Southern's complaint. The court grants such motion with respect to Counts IV (IEPA § 22.2(f)) and X (Trespass) of Norfolk Southern's complaint. The court grants James Gee, Sr.'s motion (Doc. 80-1) with respect to Counts I, II, and III (CERCLA § 113(g)(2)) of Norfolk Southern's complaint. The court denies CFW Specialties' and Mancini's motions (Docs. ??, 101-1) with respect to Counts I, II, III, V (Breach of Lease), and VIII (Waste) of Norfolk Southern's complaint as well as Gee Co.'s cross-claim (CERCLA § 113(f)). The court grants such motion with respect to Count X (Trespass). Finally, the court grants CFW Specialties' motion (Doc. 83-1) as to any claim based on successor liability.

ENTER:

Dated: June 25, 2001

REBECCA R. PALLMEYER
United States District Judge