# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 1619 | **DATE** | 9/30/2002 |
| **CASE TITLE** | Norfolk Southern Railway Co. vs. Gee Co | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order.  The court enters judgment for the Plaintiff and against Defendant Gee Co. and awards damages of $1,425,610.13 to be paid by Gee Co. Claims against CFW Specialties and Vincent Mancini are dismissed.  The motions of Defendants CFW Specialities and Vincent Mancini for judgment in their favor (Docs. No. 134-1 and 137-1) are granted.  Defendant Gee Co.'s motions for partial judgment pursuant to Rule 52(c) (Docs. No. 135-1 and 140-1) are denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **3** number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | **SEP 3 0 2002** date docketed | |
| | Notified counsel by telephone. | | | **157** |
| | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | 9/30/2002 date mailed notice | |
| | Copy to judge/magistrate judge. | | | |
| | ETV | courtroom deputy's initials | Date/time received in central Clerk's Office | ETV mailing deputy initials |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



NORFOLK SOUTHERN RAILWAY )
COMPANY, )
)
Plaintiff, )
)
v. ) No. 98 C 1619
)
)
GEE CO., CHICAGO FLAMEPROOF ) Judge Rebecca R. Pallmeyer
AND WOOD SPECIALTIES CORP., )
and VINCENT M. MANCINI, )
)
Defendants. )

### MEMORANDUM OPINION AND ORDER

Raising claims under both federal and state law, Plaintiff Norfolk Southern Railway

Company ("Norfolk Southern") seeks recovery from two corporate and one individual defendant for

environmental damage to Plaintiff's property and an adjacent high school athletic field. Named as

Defendants are Gee Company ("Gee Co."), Chicago Flameproof and Wood Specialties ("CFW

Specialties"), and Vincent Mancini, each of whom are alleged to have owned or operated a wood

treatment facility that released hazardous waste on the property at times beginning in 1969 and

continuing into the 1990s. In its eight-count complaint, Norfolk Southern seeks direct recovery, or,

in the alternative, contribution, for clean-up costs under the relevant provisions of the

Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C.

§ 9601 *et seq.*, and other Illinois contract and tort theories.

### FACTUAL BACKGROUND

**The Parties**

Plaintiff Norfolk Southern, a Virginia corporation, owns a piece of property on Chicago's

southwest side. (Agreed Statement of Uncontested Facts ¶ 4, Schedule A1, Pretrial Order

(hereinafter "Uncontested Fact Stmt.").) For several years beginning in 1969, Defendant Gee



Company ("Gee Co."), an Illinois corporation, rented the property for use as a wood treatment facility, which Gee Co. operated under its own name, as well as under the names R.T. Feltus Lumber Company and Chicago Flameproof and Wood Preserving Co ("CFW Preserving"). (Uncontested Fact Stmt. ¶ 5.) Defendant CFW Specialties, formerly named Chicago Flameproofing and Wood Preserving Co., is an Illinois corporation with its principal place of business in Montgomery, Illinois. (Uncontested Fact Stmt. ¶ 6.) At all relevant times, a parochial high school operated on property owned by the Order of the Augustine, adjacent to Norfolk Southern's property. St. Rita High School has operated on the property since the summer of 1990, and prior to that time Quigley Seminary operated on the property. *Norfolk Southern Ry. Co. v. Gee Co.*, No. 98 C 1619, 2001 WL 710116 at *1 (N.D. Ill. 2001) (this decision on the parties' summary judgment motions will hereinafter be referred to as "*Norfolk I*, 2001 WL 710116"; references to the Transcript of Testimony at a seventeen-day bench trial will be cited as "TT," followed by the page number).

**The Properties**

Chromated copper arsenate ("CCA") is a toxic chemical pesticide used to protect wood from rot, decay, and termite attack. There is no dispute that CCA contaminated the property owned by Norfolk Southern and an adjacent athletic practice field that is part of the St. Rita's High School campus. *Norfolk I*, 2001 WL 710116 at *2. Norfolk Southern owned property located at 2622 West 79th Street, Chicago, Illinois, which it leased first to Defendant Gee Co., and then to Chicago Flameproof and Wood Specialties Corporation ("CFW Specialties"). *Id.* at *1. The Defendants, during their respective tenancies, each operated a wood treatment facility on the Norfolk Southern property. *Norfolk I*, 2001 WL 710116 at *1. The land comprising St. Rita's practice field, adjacent immediately to the east of the wood treatment facility, sits about 3 or 4 feet lower than Norfolk Southern's land. *Id.* at *1-2; (Uncontested Fact Stmt. ¶ 3.) The elevation differential facilitated

2

surface migration of wood-treating chemicals from Norfolk Southern's property onto St. Rita's practice field. (Uncontested Fact Stmt. ¶ 3.)

In 1965, Norfolk Southern leased its property to Defendant Gee Co., which already owned approximately 7.4 acres of adjacent property, under a lease that held the lessee responsible for any environmental damage. *Norfolk I*, 2001 WL 710116 at *1. Gee Co. constructed a wood treatment facility on the leased property, and operated the facility from 1965 until August 1991 under a separate division, CFW Preserving. *Id.* In August 1991, Gee Co. sold the wood treatment facility to CFW Specialties.[1] *Id.* A fire destroyed the operations of the wood treatment facility on September 27, 1992; CFW Specialties subsequently vacated the premises in or about May of 1993. *Id.* at *7.

**Defendant Gee Co.'s Wood Preserving Operations**

At all times relevant to this lawsuit, the CFW Preserving division of Defendant Gee Co. was managed by Ed Klein, Jack Hoffman, and Steven Dooley, Jr. *Id.* at *2. As explained in the court's earlier decision, CFW Preserving conducted its wood treatment operations as follows: Cylinders, approximately six feet in diameter and twenty-five feet long, were filled with either CCA or D-Blaze, a non-hazardous fire retardant. *Id.* at *3. Relatively small, tram-like cars were loaded with wood and pushed on metal rails towards one of these two cylinders. *Id.* The cylinders were situated in concrete pits surrounded by a concrete apron. *Id.* The cars, loaded with wood, entered the cylinders where the wood was treated by immersion in a solution of CCA. (Plaintiff's Proposed Findings of Fact ¶ 8; CFW Specialties' Proposed Findings of Fact ¶ 19.) After immersion, the treated wood was removed from the cylinders and placed on an open-air drip pad to dry. *Norfolk I,* 2001 WL 710116 at *3.

---

[1]    In an earlier ruling, the court concluded that CFW Specialties was unrelated to, and did not succeed to the corporate liabilities of, CFW Preserving. *See Norfolk I,* 2001 WL 710116 at *23-24.

The drip pad was a flat, driveway-like surface on the property border between the wood treatment facility and the Quigley/St. Rita property. *Id.*  Prior to 1986, however, a portion of the drip pad, running along the boundary with the practice field and measuring approximately 15 to 20 feet wide by 100 to 150 feet long, was made of gravel. (Stephen Dooley Evidentiary Deposition ("Dooley Dep.") at 133-34).[2]  CCA was allowed to drip from the treated wood as it dried, onto the gravel (and later asphalted) drip pad. (Dooley Dep. 98-100, 134.)  A concrete curb ran along the drip pad, between the drip pad and the practice field. (Dooley Dep. at 35-37.)  Until 1986, the curb was only about one or two inches high, but when Gee Co. placed asphalt over the gravel drip pad in 1986, Gee also increased the height of the curb to between four and six inches. (Dooley Dep. at 36-38.)

Stephen Dooley worked for Defendant Gee Co. from August of 1977 to January of 1990. On a number of occasions during his employment, Dooley witnessed spillage and/or flow of CCA waste from Gee Co.'s CFW Preserving operations onto the adjacent Quigley/St. Rita property, and the effects of that spillage. (Dooley Dep. 14, 101.)  Dooley explained that the drip pad angled slightly away from the curb, back in towards the pits inside the treatment facility. In theory, thus, excess chemicals would drain in the direction of the pits, as opposed to the adjacent property. (Dooley Dep. at 38-39.)  In fact, however, despite the curb and the angle of the drip pad, chemicals would on occasion run over the curb and onto the Quigley/St. Rita property. (Dooley Dep. at 41.) According to Dooley, any large rainfall event would cause flooding inside and outside of the facility, so that rain mixed with CCA from the drip pad, and from any treated wood that happened to be drying on the drip pad at the time, would flow over the curb. (Dooley Dep. at 42-43.)  Flooding inside the facility also contributed to the amount of CCA flowing over the curb: the pit below the CCA cylinder, which collected CCA that spilled out of the cylinder, would fill up during flooding, and,

---

[2]    Dooley did not testify at trial, but the transcript of his evidentiary deposition was offered into evidence.

4

during any "really hard rain," would overflow outside of the facility. (Dooley Dep. at 43-44, 60.) Dooley recalled, further, that at various times he saw green staining from CCA spills and overflow from the pits on the floor of the treatment facility, on the drip pad, and on and over the curb designed to prevent such flow onto the Quigley/St. Rita property. (Dooley Dep. at 127.) He also reported seeing green CCA stains on the dirt in the area of the practice field whenever there was spillage from the facility onto the field. (Dooley Dep. at 156-57.)

As early as 1979 or 1980, Dooley and others at the plant discussed with James Gee, Sr. ("Gee Sr.") and James Gee, Jr. ("Gee Jr.") the need to raise the curb and increase the slope towards the pits to address the overflow problem. (Dooley Dep. at 71-72, 77-79.) Until the height of the curb was first raised in 1986, however, no such changes were made. (Dooley Dep. at 79.)

On two occasions during Dooley's employment, Gee Co. repaired damage from CCA overflow and contamination by replacing sod on Quigley's field, the land that later became the St. Rita's practice field.[3] (Dooley Dep. at 67.) The first such occasion was in approximately 1981 or 1982, and the second in 1985 or 1986. (Dooley Dep. at 68.) Dooley explained that the grass on the adjacent property was dead, and that stains left behind by a trail of CCA that flowed up and over the curb demonstrated that CCA had flowed onto that portion of St. Rita's property. (Dooley Dep. at 68.) In 1981 or 1982, Dooley estimated that approximately 1,000 gallons of rain water mixed with CCA flowed onto the adjacent property, and as a result, Gee Co. replaced an area of sod measuring approximately 15 by 40 feet. (Dooley Dep. at 69-70, 73.) Dooley recalled that the dirt below the contaminated sod was not removed on this occasion, but some new dirt was added before the new sod was put down. (Dooley Dep. at 74.) Again in approximately 1985 or 1986, an overflow of CCA mixed with rain water from a large rainfall event prompted Gee Co. to replace sod on the Quigley/St. Rita property. (Dooley Dep. at 75.) This time the damage was more

---

[3]     It is not clear whether, or for what purpose, Quigley Seminary used the field.

widespread, and Gee Co. replaced an area of sod measuring approximately 25 by 50 feet.[4] (Dooley Dep. at 75.)

In 1986, Gee Co. installed blacktop over the gravel drip pad and increased the height of the curb to between four and six inches. (Dooley Dep. at 36-38.) At this time, Gee Co. also increased the slope of the drip pad and lined the CCA pit with steel. (Dooley Dep. at 89, 94.) Dooley testified that inclement weather conditions, including severe temperature changes, caused hairline cracks to form throughout the drip pad, some measuring approximately an eighth of an inch. (Dooley Dep. at 82.)

Gee Co.'s CFW Preserving division treated lumber with CCA during all seasons of the year. (Dooley Dep. at 54.) The treated wood was left on the drip pad to dry for a day or less in warm weather. (Dooley Dep. at 57.) During the winter months, however, the treated wood took longer to dry, sometimes two or three days. (Dooley Dep. at 57.) In the winter, the CCA that dripped from the treated wood was often visible, frozen on the gravel drip pad. (Dooley Dep. at 57-58.)

Osmose Wood Preserving, Inc. was Gee Co.'s supplier of CCA. Chet Popadzuik, of Osmose, testified that he visited his customers, such as Gee Co., to "look at the equipment, propose[] improvements, [and perform] any troubleshooting that [the customer] may have needed from a maintenance standpoint." *Norfolk I,* 2001 WL 710116 at *4. Popadzuik visited the wood treatment facility on March 4 and April 8 of 1988 to meet with Gee Sr. *Id.* On April 26, 1988, Popadzuik sent to Gee Sr. a summary of the recommended equipment and environmental improvements discussed during Popadzuik's visit. *Id.* In Paragraph 13 of this summary, Popadzuik summarized their discussion in these words:

> We have also discussed the need to ensure that proper housekeeping measures are maintained in the treating process and plant areas. As I mentioned to you and Jack Hoffman, any contaminated soil and contaminated dirt around the

---

[4]    Dooley did not say whether any soil was removed or added when Gee Co. replaced sod on this second occasion.

cylinders, tank farm, and plant area must be removed and placed in a properly maintained 17H drum for proper handling as a hazardous waste. As discussed, it is important that proper housekeeping measures be maintained.

*Id.* Then in Paragraph 15, Popadzuik wrote: "We then discussed the installation of a concrete retaining wall around the storage tanks and plant area to contain any accidental spills." *Id.* Dooley testified that Gee Co. did not comply with these recommendations, or with other recommendations made by Popadzuik. (Dooley Dep. at 126-28.)

At least one Gee Co. employee testified that he did not observe any CCA spills. James Tsingos began working for Defendant Gee Co. in 1983 in Gee's retail facility. In the late 1980's, Tsingos moved to the wood treatment facility where he remained even after the August 1991 sale to CFW Specialties. (TT at 1202.) Tsingos testified that he personally had never seen any evidence of a CCA spill while he worked for Gee Co. and never saw green staining on the concrete or gravel between the drip pad and the practice field. (TT at 1281.) Tsingos testified that the drip pad was hosed down every day, and that he never saw any cracks in the concrete drip pad. (TT at 1286.)

Adam Jung, another Gee Co. employee, concurred with Tsingos's recollection that there were no cracks in the drip pad, but testified about other evidence of CCA releases, including his observations of green staining along the curb by the drip pad. Jung began working in Gee Co.'s retail store in 1985. In 1988 or 1989, he started working in the mechanic shop located just south of the wood treatment facility. (TT at 1299-1301.) While working at the mechanic shop, Jung also performed maintenance services for the wood treatment facility, including electrical work and pump repair. (TT at 1301.) Jung testified that during his years with Gee Co., a tanker trailer was located on the east side of the wood treatment facility. (TT at 1306.) The tanker was connected by a hose to the pits so that when excess water collected in the pits, it could be pumped into the tanker. (TT at 1306.) Although the hose permitted pumping, Jung did not know of any occasion where such pumping occurred. (TT at 1306-07.) At some unidentified point in time, Jung climbed up onto the

tanker to look inside and observed that it was approximately one-quarter filled with "dirty water." (TT at 1306-07.)

Jung also explained that during the 1980s, Gee Co. employees mixed CCA concentrate into a solution in the open-air pit just south of the CCA cylinder. Just before he stopped working for Gee Co. in 1991, Jung learned that Gee employees were no longer allowed to mix CCA concentrate in the open-air pit because the concentrate and the waste generated in the wood treatment process were both carcinogens. (TT at 1310-11.) During the years that the CCA concentrate was mixed in the open pit, Jung recalled that it remained there for longer than an hour before being pumped into the working solution tanks. (TT at 1333, 1336.) Contrary to Dooley's memory, however, Jung testified that lumber freshly treated with CCA was never stacked along the St. Rita's practice field and was not allowed to sit on gravel or dirt portions of the drip pad, but instead, dried while stacked above concrete or asphalt. (TT at 1341, 1350.) According to Jung, any debris or waste that spilled from the cylinder into the pit following a round of wood treatment would be scooped up and dried on a screen, then stored in a 55-gallon barrel. (TT at 1351.) Jung was not aware of any cracks in either the CCA pit or the rear open-air mixing pit (TT at 1336-37), but he did recall seeing green staining around the rear pit, along the concrete curb by the drip pad. (TT at 1321-22.) On one occasion between 1988 and 1990, Jung witnessed Gee employees using a sod cutter to remove dead sod (but not any underlying soil) from an area of the practice field directly to the east of the drip pad, and later replacing the sod. (TT at 1317-19.)

St. Rita High School moved onto the former site of the Quigley Seminary in June of 1990. (TT at 498.) James Angsten, St. Rita's athletic director, testified that he observed personnel from Gee Co. replacing sod on the practice field, and that he observed fresh sod on the same area on a number of other occasions. (TT at 500-01.) Angsten concluded that Gee Co. employees were responsible for these sod replacements because he himself was in charge of athletic field maintenance, and no other St. Rita's staff member would have replaced the sod. (TT at 505.)

8

Angsten recalled seeing green-stained lumber stacked outside of the facility, along the border with St. Rita's practice field, until the 1992 fire. (TT at 519-20.) Angsten also recalled that when the football team started practicing on the field in the summer of 1990, he talked with the students about a large green-colored puddle that would form in the area where the green-stained lumber was stacked. (TT at 510, 512, 513, 516.) According to Angsten, the puddle became "almost a joke with the kids after awhile," and they "didn't want to go over the fence by the green puddle" to retrieve stray footballs. (TT at 512, 516.) When it rained, Angsten explained, the puddle would grow larger and ultimately overflow onto the field, leaving green stains on the concrete curb, and on the gravel and dirt, including dirt on the practice field. (TT at 510, 512, 516, 518.)

**CFW Specialties' Operation of the Wood Treatment Facility**

Defendant Vincent Mancini and John Janssen purchased the wood treatment facility in 1991. On June 4, 1991, in preparation for that purchase, Mancini and Janssen incorporated under the name "Chicago Flameproofing & Wood Preserving Corporation." *Norfolk I,* 2001 WL 710116 at *5. On June 23, 1991, Chicago Flameproofing & Wood Preserving Corporation, acting through Mancini as its Chairman and CEO and Janssen as its President, executed a Purchase Agreement to purchase the assets of CFW Preserving from Gee Co. *Id.* Under the Agreement, Chicago Flameproofing & Wood Preserving Corporation would purchase the inventory (including 10,000 gallons of CCA), buildings, and equipment of CFW Preserving for the sum of $1,140,000 plus 3% of Chicago Flameproofing & Wood Preserving Corporation's gross sales for the first 36 months of its operation. *Id.* Just prior to the August 8, 1991 closing, Chicago Flameproofing & Wood Preserving Corporation changed its name to "Chicago Flameproof & Wood Specialties Corp." *Id.*

Neither Janssen nor Mancini was aware at the time of closing of any CCA contamination at either the wood treatment facility or the adjacent property. *Id.* at *6. To the contrary, Mancini testified that Gee Sr. reported that there were no environmental problems at the facility, and that

9

a Chicago environmental agency had performed an audit in 1990 which did not "turn up any infractions." (TT at 1455.) Mancini did nothing to verify whether Gee's representations were true, nor did he perform any sort of environmental due diligence on the property or try to establish what sort of audit had been performed. (TT at 1456, 1461.) Even after the closing and during the entire time CFW Specialties owned the facility, Mancini admittedly made no effort to assess the environmental condition of the premises. (TT at 1474.) He did, however, see green stains, which he assumed to be CCA, on the front concrete pit, underneath the CCA cylinder at some point prior to April of 1992. (TT at 1476-77.)

On April 7, 1992, CFW Specialties entered into a license agreement with Norfolk Southern to use the land on which the wood treatment facility was located.[5] (TT at 1478.) Under that agreement, CFW Specialties "agreed to comply with . . . federal, state and local safety, health, environmental and sanitation laws. . ." and supply Norfolk with a "written report detailing all releases as defined in Section 101(22) of CERCLA." (TT at 1477-78.) CFW Specialties also agreed to reimburse Norfolk for the cost of any clean-up of any release by CFW Specialties. (TT at 1487-88.)

CFW Specialties sold CCA-treated products that it purchased from other suppliers, but never itself treated wood with CCA. (TT at 1439-42, 1509.) Under its purchase agreement with Gee Co., CFW Specialties bought Gee Co.'s remaining supply of CCA. Further, CFW Specialties was licensed by Osmose, Gee Co.'s former CCA supplier, to treat wood using the CCA it purchased from Gee Co. and to purchase more CCA from Osmose. (TT at 1460, 1464.) In fact, however, Mancini testified that CFW Specialties had already determined that it "would not treat CCA going forward." (TT at 1460, 1464.) CFW Specialties never bought CCA from Osmose, or any other supplier, for use at the facility it purchased from Gee Co. (TT at 1506-07.) Nor did CFW

---

[5]    The parties do not offer an explanation for why CFW Specialties and Norfolk did not enter into such a license agreement until approximately eight months after the closing of the sale of the facility to CFW Specialties.

Specialties use any of the CCA that it purchased with the other assets of Gee Co. Instead, CFW shipped the CCA to its other wood treatment facility in Montgomery, Illinois in early spring of 1992. (TT at 1894-95.) CFW Specialties also acquired some CCA-treated timber from Gee Co. At the time of the closing in August of 1991, Mancini explained, those treated timbers were kept in the timber yard in the northernmost part of the wood treatment facility property, immediately west of the residential area that lies to the north of the St. Rita property. (TT at 1506.)

Mancini testified that immediately after CFW Specialties bought the facility, CFW "sealed the pits," by applying "an epoxy resinous-based paint sealer" with a brush. (TT at 1881.) In addition, Mancini explained, CFW Specialties sealed the drip pad area "with an asphaltic-based generically called a glycinate type of sealer" immediately upon purchasing the facility, and again one time approximately six months later. (TT at 1883.) Because both CCA-treated wood and wood treated with non-hazardous fire retardants varies in color from medium brown to light or medium green, it can be difficult to distinguish between the two types of treated lumber. (TT at 1889-90.) Mancini testified that there were no green puddles, nor any puddles of chemicals on the drip pads or anywhere else on the property while CFW Specialties owned and operated the facility. (TT at 1890-91.) James Tsingos, who continued to work at the wood treatment facility after CFW Specialties purchased it from Gee Co., confirmed that CFW Specialties did not treat lumber with CCA, that there was never any freshly treated CCA lumber stored on the drip pad, and that there was never a chemical spill of any type while he worked for CFW Specialties. (TT at 1271.)

On Sunday, September 27, 1992, a fire destroyed the operations at the wood treatment facility. *Norfolk I,* 2001 WL 710116 at *7. Janssen testified that at least three fire engines sprayed substantial amounts of water on the facility. *Id.* Because the land sloped towards St. Rita's property, much of the water used to extinguish the fire flowed onto the practice field. *Id.* Vincent Mancini testified that the CCA-treated lumber that CFW purchased from suppliers was not burned because it was stored in a location remote from the fire, in the northernmost timber yard. (TT at

11

1902.)

Angsten testified that the fire left St. Rita's practice field "a mess, . . . devastated." (TT at 524.) The fire trucks drove over the field and "tore it up," and debris, including pieces of burnt wood and ash, were deposited all over the field. (TT at 524-26.) Immediately after the fire, St. Rita's staff roped off the practice field and prohibited faculty and students from using the field until it had dried. *Norfolk I,* 2001 WL 710116 at \*7. According to Angsten, no one from the wood treatment facility took any action or responsibility for the damage to the field, or offered to investigate the resultant environmental conditions. *Id.* Angsten was not certain whether any of the stacks of green–stained wood had burned in the fire, but he did notice that soon after the fire the stacks of green lumber were gone. (TT at 527, 540.) After the fire, Angsten no longer observed the green puddle at the wood treatment facility, nor did he observe any more resodding, and the problem of grass dying on the practice field seemed to diminish. (TT at 527.)

Mancini testified that there was no CCA on the property at the time of the fire, that the pretreated CCA lumber did not burn in the fire, and that the steel tanks holding the non-hazardous fire retardant chemicals were all intact. (TT at 1901.) Mancini arranged for Heneghan Wrecking & Excavating Co. to remove remaining materials, including pre-treated CCA lumber, from the wood treatment facility after the fire, and CFW Specialties vacated the premises in May of 1993. *Norfolk I,* 2001 WL 710116 at \*7. At that time, according to Mancini, the pits were clean, there were no liquids or barrels in them, and the drain on the drip pad was clean and unblocked. (TT at 1923, 1930.)

William James Harris, III, is resident vice president of public affairs for Norfolk Southern in Ohio and a Norfolk Southern employee since 1979. Harris testified that on June 17, 1993, Cathy Williams of Norfolk Southern's real estate department sent a letter to Janssen of CFW Specialties, reminding him that under the terms of the license, CFW Specialties was required to "remove all facilities and/or improvements owned or placed upon the property by [CFW Specialties] and leave

12

the property in a condition satisfactory to the railway." (TT at 1566.)

Left standing on the property after CFW Specialties' departure was a tanker truck that CFW Specialties never used during its operation of the facility. (TT at 1926-27.) Walter Dissen of Norfolk Southern called Mancini regarding the tanker in January of 1995 and advised him that there was liquid in the tanker, and that Norfolk Southern was concerned that it might be something toxic or hazardous. (TT at 1926-27.) Mancini offered to pump out the tanker and dispose of the liquid, and assured Dissen that CFW Specialties never used CCA on the property. (TT at 1928.) Dissen told Mancini that Norfolk Southern would have the liquid tested, and then get back in touch with Mancini about how to proceed with disposal of the liquid and the tanker itself. (TT at 1928.) It appears that neither Dissen, nor anyone else from Norfolk Southern, ever contacted Mancini again about the tanker.

**Plaintiff Norfolk Southern's Clean-up Activities**

As set forth in detail in the discussion section that follows, Gee has challenged Norfolk's right to recover on the basis that, in Gee's view, Norfolk has failed to comply with the requirements of the EPA's National Contingency Plan ("NCP"). Specifically, Gee emphasizes the NCP's guidelines for community relations efforts, as well as NCP provisions expressing preference for a cost-effective remedy. As described below, the parties' evidence concerning Norfolk Southern's clean-up activities addressed these requirements.

### 1. Norfolk Southern's Initial Investigation

Beginning no later than June 1993, Norfolk Southern contacted environmental engineers, including Patrick Engineering, Weinberg Consulting Group, and Radian International, and requested that they perform a site investigation and prepare proposals regarding the environmental status of the property at issue. William Harris, who was Norfolk Southern's Director of Environmental Audits and, later, its Director of Environmental Protection, explained that Norfolk

13

Southern ultimately chose Patrick Engineering ("Patrick") to perform environmental testing and clean-up work at the wood treatment facility and the practice field. (TT at 1526, 1527.)

Some time prior to June 9, 1993, Norfolk Southern engaged Patrick to begin an inspection and assessment of the property.[6] Jeffrey Schuh, Patrick's Vice President in charge of geosciences, visited the facility on that date and observed burned and charred lumber and barrels on the site, as well as a greenish liquid in the pits that "gave [him] the impression that there was an environmental concern at that location." (TT at 728, 729.) In addition, Schuh observed green staining on the concrete along the edges of the pits, and on soil around and near the pits. (TT at 741-43.) Jerry Bowden, a project manager in Patrick's geosciences division, was also involved in the site assessment. Bowden visited the wood treatment facility for the first time in December of 1993 and observed 55-gallon drums strewn about the site, green-tinted liquid in the pits, a barrel floating in the liquid in the pits and green staining on some of the exposed surface soil in the pit vicinity. (TT at 629, 631, 633-35.) Bowden did not view the pits as a "flooding hazard" because the level of the liquid "was well below the tops of the pits." (TT at 636.)

Schuh prepared a proposal dated October 19, 1993, for a Phase I and partial Phase II assessment of the property. (TT at 743-44; Norfolk Exhibit 28.) The environmental assessment involved two "phases": In Phase I, Patrick offered its professional opinion regarding the potential that the site had been "environmentally impacted by present, former, or adjacent property owners" or might contain "hazardous materials in quantities such that the economic feasibility of

---

[6]     The record is unclear as to who at Norfolk requested this site visit. As mentioned in the previous paragraph, Harris did not become involved in this matter until 1995. Following his June 9, 1993 site visit, on October 19, 1993, Schuh prepared a proposal for an environmental assessment of the site and submitted it to F.M Roach, Jr. of Norfolk. (Norfolk Exhibit 28.) The record is unclear on whether Roach was Patrick's contact person with Norfolk up until 1995, when Harris became involved.

conventionally developing or selling the site should be precluded or significantly affected."[7] (Norfolk

Exhibit 28.) The Phase II environmental assessment involved a subsurface investigation of soil

beneath the southwest corner of the property, where underground storage tanks were located, as

well as the soil beneath the wood treating facility. The purpose of this Phase II assessment, the

proposal explained, was "to determine if the near surface soils and groundwater have been

impacted by gasoline/chromated copper arsenate (CCA) leakage, and if so, what the costs could

be to clean up the contaminated areas." Id.[8]

Norfolk Southern ultimately accepted Patrick's proposal, and Patrick performed the

investigation pursuant to that proposal, submitting the report of its Phase I/II environmental site

assessment on February 24, 1994. (TT at 743-45; Norfolk Exhibit 33.) Schuh testified that the

investigation revealed that soil at the treatment facility site had been "impacted by chromium,

copper and arsenic and the groundwater at the site was contaminated by chromium, copper and

arsenic." (TT at 746, 748.)

After completing the Phase I/limited Phase II report, in a March 16, 1995 letter, Patrick

recommended that additional soil borings be taken farther away from the pits to identify the extent

of the CCA contamination. (TT at 647, 650, 748-49; Norfolk Exhibit 39.) Norfolk accepted Patrick's

recommendations and contracted with Patrick to do the additional investigation. (TT at 648.)

Weinberg Consulting Group, another environmental consulting firm, reviewed Patrick's sampling

---

[7]     Patrick's October 19, 1993 proposal described the services Patrick was to perform
in Phase I, including: conduct an on-site reconnaissance of the property by a geologist; make visual
observations of the ground to detect obvious signs of contamination; review at least two historical
aerial photographs; review ownership of the property; provide a questionnaire to the current
property owners; review logs of borings, laboratory tests, geotechnical reports and pertinent
environmental reports previously performed and submitted to Patrick; and contact local, state and
federal agencies. (Norfolk Exhibit 28.)

[8]     Phase II of the assessment was anticipated to include underground storage tank
investigation, wood treatment area investigation, and general property investigation. In each area
to be studied, Patrick expected to conduct a series of soil borings and monitoring wells to
investigate possible contamination. (Norfolk Exhibit 28.)

and testing methodologies and performed an independent evaluation of the site. (TT at 666, 685.) Bowden testified that this additional investigation, including initial soil borings, soil sampling, and ground water monitoring conducted at the wood treatment facility in June and July of 1995 revealed that the zone of CCA contamination was greater than Patrick had anticipated it would be, with the heaviest contamination between the pits and the property line to the east, bordering the practice field.[9] (TT at 650.)

In the meantime, Norfolk Southern contracted with Clean Harbors, an environmental services company that maintains hazardous waste facilities in the northeast and midwest United States, to perform an additional overall inventory of the site, listing all potentially hazardous materials found there. (TT at 272, 276.) In January 1995, Kevin Falvey, a senior field specialist with Clean Harbors, took a sample of the small amount of sludge material remaining in the bottom of the stainless steel tanker trailer abandoned on the wood treatment facility site. (TT at 279-80.) Testing at Clean Harbors' Massachusetts lab revealed that the level of arsenic in the sample was 300 parts per million, 60 times the regulatory limit[10] of five parts per million for arsenic hazard. (TT at 281-83.) Falvey also performed a physical inventory of the site in March of 1995, making a list of everything he observed that was a potentially hazardous material. (TT at 289.) Falvey found barrels scattered around the property, though not in the pits themselves. (TT at 293-94.) The pits, Falvey observed, were broken and strewn with debris such as wood and crumbled foundation, although the liquid in them did not appear to be hazardous. (TT at 295-96.) Rather, he testified, the condition of the pits was consistent with what one would expect to find at an abandoned site:

---

[9]     These tests, performed in June and July of 1995, generated waste, such as soil cuttings, which Patrick placed into 55-gallon drums, then sealed, labeled and stored on-site. (TT at 650-51.) Bowden testified that Clean Harbors, a hazardous waste disposal service, ultimately disposed of those drums. (TT at 651.)

[10]     It is not clear whether this regulation was promulgated by the EPA or some other agency.

the color of the liquid was not unusual in groundwater or rainwater that has collected in a pit at an industrial site in Chicago, and the liquid did not present any detectable odor. (TT at 295.)

Falvey prepared a proposal for the site-specific, comprehensive plan of activities Clean Harbors would perform on the site. (TT at 296-97.) Norfolk Southern accepted the proposal, as reflected in Clean Harbors' invoice, and on June 15, 1995 Clean Harbors proceeded to remove all CCA-contaminated sludge from the tanker trailer and place the material into open-top 55 gallon drums. (TT at 301; Norfolk Exhibit 36 I.) Clean Harbors also cleaned up other potentially hazardous and non-hazardous material, loading it into drums or dumpsters which Clean Harbors then removed for proper disposal. (TT at 302.) Falvey testified on cross-examination that most of the materials Clean Harbors removed from the site were not hazardous under CERCLA provisions, and that the only waste he could identify as definitely hazardous under CERCLA was the CCA left in the tanker trailer. (TT at 322.) The bills that Clean Harbors submitted to Norfolk Southern do not separate costs for hazardous waste clean-up and disposal from costs for all other clean-up and disposal. (TT at 311-12.) In its original proposal, however, Clean Harbors estimated the costs for testing and removal of the CCA in the tanker trailer at $5,095. (TT at 358.) According to the calculations prepared by Harris, Norfolk Southern paid Clean Harbors a total of $17,406.[11] (TT at 364, Norfolk Southern Exhibit 199.)

## 2.    Further Testing of the Wood Treatment Facility and Practice Field

In August of 1995, based on the results of the soil tests at the wood treatment facility in June and July 1995, Jerry Bowden of Patrick Engineering advised John Reichling of Norfolk Southern that soil testing should be expanded to include St. Rita's practice field. Norfolk Southern contacted Father Michael John O'Connor, president of St. Rita's, to inform him of the problem and request permission to perform testing on the property. (TT at 1572-73; Norfolk Exhibits 44-47.)

---

[11]    Norfolk Southern was billed for more than $17,406 for Clean Harbors work but only seeks to recover $17,406. (Norfolk Southern Exhibit 199.)

Schuh testified that one of the tests Patrick performed revealed arsenic levels at concentrations of 1,000 milligrams per kilogram on the western edge of the practice field, closest to the treatment facility. Further east, the samples tested revealed concentrations of 664 milligrams per kilogram, then as low as 252, and 102. (TT at 756.) On the farthest east side of the practice field, Schuh explained, concentrations of arsenic were much lower, on the order of 15 to 25 milligrams per kilogram. (TT at 756.) Patrick's tests also revealed some higher concentrations of arsenic, 65.4 and 62.6, in the northeast and southwest corners of the practice field. (TT at 756.) According to Schuh, Patrick's investigation revealed that there were more than 440,000 grams of arsenic just in the top two feet of the soils at the wood treatment facility, and 70,000 grams of arsenic on the contaminated portion of St. Rita's practice field. (TT at 929-30.)

### 3. Contacts with Father O'Connor at St. Rita's

Father Michael John O'Connor testified that, as president of St. Rita's High School from 1993 until approximately sometime early in the year 2000, he was in charge of the overall operation of the school as an institution, primarily in the area of finances, management and development. (TT at 375, 377, 379.) William Harris, Norfolk Southern's Vice President of Public Affairs, recalled that Father O'Connor agreed to contact the St. Rita's community about the contamination and clean-up efforts, and in fact, O'Connor insisted that all communications with the St. Rita's community were to be O'Connor's own responsibility. (TT at 1675.) When the initial test results of the practice field came back in September of 1995 confirming arsenic and chromium contamination on the practice field, Father O'Connor explained that he communicated to a "whole group of people," including the school principal, the provincial and his council, the board of advisors, the finance committee, the education commission of the province, the school's attorney, the school's administration, the athletic director, the coaches, and the faculty. (TT at 389-90, 394-95.) In the first memorandum Father O'Connor sent to the faculty, informing them that they were

18

not to use the practice field, he explained that the field was fenced off because "Norfolk Southern was doing some work" and referred to a utility easement, but did not mention the contamination.[12] (TT at 394.)

Harris subsequently met with Father O'Connor and sent him another letter to make sure that Father O'Connor himself understood that the field had been cordoned off to protect students and staff from exposure to high levels of arsenic. (TT at 1675-76.) In a September 25, 1995 letter Harris thanked Father O'Connor for meeting with Norfolk Southern representatives on three separate occasions, September 7, 18 and 25, 1995. (Norfolk Exhibit 51.) This letter from Harris also made it clear that the sampling on the practice field indicated the presence of arsenic and chromium on the property. (Norfolk Exhibit 51.) Although Father O'Connor assured him that he would correct his earlier statements about the work Patrick was doing on the practice field, Harris in fact never saw a letter or memorandum from Father O'Connor making such a correction. (TT at 1676-77.) Some weeks later, when the initial tests were confirmed and he knew the field was contaminated, Father O'Connor clarified with those to whom he had sent the misleading memorandum that there was in fact contamination on the site and that for the safety of the students, it was necessary to block access to the field. (TT at 394-95.)

Father O'Connor acknowledged that he never notified any students, parents, or staff that they could provide input regarding alternative remedies for the practice field clean-up. (TT at 1386.) Instead, he himself, along with his superiors, worked with Norfolk Southern to come to an agreeable remedy. (TT at 1386.) Norfolk Southern did not seek input from Father O'Connor or the St. Rita's community regarding how the clean-up of the wood treatment facility should progress (TT at 1389), but in letters dated November 29, 1995, December 6, 1995 and February 1, 1996, Harris did offer to review with Father O'Connor the various documents and applications Norfolk

---

[12]    The record is unclear as to the date this first memorandum was sent out to the faculty.

19

Southern was submitting to the IEPA and the clean-up process. (TT at 1594-97.) In a letter dated December 6, 1995, Harris advised Father O'Connor that the IEPA had a community relations group available; the IEPA subsequently assigned Stan Black to be the community relations liaison for this project.[13] (Norfolk Exhibit 62; TT at 1595.) O'Connor testified that he nevertheless did not view the practice field clean-up as a matter of public concern. (TT at 1397-1401.) To the extent he communicated about the clean-up and contamination at all with parents and students, Father O'Connor communicated verbally. (TT at 1415-16.) Father O'Connor admitted that he never told *all* of the parents or *all* of the students that the students may have been exposed to hazardous chemicals on the practice field. (TT at 1416.)

In October of 1995, Father O'Connor recalled that Norfolk Southern presented him with a number of options regarding the clean-up of the practice field, including the potential sale of the practice field to Norfolk Southern or the installation of Astroturf on the practice field. (TT at 401, 403-04, 409; Norfolk Exhibit 55.) When Norfolk Southern entered the wood treatment facility and the practice field into IEPA's pre-notice program, Norfolk Southern gave Father O'Connor a copy of the application and the Phase I and II site assessments. (TT at 411-12.) Father O'Connor shared information about the contents of that application with the "whole group of people" noted above that he initially told about the contamination, and made available his copy of the assessments and the application to any of those people who requested it. (TT at 412.) Father O'Connor also testified that he consistently met with this same group, and kept them informed about the contamination and the clean-up efforts.[14] (TT at 423.)

_____

[13]     It is not clear when Black was assigned to the St. Rita project, nor whether his assignment was made at the request of Norfolk Southern or St. Rita's or on the IEPA's own initiative.

[14]     Father O'Connor did not explain whether he held official meetings to convey information, or whether he met with various people individually. It is not clear what specific efforts he undertook to "consistently" keep people informed as he testified. Nor are the dates and times
(continued...)

### 4.    Norfolk Southern's Contacts with IEPA

Upon reviewing the site contamination numbers, Schuh contacted the Illinois Environmental Protection Agency ("IEPA") to enlist Norfolk's property in the "pre-notice program" for the state's "voluntary clean-up program." (TT at 757.) Schuh explained that the goal was to clean up the contamination sufficiently that the state would issue a "no-further-remediation" letter, a letter certifying that the property owner had complied with the state's requirements for remediating the property and that the agency would not require further efforts to mitigate the environmental problem. (TT at 834.)

On December 19, 1995, IEPA acknowledged receipt of Norfolk Southern's application for enrollment into the pre-notice program. (Uncontested Fact Stmt. ¶ 25.) Thereafter, between December 1995 and March 1996, Patrick prepared a Site Investigation Work Plan for submittal to the IEPA. (Uncontested Fact Stmt. ¶¶ 26, 27; Norfolk Exhibit 74.) The Plan included proposals for determining the lateral and vertical extent of CCA contamination in the soil and groundwater on St. Rita's practice field. (Uncontested Fact Stmt. ¶ 27.) A copy of the Site Investigation Work Plan was made available to Father O'Connor. (Uncontested Fact Stmt. ¶ 29.)

On May 10, 1996, Norfolk Southern sent letters to Janssen, CFW Specialties, Gee Co., and Gee Sr. informing them of the need for response actions and demanding reimbursement for costs incurred during the remediation of the contaminated property. *Norfolk Southern I*, 2001 WL 710116 at * 11. The letters indicated that the estimated remediation cost was $1.5 million. *Id.* There is no evidence that any of these parties ever responded to Norfolk Southern's letters.

On June 25, 1996, Norfolk Southern received comments from the IEPA concerning the Investigation Work Plan. (Uncontested Fact Stmt. ¶ 30.) In his June 25, 1996 letter, James Salch, the IEPA's technical project manager assigned to this project, expressed the IEPA's reservations

---

[14](...continued)
of his communications set forth in the record.

about the proposed plan and suggested for the first time that the liquid in the pits should be removed. (TT at 1603, 1608-09; June 25, Norfolk Southern Exhibit 86.) William Harris explained that although he understood this suggestion as a "casual recommendation," Patrick and Norfolk Southern took it seriously. (TT at 1611.) Harris received Salch's June 25 letter on July 1, 1996. In a response on July 5, Harris advised Salch that Patrick had obtained a sample of the liquid in the pits and would, upon receipt of the waste test characterization results for the sample, arrange for the proper disposal of the liquid. (TT at 1612.) Three months later, on October 7, 1996, Patrick pumped 1100 gallons of CCA-contaminated liquid from the pit and transported the hazardous waste to Minnesota. (TT at 775, 822; Uncontested Fact Stmt. ¶ 32.)

On July 23, 1996, Patrick submitted additional responses regarding the Investigation Work Plan for IEPA's review, and on July 24, 1996, conducted additional testing of the practice field to address the IEPA's concerns. (Uncontested Fact Stmt. ¶ 31; Gee Co. Exhibit 132.) Lab tests performed by Advanced Environmental Technical Services, Inc. revealed that the arsenic concentration in the pits was 9 milligrams per liter. (TT at 1612-13; Gee Co. Exhibit 134.)

In a January 20, 1997 letter, Bowden presented several options for the clean-up at the practice field, all of which were premised on both Norfolk Southern's and Patrick's belief that the IEPA would accept a clean-up that restored the field's soil to a level of either 25 or 64 milligrams per kilogram of arsenic, together with either restoring the field or elevating the field by adding more backfill onto it. (TT at 1619-20.) Jerry Bowden, project manager in Patrick's Geosciences division, described the options in a January 20, 1997 letter to Harris, and informed Harris that the range of costs associated with the various scenarios was between $318,000 and $447,000. (TT at 1620; Norfolk Southern Exhibit 98.) Shortly after submitting the four proposals to Norfolk Southern, Bowden wrote a letter to Father O'Connor, advising him that a Site Remediation Work Plan would be submitted to the IEPA very soon, inviting his "comments and recommendations," and requesting

a meeting to discuss (a) a plan for managing community relations with the students, parents and neighbors of St. Rita's and (b) St. Rita's requirements for the practice field restoration. (TT at 1620-21; Norfolk Southern Exhibit 99.)

On February 10, 1997, Patrick submitted its Property B [St. Rita's Practice Field] Restoration Work Plan and Phase III Investigation Report to IEPA, regarding the environmental response at the St. Rita's practice field, for review and approval by IEPA. (Uncontested Fact Stmt. ¶¶ 33-34.) Jeffrey Schuh explained that the Phase III investigation, an extension of the Phase II site assessment, is "targeted to delineate the extent of contamination that may have been identified as a result of the Phase II and is the precursor to beginning the cleanup of a property." (TT at 632.) The plan submitted February 10, 1997, required Patrick to clean the affected land to 25 milligrams per kilogram by removing the upper five or six inches from the whole site, going deeper in the "hot spot" of greater contamination near the CCA pits, and then placing a "clean cap [of soil] on top." (TT at 899-900, 902; Gee Exhibit 136; Norfolk Southern Exhibit 103.) Patrick proposed using nonimpacted soil from the site for the soil cap so that it would have the same background level of arsenic as the remainder of the property. (TT at 900-01.) Schuh testified that Patrick proposed this solution to the IEPA because Schuh and others at Patrick were confident that it would have been "fully protective of human health and the environment." (TT at 900-01.)

At a meeting with the IEPA on March 4, 1997, the IEPA "strongly recommended a community relations plan" that would include distributing a fact sheet to residents, local officials, local media and school officials.[15] (TT at 1669, 1674.) Harris met with Father O'Connor the next day and "strongly encouraged" him to agree to an additional communications effort specifically with the property owners to the north of the practice field. (TT at 1672-74; 1699.) Harris acknowledged on cross examination that after the March 4 meeting, Norfolk Southern was still considering

_____

[15] It is not clear from the record who attended this meeting on Patrick's or the IEPA's behalf, but Harris attended for Norfolk Southern.

23

alternatives for the practice field clean-up, but that to Harris's knowledge, those alternatives were never communicated to anyone other than Father O'Connor, the IEPA, and the Illinois Department of Public Health. (TT at 1674-75; 1681-82.)

In a March 18, 1997, letter from John Salch, Project Manager with the IEPA, to Harris, the IEPA issued its comments on the Property B Restoration Work Plan, withholding approval for the plan pending receipt of additional information. (Uncontested Fact Stmt. ¶ 36; Norfolk Southern Exhibit 103.) In this letter Salch listed a number of the IEPA's concerns regarding the Property B Restoration Work Plan and Phase III Investigation Report. (Norfolk Exhibit 103.) Salch's letter stated that the Plan was unacceptable to IEPA because without information concerning the background arsenic levels in the area, the IEPA concluded that the proposed arsenic level of 25 milligrams per kilogram was still too high. (TT at 702, 705.)

The IEPA publishes a table of "background," or naturally occurring, concentrations of arsenic from sample locations in all counties of Illinois. (TT at 759.) According to that table, no Illinois locations has a background level of arsenic lower than 1 milligram per kilogram; across the state, background arsenic concentrations range from 1.1 to 24 milligrams per kilogram. (TT at 759-60.) The IEPA table identifies the median background level of arsenic as 7.2; unless there are detailed test results from a particular site indicating that it should set a different objective, the IEPA will use the median background concentration of 7.2 as an objective for arsenic clean-up. (TT at 760, 788.) Jeffrey Schuh and Jerry Bowden acknowledged that Patrick had not made a determination of the background arsenic levels in the soil around the practice field. Bowden explained that it would have cost approximately $200,000 to conduct such an analysis; moreover, regardless of what such an analysis would show, there was no guarantee that the IEPA would accept any arsenic concentration level over the median, particularly in light of the potential exposure of high school students. (TT at 709-11.) Because Patrick Engineering did not collect

24

background data regarding arsenic levels for the wood treatment facility or the St. Rita's practice field, the arsenic value of 7.2 became the objective for clean-up on the properties. (TT at 788-89.)

Ultimately the IEPA required a clean-up process much more rigorous than Patrick had originally proposed, resulting in a much lower concentration of arsenic in the surface soil. (TT at 1620.) In response to Patrick's proposal to use a 25 milligrams per kilogram clean-up objective and remove the top six inches of the entire practice field, the IEPA required instead that 18 inches of soil be removed and a three-foot cap be installed. (TT at 1621-22.) Harris testified that the range of potential costs associated with meeting the IEPA's requirements varied from $221,000 to $1,033,000. (TT at 1623.) According to Harris, throughout its negotiations with Norfolk Southern and Patrick regarding the proper clean-up remedy for the St. Rita's site, the IEPA was "absolutely conservative." Because of the potential exposure of high school students, IEPA rejected what Harris called Patrick's "rationally conservative" proposals, instead requiring Patrick to repeatedly reevaluate and resubmit its proposals. (TT at 1607.)

On June 12, 1997, Norfolk Southern submitted responses to IEPA's comments on the Property B Restoration Work Plan. (Uncontested Fact Stmt. ¶ 37.) This letter detailed how Norfolk would resolve and comply with the concerns expressed in the IEPA's March 18, 1997 letter. (Norfolk Exhibit 110.) On June 17, 1997, Patrick finalized the plans and specifications for restoration on St. Rita's practice field, and on June 30 awarded contracts to Robinette Demolition and to Sportsfield Inc., for response activities on St. Rita's practice field. (Uncontested Fact Stmt. ¶¶ 38-39.) On July 3, 1997, IEPA issued its approval letter for Property B Restoration Work Plan and Phase III Investigation Report. (Uncontested Fact Stmt. ¶ 40.)

### 5.     Clean-up of St. Rita's Field and the Former Wood Treatment Facility

The clean-up process at St. Rita, which involved excavation of soil, installation of sewers and an in-ground irrigation system, and the replacement of trees, took place between July 1997

and October 1997. *Norfolk Southern I*, 2001 WL 710116 at *11. Bowden testified that Patrick removed approximately 5,000 cubic yards of soil from St. Rita's practice field, the upper 18 inches of soil of the entire field. (TT at 978.) At the wood treatment facility, Patrick removed 2,700 cubic yards of material, excavating depths ranging from four to eight feet. (TT at 1008-09.) Patrick reconstructed the berm that divided the two properties, and installed a five-inch thick asphalt cap over an area of the former wood treatment facility measuring 320 by 110 feet. (TT at 1012.) The IEPA required that Norfolk Southern install the asphalt cap, but did not specify what thickness it should be. (TT at 1017.)

Norfolk Southern submitted its completion report to IEPA in January 1998 regarding its work on St. Rita's practice field, reporting that the average concentration of total arsenic in the surface soils was even lower than the soil objective for background conditions for the Metropolitan Statistical Area, as published in 35 IAC 742, TACO (Tiered Approach to Cleanup Objectives) 1997. (Uncontested Fact Stmt. ¶ 41; TT at 567.) Bowden explained that from his working knowledge of background concentrations in the Chicago area, he believed that background arsenic levels for the St. Rita's practice field was between 10 and 15 milligrams per kilogram. (TT at 1035-36.) Thus, Bowden acknowledged, because Patrick removed 18 inches of soil from the entire practice field, there were areas of soil excavated that had arsenic concentrations below or within the range that Bowden believed to be background for the area. (TT at 1037-38.) In a letter dated July 21, 1998, the IEPA issued Norfolk Southern a "no-further-remediation-letter" regarding the St. Rita property.

Because St. Rita's had been unable to use its practice field since September of 1995, the school's football team had used the school's stadium football field for practice. (TT at 389, 395, 1623.) On May 28, 1997, Father O'Connor asked, and Norfolk Southern agreed, to resod the playing field because it had been torn up from use during practices.[16] (TT at 1623-24; 1689.)

---

[16]     The parties did not specify the two dates on which Norfolk Southern resodded the
(continued...)

Patrick chose to install sod on the practice field instead of planting grass seed, at least in part because the practice field had been out of use for about two years and sodding the field was more expedient. (TT at 1148.) Jerry Bowden could not specify the amount charged for these stadium field repairs. (TT at 1096-97.) Patrick also installed privacy slats in orange and blue, St. Rita's colors, around the practice field. (TT at 1098.)

On February 9, 1994, Patrick sent Norfolk Southern an invoice for $28,290.29 for the Phase I, limited Phase II work it performed. (TT at 1019.) Bowden explained that Patrick acted as the general contractor for Norfolk Southern in implementing the clean-up and reconstruction of the St. Rita's practice field. (TT at 1022.) Bowden testified that the cost for the soil removal contractor was $688,461.30, and for the sports field construction, the charge was $166,883.60. (TT at 1022.) Norfolk Southern also installed an automatic sprinkler system at a cost of about $27,000. (TT at 1147.) Finally, Bowden explained that French drains were installed on the field to improve drainage of the surface, and to prevent the new soil "cap from being eroded away by free-flowing drainage." (TT at 714.) The irrigation system, Bowden explained, was also part of the plan to prevent erosion of the cap, but St. Rita's had requested that the system be automated, and that accommodation was made for the school's benefit. (TT at 714.)

Harris acknowledged that some of the field repairs made by Norfolk Southern were really just a "courtesy" to St. Rita's, such as replacing the shot put pad. (TT at 1628.) He deducted those expenses he believed to be "extras" from the total claim for response costs. (TT at 1627-28.) Thus, when he calculated the amounts that Norfolk Southern had spent cleaning the wood treatment facility and St. Rita's practice field, Harris specifically excluded any amounts that he could

---

[16](...continued)
football stadium field.

not verify were exclusively attributable to CCA-related expenses.[17] (TT at 1626-28; Norfolk Southern Exhibit 199.)

Schuh testified that in performing the remediation work for Norfolk Southern, Patrick followed the guidelines and requirements of the Illinois Site Remediation program, and acknowledged that those guidelines do not require implementation of the most cost -effective remedy. (TT at 839.) Schuh acknowledged, further, that the IEPA "strongly recommended" that a community relations program be undertaken, including going "door to door to the residents that back up to the [practice] field." (TT at 845.) Schuh further testified that Patrick itself was not involved in any community relations efforts with respect to the clean-up, and that he did not know whether any had been undertaken. (TT at 849.) Similarly, William Harris testified under cross-examination that Norfolk Southern made no effort to contact students who attended Quigley Seminary in the 1970's and 1980's. (TT at 1680.) He testified, further, that Norfolk Southern never directly contacted the parents of St. Rita's students or the homeowners adjacent to the north of the practice field regarding the clean-up process or alternatives at the wood treatment facility site. (TT at 1660-61.)

Norfolk Southern paid Loyalty Environmental, Inc. ("Loyalty") $318,605.66 for the work it performed in cleaning up Property A [the former wood treatment facility].[18] (Norfolk Exhibit 199.) Loyalty started working at Site A on June 28, 1999 and concluded the work in the fall of 1999.[19] (Norfolk Exhibits 182, 199.) Loyalty was the contractor recommended by Patrick and selected by

---

[17]     Harris did not specify when he made these calculations, and the chart he prepared to sort out the expenses Norfolk Southern incurred (Norfolk Southern Exhibit 199), is not dated.

[18]     Loyalty was no longer in business when Norfolk paid the last invoice for Loyalty's work. This payment of $31,477.50 was made instead to the bonding company. (Norfolk Exhibit 199.)

[19]     The record is unclear regarding what date Loyalty completed its work. The record does reflect that Loyalty's last invoice was dated November 30, 1999. (Norfolk Exhibit 199.)

Norfolk Southern to perform the remediation work at Property A. (TT at 1006.) Loyalty was responsible for the removal, transportation and disposal of waste from that property and was also the contractor that installed the asphalt cap on the property. (Norfolk Exhibit 199.)

**Environmental Consultants and Experts**

The parties called a number of experts to testify concerning their observations, testing, and analysis of the environmental concerns at the wood treatment facility and adjacent property; the causes of the environmental harm; and the propriety of Norfolk's response. The court summarizes this expert testimony below.

Wayne Grip is president and owner of Aero-Data Corporation, an aerial mapping company. (TT at 60.) Norfolk Southern retained Grip to review aerial photographs that had been taken over several years of the wood treatment facility and the adjacent practice field. Grip testified that photos he reviewed depict a "flow pattern" emanating from the wood treatment facility, flowing onto the Quigley/St. Rita property. (TT at 103-04.) Photographs of the area taken in 1970 did not yet show any flow patterns, or plumes indicating stressed vegetation caused by liquids flowing across the site. (TT at 134-35.) By April 21, 1985, according to Grip, aerial photography showed a "very distinctive . . . west to east plume emanating from the wood treating plant area." (TT at 131.) Two aerial photographs taken in 1988 also depict a plume emanating from the wood treatment facility, but according to Grip, they represent a different plume than the one depicted in the 1985 photograph. (TT at 147.) Grip analyzed the results of the soil borings that Patrick performed on August 21, 1995, and concluded that the areas of heavily and moderately-stressed vegetation he detected from the aerial photographs corresponded to the areas on the practice field where the highest concentrations of arsenic were found. (TT at 154-155, 159-60; Norfolk Exhibit 2.)

Defendant Gee Co. called Anthony Mellini, previously employed by Radian International, an international environmental consulting company, to testify about his visit to the wood treatment facility on June 9, 1993. (TT at 1958, 1966.) Radian was one of the environmental engineering

firms Norfolk Southern contacted at the beginning of its assessment of the property. The purpose of Mellini's visit was to "collect sufficient information to prepare a proposal. . . for a Phase I, Phase II site assessment" for Norfolk Southern. (TT at 1968.) Mellini took photographs of the site, and testified that it would have been "imprudent" for an environmental consultant on a site visit to fail to take photographs. (TT at 1972-73.)

Mellini observed on his visit that the pit areas were filled with liquid that in some areas had a greenish tint to it, but that looked to be "primarily water." (TT at 1975-76, 2001-04.) His photographs confirm that the pits were filled with a watery liquid. (TT at 1970, 1976; Gee Photographic Exhibit 243, Photo #3.) Mellini was also shown photographs taken between December 17 and December 23, 1993, six months after his visit; in his judgment, water shown in the later photographs was a different, more troubling, shade of green than was the water that he observed in the pits on June 9.[20] (TT at 1976-77.) Mellini also observed that in addition to the green liquid in the pits, the December photographs show a barrel lying on its side in a pit, a barrel Mellini testified was not there at the time of his June visit. (TT at 1974; Gee Photographic Exhibit 243, Photo # 5, 6, 7, & 8.)

In his October 22, 1993, proposal for a Phase I and II investigation of the site, Mellini identified the area near the fence between the drip pad and St. Rita's as a potential environmental concern, as runoff from the wood treatment operations could have entered the practice field. (TT at 1977, 1983-84: Gee Exhibit 20.) He did not, however, recall seeing evidence of green staining or streaks on surface areas during his June 1993 investigation, and explained further that if he had seen such evidence, he would have made a photograph of it. (TT at 1984-85.) Mellini did observe

---

[20]     Schuh contested this opinion. Schuh acknowledged that the liquid in the pits appeared to be two different shades of green in June and December 1993 photographs, but he was unable to determine from the photographs whether there was a meaningful difference in the composition of the liquids. (TT at 943-44.) As stated during the trial, the court is unwilling to draw any conclusions from color variations between photos taken at different times, under different light conditions, using different film and cameras, and reproduced in a variety of formats.

and photograph areas of dirt between the tracks between the pits and the drip pad, as well as areas of deterioration and cracking on the drip pad and on the edges of the pits. (TT at 1998-2000.) He recommended testing of the surface and subsurface soils and groundwater under and around the pits and drip pad to determine whether there was CCA contamination in those areas. (TT at 1998-2000.) Though less troublesome than the liquid that appeared in the December photographs, Mellini believed the watery liquid present in the pits on June 9, 1993 should have been tested to confirm whether or not any hazardous waste was present. (TT at 2004.)

Gee also called Scott Letzel, a long time Patrick Engineering employee who participated in the Phase I environmental site assessment of Norfolk Southern's property in December 1993. (TT at 2286.) Two weeks later, Letzel returned to the site to perform soil and groundwater tests. (TT at 2286.) During the course of this analysis, Letzel drafted a report which made no mention of a tanker truck, drums, or green staining at the site (TT at 2300-01, 2303), and stated to the contrary that "there are no obvious signs of hazardous material storage or spillage of hazardous substances on the site. Debris, while present, was typically in the form of discharged automotive batteries, tires and lumber scraps." (TT at 2300.) On cross-examination, however, Letzel pointed out that photographs which supplement his written report reveal the barrels, drum and staining at the site. (TT at 2342.) Letzel testified, further, that in his view the conditions at the facility as of December 1993 indicated a possible immediate threat to the environment and to public health. (TT at 3328.) Letzel believes that the contamination was a result of surface releases at the wood processing plant and that surface releases of contaminants from the wood treating facility also fouled the St. Rita site. (TT at 2312, 2313.)

During his December 1993 inspection, Letzel saw geotextile fabrics over the pits and fencing around them to protect the pits from debris and prevent entry; but there was no waterproof covering over the pits to prevent further overflows. (TT at 2329, 2230.) On cross examination, Letzel testified that while he was at the site he never saw surface migration or an overflow of the

pits, and reiterated his belief that the surface migration resulting in contamination occurred during the operation of the wood treatment plant and during the fire fighting efforts in 1992. (TT at 2343, 2345.)

Gee Co. called Eric Hasman, a professional geologist for Laicon, Incorporated, to testify regarding a Phase I investigation he performed of the Gee Lumber property, a property lying immediately to the south of the wood treatment facility, on August 16, 1993. (TT at 2009, 2013.) Laicon was hired by Pinnacle Bank to do the inspection in conjunction with a loan application made by Gee Sr. (TT at 2047.) The wood treatment facility lay just north of the property Hasman inspected, and was thus considered part of his "off-site investigation." (TT at 2022.) Hasman prepared a report as part of his Phase I environmental assessment. (TT at 2012-13.) Referring to the wood treatment facility to the north of the property he was investigating, Hasman noted in his report that there were "obviously high-risk neighbors in adjacent properties engaged in producing, storing or transporting hazardous waste chemicals or substances." (TT at 2023.) Hasman reported seeing water in the pits at the wood treatment facility, not green-colored liquid or barrels. (TT at 2025-26.) Like Mellini, who inspected in June, Hasman reviewed the December 1993 photographs, and testified that he conditions reflected in those photos, including an abandoned barrel and green liquid in the pits, did not exist at the time of his visit. (TT at 2027.) Had such conditions existed, Hasman would have highlighted them as a potential environmental problem and taken photographs to record the condition. (TT at 2026.) In the conclusion section of his Phase I report, Hasman noted that environmental liabilities from off-site posed a low environmental risk. (TT at 2044.) He explained, however, that because he discovered that the wood treatment facility had already been placed on a government list for remediation, he concluded it was not necessary to note this off-site concern. (TT at 2042, 2045.) Hasman also explained that Gee Sr. told him that there was no hazardous waste at the site, and did not show Hasman any waste manifests or other documentation concerning waste handling on the site when Hasman

asked to review any such documents. (TT at 2037, 2046-47.)

Although some portions of Hasman's report are consistent with Patrick's conclusions, the court notes that the photographs made in June do reflect the presence of numerous drums on the wood treatment facility. Hasman's failure to notice this evidence of outdoor storage of chemicals, and the fact that his assignment was to investigate the property to the south of the wood treatment facility, gives the court less confidence in his conclusions that the property at the facility was in good shape as of August 1993.

Robert Kewer is vice president and head of the Chicago environmental management group at Montgomery Watson Harza, MWH Americas (hereinafter, "Harza"). (TT at 2222, 2226.) Gee Co. called Kewer to testify concerning tests Harza performed in September 1992 at the request of Jim Segredo, the director of development for St. Rita's. (TT at 2231; Gee Co. Exhibit 240.) When he contacted Kewer in September 1992, Segredo expressed his concern that past surface water runoff from the adjacent wood-treating facility might have impacted the practice field, and requested a proposal for an environmental investigation of the practice field. (TT at 2231; Gee Co. Exhibit 240.) At the time he oversaw the St. Rita's investigation, Kewer was head of the geology and hydrogeology section of Harza, and had approximately 20 years of experience in environmental investigations. (TT at 2232.) John Pyrich, a senior hydrogeologist at Harza with approximately 35 years of experience, conducted the on-site investigation of the practice field. (TT at 2234-35.)

In an October 23, 1992 letter to Segredo reporting the results of Harza's investigation, Kewer described "apparent discoloration of grass and soils in the practice field along surface drainage paths," the color of which Kewer testified was "yellowish" or "yellowish-brownish." (TT at 2235;Gee Exhibit 240.) In addition to Pyrich's visual observation of the site, Harza used an instrument to screen the soils on-site for volatile organic compounds. This instrument did not detect any evidence of contamination. (TT at 2235-36.) Using information Segredo provided

33

concerning past overflow events from the wood treatment facility, Harza selected five areas on the practice field for soil testing, three of which were located along the western edge of the practice field. (TT at 2238-39.) Pyrich collected the samples with a "hand-operated trowel" (a small hand shovel), and targeted only surface soils, from the upper six inches of soil beneath the sod. (TT at 2238-39;Gee Exhibit 240.) Kewer explained that the sampling was biased towards surface soils because the objective of the testing was to screen soils that would have been most susceptible to impact from surface water run-off from the wood treatment facility. (TT at 2238-39.)

Harza sent the soil samples to DTC Laboratories, an IEPA certified laboratory in Springfield, Illinois. (TT at 2239.) The October 7, 1992 laboratory test results for arsenic revealed arsenic concentrations of less than .21 parts per million, a concentration lower than most background arsenic concentrations in the Chicago area. (TT at 2132, 2240.) Kewer offered two reasons that this very low arsenic result did not cause him to question the accuracy of the laboratory testing: (1) a Ph.D. chemist had reviewed the data and indicated the results were sound, and (2) because the samples had been taken from surface soils on a practice field, they may have been brought in from somewhere else at the time the field was constructed. (TT at 2241.)[21] Kewer further explained that even if he knew all of the soil Harza tested was indigenous to Illinois, he would not have been suspicious about the low concentrations of arsenic discovered in the laboratory testing; although most Illinois soils have higher arsenic concentrations, there could be some with less than one part per million. (TT at 2245.) Kewer pointed out that the figures published by the IEPA reporting background arsenic concentrations in 102 Illinois counties were not published until 1994, and would not have been a basis for comparison with Harza's 1992 practice field data. (TT at 2266.) He

---

[21]     It is undisputed that the Harza test was limited to surface soils; the samples were collected by hand from the top six inches. The court notes, however, that Norfolk Southern has demonstrated that on occasions when the grass was discolored by CCA run-off from the wood treatment facility, Gee employees would replace this sod and top soil. The court concludes it is likely that some of Harza's samples were taken from soil and sod deposited in the field by Gee employees rather than resident soil affected by the CCA run-off.

acknowledged, however, that sample background concentrations for broader regions, such as the upper Midwest, were available from the United States EPA. (TT at 2270.) Kewer testified that he asked other Harza project managers if they had ever encountered arsenic concentrations of less than one part per million in the general area of south Chicago and learned that at least a couple of other project managers had encountered such low concentrations.[22] (TT at 2281-82.) Based on his comparison of the data collected by Harza in 1992 with the results of Patrick's 1995 soil testing, Kewer concluded that the arsenic levels found by Patrick were "indicative of later spills, post-1992 spills." (TT at 2226-27, 2250.)

Harza charged St. Rita about $4,000 for its investigation, an investigation that Kewer categorized as a "small. . . screening-type study." (TT at 2250-51.) Harza did not obtain the "full data package" from the lab, the "full paper package of data supporting the results," because the package would have been an extra cost for this "cost-conscious" client, and was not necessary where the purpose was only to determine whether there were significant impacts from run-off. (TT at 2251.)

In December 2000 Richard Baldino, a project chemist with Harza, reviewed the data DTC Laboratories had collected eight years earlier. (TT at 2093, 2129, 2131.) Baldino acknowledged that the data had never been validated, that is, reviewed to ensure that data is accurate and usable. Baldino explained that such validation is only required on larger projects where samples have to be of the highest quality, and for projects where the USEPA is involved and requires "usable" data. (TT at 2093-95.) The testing of the St. Rita's practice field, on the other hand, did not necessitate generating a full data package because it was a small screening project: Harza was only asked to determine the highest possible concentration of arsenic in the practice field's soil, rendering the

---

[22]     Kewer did not indicate when he made this inquiry, nor did he provide any further details about this hearsay evidence that there are other Chicago locations that tested at below one part per million for arsenic.

expense of a full data package excessive and unwarranted. (TT at 2103-04.) When he again analyzed the data in 2000, Baldino made "very conservative assumptions regarding the sample size and the amount of water in the soil" so that he could be certain that his "worst case scenario number" for the arsenic concentration was definitely higher than any concentration actually in the soil. (TT at 2104-05.) He concluded that the maximum amount of arsenic that could have been in the soil samples in 1992 was 40.5 parts per billion. (TT at 2105.) Back in 1992, DTC Laboratories had reported a result of less than 210 parts per billion, a result that was consistent with the conclusions Baldino reached on the basis of his reanalysis of this then-eight-year-old data. (TT at 2105.) Neither DTC's results nor Baldino's own conclusions raised any concerns for Baldino concerning the validity of the testing, despite the results showing arsenic concentrations well below average background concentrations of arsenic in Illinois. (TT at 2150-52.)

For a number of reasons, the Harza data does not establish to the court's satisfaction that the property was free of arsenic contamination in 1992. First, Baldino testified that "check standards" help determine whether the testing instrument is "calibrated correctly," but he acknowledged that the separate form that lists the concentrations of check standards was absent from DTC's data. (TT at 2158.) Other documents that would help confirm the validity and accuracy of DTC's sampling were also missing; Baldino referred, for example, to spike recovery pages, dilution summary pages, lab control samples, correction factors, technician's bench notes, and a case narrative report. (TT at 2158-62.) Baldino testified that this was the first data analysis he had conducted that was based on just one page of raw data. The court has no basis for sharing his confidence that the additional pages would simply be more of the same information contained on the single page and would not "make any difference." (TT at 2163-64.) Kewer also acknowledged that the report Baldino prepared based on DTC Laboratories' data was not intended to be a data validation report, and would not be accepted by the USEPA as such, nor would it be accepted by the IEPA for purposes of making clean-up decisions at the St. Rita's site. (TT at 2276.)

Additionally, because DTC Laboratories' laboratory backup data was incomplete, the 1992 findings could not be reproduced quantitatively. (TT at 2274-75; December 2000 Statement of Opinion of Robert Kewer, P.G., Gee Exhibit 240.) For example, information concerning water content of the soil was missing from the backup data that Baldino reviewed. (TT at 2275.)

Dr. Shawn Sager, associate vice president of Arcadis G&M[23] was presented by Norfolk Southern to prepare a report regarding the human health risks at the contaminated site. Sager also provided an expert opinion regarding the findings and procedures used to created the Harza report. (TT at 564, 585.) Sager's work for Arcadis G & M requires her to perform technical oversight for human health risk assessments; that is, she reviews data to determine human health risks related to various hazardous waste sites. (TT at 564.) In developing her opinion in this case, Sager reviewed the reports prepared by Patrick and Harza concerning soil analysis both at the wood processing site and the high school property. (TT at 571). Sager determined that the cancer risk at the wood treatment site well was above the IEPA benchmark and at the high end of the federal target risk range and that the noncancer hazard index was also greater than the regulatory benchmark. (TT at 577.) Sager testified that the location of the school in relation to the wood treating plant was a "red flag," i.e., a factor that would lead the USEPA or IEPA to take a hard line approach to addressing the risks involved with the contaminated site. (TT at 577.)

Sager also cast more doubt on Harza's findings. She noted that Harza analyzed the soil exclusively for organics, volatile organics, semivolatile organics, arsenic and lead. (TT at 585.) According to Sager, because the site included a wood treating plant, Harza should also have examined the soil for the presence of inorganics, including copper and chromium. (TT at 585.) Sager was further concerned by the fact that Harza's test results showed arsenic and lead were "nondetect" in every single sample taken by Harza, an unlikely finding because arsenic and lead

---

[23]     It is unclear from the record what exact business is performed by Arcadis G&M.

occur naturally in soil and should show up on any test of soil in the Chicago metropolitan area. (TT at 586.) Indeed, the IEPA background levels for arsenic on soil in the Chicago metropolitan area is in the range of 15 or 16 parts per million, higher than the Illinois average. (TT at 587.) Sager pointed out that the Harza analysis did not take duplicate samples of the soil, which Sager characterized as standard practice. (TT at 587.) Furthermore, Sager noted that the data Harza analyzed regarding the soil samples appeared on a single page and was too incomplete to support any conclusions. (TT at 590-91.)

In Sager's view, the presence of wood treating contaminants on the property of the wood treating facility and the high school properties was significant. The potential for children to be exposed to contaminants such as arsenic, chromium, and copper required that prompt action be taken to avoid any adverse health risks. (TT at 592.) Accordingly, Sager testified, because risk levels exceeded both federal and state limits, it was appropriate for Norfolk Southern to go forward with a response action as quickly as possible. *Id.*

Finally, Gee called Frank Rovers, a professional engineer and chairman of the board of Conestoga-Rovers & Associates, Limited, to testify that Gee was not the source of the contamination. Rovers concluded that "the contamination on St. Rita's came from a failure of the railroad to care for the property once it was in the railroad's possession." (TT at 2372.) Significantly, in holding Norfolk Southern responsible for the contamination, Rovers observed that it was "very clear from the concentrations and what was done when the property was left. . . that there was contamination. . . on that property that had not been remediated when the property was handed back to the railroad [in] April 1993." (TT at 2373-74.) Rovers further recognized that while the facility was used for wood treatment operations, the pits would overflow onto the low-lying St. Rita's practice field during rain storms. (TT at 2375.)

According to Rovers, the "grab" sample of the liquid in the pit taken in December 1993 which revealed an arsenic concentration of 14 parts per million was not representative of the

38

concentration of arsenic throughout the pit. (TT at 2382-83.) Rovers explained that there was green sludge at the bottom of the pit, and that the liquids and sediment had stratified, which would result in non-uniform arsenic concentrations in the liquid. (TT at 2382-83.) This sediment at the bottom of the pit was "heavily contaminated with CCA" and would have been the "primary source" continuing to contaminate water that flowed into, and overflowed out of, the pit. (TT at 2399.) Rovers testified that the soil tests Harza conducted on the practice field at the end of 1992 contribute significantly to his opinion that most of the contamination on that field occurred during and after 1993. (TT at 2411-12.) He acknowledged that if the Harza tests are incorrect, he would not be able to determine how much contamination was attributable to pre- versus post-1993 activities. (TT at 2412.) Furthermore, Rovers agreed with Grip's testimony that there were spills and releases at the wood treating facility during the 30 years of operation, before the property was returned to Norfolk Southern. (TT at 2448.) Thus, Rovers ultimately acknowledged, not all of the contamination on the St. Rita's practice field that was remediated in 1997 and 1998 occurred after April of 1993. (TT at 2449.) Rovers was not able to quantify the amount of contamination that occurred before April of 1993, and he agreed that Harza's testing of the site in 1992 was not complete. (TT at 2449.)

For several reasons, the court is reluctant to rely on Rovers' opinion regarding the contamination of the wood treatment site and the St. Rita practice field. First, Rovers' opinion is potentially flawed because it is based in large part on the Harza report. As noted above, there are significant reasons to doubt the reliability of the data included in the Harza report and any opinions drawn from this data. In any event, Rovers' opinion regarding the contamination was at best equivocal. He initially asserted that the contamination was mostly a result of conditions that occurred after the property was returned to Norfolk's possession. He agreed, however, with Norfolk Southern's expert, Wayne Grip, that there were spills and releases in the thirty years prior to Norfolk taking possession of the property in 1993. Ultimately, Rovers himself acknowledged that

39

some of the contamination was a result of spills that occurred prior to 1993, a conclusion amply supported by other evidence in this record.

Some further contamination may well have occurred after 1993. William Harris of Norfolk Southern testified, for example, that he believed the concrete pits lacked "structural integrity," and had leaked between 1993 and the time they were pumped in 1996. (TT at 1637-39.) The notion that the bulk of the contamination was the result of post-1993 overflows or leaks is not persuasive to the court, however. Jeffrey Schuh, whose expertise in environmental engineering is not challenged, identified several factors that led him to conclude that the pits did not overflow onto the practice field between June of 1993 and the time that 1100 gallons of liquid was pumped from the CCA pit in October of 1996. (TT at 775, 822.) First, such an overflow would require an amount of rainfall uncharacteristic for the Chicago area. (TT at 776.) Schuh testified further that the concentration of arsenic in the pits in 1993 was too low to have produced, from a mere pit overflow, the levels of contamination present on the practice field in 1993. (TT at 776-81.) Nor did Schuh believe it likely that the contamination on the practice field could have resulted from pit leakage between 1993 and 1996. If the pits had leaked, he would have expected the concentrations to be "more or less uniform" throughout depths where contamination was detected, as opposed to the concentrations being higher at the surface and decreasing deeper in the soil. (TT at 781-82.) Schuh thus concluded that the higher concentrations of arsenic present at the upper elevations indicates that the contamination resulted from the dripping of CCA onto the drip pad. (TT at 781.)

## DISCUSSION

The Comprehensive Environmental Response, Compensation, and Liability Act (the "Act" or "CERCLA") was enacted in 1980 for the purpose of establishing "a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites." *Pub. Serv. Co. of Colo. v. Gates Rubber Co.*, 175 F.3d 1177, 1181 (10th Cir.1999) (quotation omitted). As the Supreme Court explained in *Pennsylvania*

40

*v. Union Gas Co.*, 491 U.S. 1, 21 (1989), "[t]he remedy that Congress felt it needed in CERCLA is sweeping: everyone who is potentially responsible for hazardous-waste contamination may be forced to contribute to the costs of cleanup." To promote efforts to clean up hazardous waste, Congress provided that private parties who voluntarily clean up hazardous waste sites may recover a proportionate cost of the clean up from other potentially responsible parties or "PRPs." In this case, Plaintiff Norfolk Southern seeks to recover the costs of clean-up from other potentially responsible parties, Defendants Gee Co., CFW Specialties, and Mancini.

Such recovery is available under two different theories. First, section 107(a) of CERCLA provides a direct cost recovery action against PRPs, defined broadly to include not only current owners and operators of the facility where the release occurred, § 9607(a)(1), but also any party that owned or operated the facility at the time of the release, § 9607(a)(2); any party that arranged for disposal, treatment, or transportation of hazardous substances at that facility, § 9607(a)(3); and any party that accepted hazardous waste for transport to that facility if the party selected the facility as the destination for the waste, § 9607(a)(4). Liability is strict, joint, and several under § 9607, and there are only very limited defenses to liability under that section.

Another provision provides for recovery where there are other PRPs that might be liable but one individual PRP is held responsible for the entire cost of a cleanup because of the joint and several liability. Under § 9613(f)(1), "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a)."

## CERCLA § 107(a)

Although §107(a) holds a landowner strictly liable for hazardous wastes contaminating its property, that landowner may also bring a direct cost recovery action under § 107(a) if: "(1) the defendant is a covered person under § 107(a); (2) there is a release or threatened release of a hazardous substance from a 'facility' as defined by § 101(9); (3) the release caused the plaintiff to incur response costs that are consistent with the national contingency plan ("NCP"), and (4) the

plaintiff did not pollute the site in any way." *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d at 784 (7th Cir. 2000) (citations omitted); *Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761 (7th Cir. 1994). This "innocent landowner" exception to §107(a)'s general rule of strict liability has come to be known as the "*Akzo* exception." To enhance its chance of recovery in the event it is not deemed an innocent landowner under the *Akzo* exception, the landowner may concurrently bring a claim under CERCLA § 113(f)(1) seeking "contribution from another person who is liable or potentially liable under § 107." *NutraSweet*, 227 F.3d at 783-84 (quoting *Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 326 (7th Cir. 1994)). If a plaintiff is partially responsible for the contamination of a site, that plaintiff is not allowed to proceed under § 107 for a direct cost recovery, *Akzo Coating, Inc. v. Aigner Corp.*, 30 F.3d 761, 764 (7th Cir. 1994), but may nevertheless proceed under CERCLA § 113(f)(1). *Rumpke of Indiana, Inc. v. Cummins Engine Co. Inc.*, 107 F.3d 1235, 1240 (7th Cir. 1997).

Gee Co. argues that Norfolk Southern is not entitled to recovery under § 107(a)'s *Akzo* exception because it has not established that it was an innocent landowner who "did not pollute the site in any way." In June of 1993, Norfolk learned, through its environmental consultants, that its property was likely contaminated. No later than December of that year, evidence of contamination appeared openly on the premises, including abandoned barrels, green liquid in the pits, and green staining around the pits and on the concrete. Norfolk did not immediately clean up the site in 1993. Instead, Norfolk waited until 1995 to engage Clean Harbors to remove all potentially hazardous material from the site. It was not until October 1996 that Patrick took action to remove 1,100 gallons of CCA liquid waste from the pits at the wood treating facility. William Harris of Norfolk Southern himself believed that the pits containing the CCA solution lacked structural integrity.

The Seventh Circuit has explained that in order for a plaintiff to demonstrate that it is an innocent landowner, it must show that "it took precautions to prevent the 'threat of release' or other foreseeable consequences arising from the pollution of the site." *Kerr-McGee v. Lefton Iron &*

42

*Metal Co.*, 14 F.3d 321, 325 (7th Cir. 1994) (citing 24 U.S.C. 9607(b)).   In 1972, Lefton Iron purchased a 40-acre industrial site from Kerr-McGee's predecessor in interest, Moss-American. *Id.* at 324.   Moss American had used the site to manufacture railroad ties and utility poles, a process that involved the use of creosote and other preservatives to treat wood.   At the time the property was transferred to Lefton Iron, it contained significant amounts of preservatives left behind from Moss-American.   Twelve years after purchasing the site in 1972, Lefton in turn transferred ownership to a third party, Lefton Land.   *Id.*   Finally in 1988, the State of Illinois discovered contaminants on the property and filed a complaint against Kerr-McGee, Lefton Iron and Lefton Land, demanding that the parties develop and implement a plan for the clean-up of the site.   One month after this complaint was filed, Kerr-McGee entered a consent decree which settled the state's claims against it and also required Kerr-McGee to pay for the clean-up.   Kerr-McGee then brought suit against Lefton Iron and Lefton Land under CERCLA to require these entities to pay for part or all of its clean-up costs.   At the time of litigation, Kerr-McGee had performed part of the clean-up at a cost of $1.5 million, with more expenses ahead.   From these facts the Seventh Circuit determined that Lefton Iron and Lefton Land were not innocent landowners because they knew about the contamination and "made no attempt to remove the substances or to take any other positive steps to reduce the threat posed by the Creosote." *Id.* at 325.[24]

Similar to Lefton Iron and Lefton Land, Norfolk Southern owned property that had been previously contaminated by another party.   And while it did not use or spill CCA on its property, it

---

[24]      The *Kerr-McGee* court addressed the question whether Lefton Land could "show that it was an 'innocent landowner' under CERCLA § 107(b) ( 42 U.S.C. § 9607(b))."  14 F.3d at 325.  CERCLA § 107(b) provides that an otherwise responsible party may raise defenses to an action for contribution if it can show that the environmental harm was the result of an act of God, an act of war, or the act of a third party, so long as the defendant can demonstrate the exercise of due care and appropriate precautions.  Section 107(b) does not contain the expression "innocent landowner."  The court concludes that the *Kerr-McGee* court used that expression as shorthand for the defense set out in § 107(b)(3), and that such defense is equivalent to the showing that a responsible party must make in an action for recovery from others under CERCLA § 113.

did allow the contamination to exist on the property for years after CFW Specialties abandoned the site. Norfolk Southern invited environmental consultants to the property in 1993 to investigate and prepare proposals for Phase I and II investigations, but, so far as this record reflects, did not act immediately on any of those proposals. In 1994, Plaintiff hired Patrick Engineering to conduct a Phase I and partial Phase II analysis. All the while, CCA contamination remained unchecked on Norfolk Southern's property. For reasons explained below, the outcome of this case does not turn on this issue; but the court recognizes on this record that Norfolk Southern could have difficulty in establishing that it did not contribute to the contamination at the wood treatment facility and the practice field "in any way."

Even if Norfolk Southern is not an "innocent landowner" entitled to proceed under 107(a)'s *Akzo* exception, it remains entitled to seek recovery of its costs in a § 113(f)(1) contribution action. The court turns next to that claim.

**CERCLA § 113**

CERCLA § 113(f)(1) provides that a party "may seek contribution from any other person who is liable or potentially liable." 42 U.S.C. § 9613(f)(1); *Akzo Coating, Inc.*, 30 F.3d at 764. In order for Norfolk Southern to succeed in an action for contribution from the Defendants under § 113(f)(1), Norfolk Southern must demonstrate that any or all of the Defendants are liable under CERCLA § 107(a). 42 U.S.C. § 9613. Under CERCLA § 107(a) liability is established if: "(1) the site in question is a facility as defined in § 101(9); (2) the defendant is a responsible person under § 107(a); (3) a release or a threatened release of a hazardous substance has occurred; and (4) the release of the threatened release has caused the plaintiff to incur response costs." *Kerr-McGee Chem. Corp*, 14 F.3d at 325 (*citing Environmental Transport. Sys. v. Ensco, Inc.,* 969 F.2d 503, 507 (7th Cir. 1992)).

Once a party is determined liable under CERCLA § 107(a), that party is deemed "liable for any response costs that are consistent with the National Continency Plan." *Kerr-McGee Chemical,*

14 F.3d at 326 (citations omitted). Thus, in order for Norfolk Southern to recover under § 113(f)(1), it must prove that the Defendants are liable under § 107 and that it incurred its costs in compliance with EPA's National Contingency Plan (the "NCP"). 42 U.S.C. § 9604(a)(4)(B); *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 616 (7th Cir. 1998). The National Contingency Plan was promulgated by the United States Environmental Protection Agency in 1985 and then revised in 1990. *Alcan-Toyo America, Inc. v. Northern Illinois Gas Co.*, 904 F. Supp. 833, 835 (N.D. Ill 1995). The revisions to the NCP in 1990 reduced the standard for those seeking to recover response costs from strict compliance to "substantial compliance" with NCP requirements. *Id.* at 835.

**Chicago Flameproof and Wood Specialties Corporation and Mancini**

CFW Specialties maintains that Norfolk Southern has not met its burden of proving that the CFW Specialties Defendants caused a release or threatened release of a hazardous substance as required by § 107. The term "release" is defined by 42 U.S.C. § 9601 as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including, the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substances or pollutant or contaminant) ...." 42 U.S.C. § 9601 (22). The court agrees. Norfolk Southern offered no evidence that Mancini or CFW Specialties ever "released" a hazardous substance under CERCLA. Instead, CFW Specialties and Mancini have demonstrated that they never used CCA on the wood treating premises. These Defendants did use other chemicals to treat wood for fireproofing. They also bought and sold wood that had been treated with CCA and stored that treated wood on the premises. CFW Specialties bought a quantity of CCA upon purchasing the wood treating business from Gee Co., but there was unrebutted evidence that Mancini and CFW never used this CCA at the property involved in this case but instead shipped the material to another facility it maintained in Illinois.

Plaintiff suggests that the court can find CFW Specialties and Mancini responsible for the

contamination because it abandoned a tanker trailer and barrels on the site or because firefighters flooded St. Rita's field when the extinguished the fire at the facility in September 1992. The court is not persuaded that these circumstances are sufficient to render CFW Specialties liable here. The evidence concerning barrels was conflicting: some witnesses who inspected the property in June 1993 did not see abandoned barrels at that time, and CFW offered evidence that it did not leave such debris when it vacated the premises in May of that year. Gee Co. left a closed tanker on the site before selling the business to CFW Specialties, and it remained there during CFW Specialties' tenure; but when contacted by Norfolk Southern, Mancini offered to empty and dispose of the tanker. Norfolk Southern's failure to respond to that offer precludes it from relying on the tanker as support for its claims against CFW and Mancini. Finally, there was evidence concerning the volume of water used to extinguish the fire, but no expert testimony established by a preponderance that those firefighting efforts resulted in deposit of contaminants on the school property.

The court concludes that CFW Specialties and Mancini are not responsible parties for the environmental harm at issue here. Even if it concluded otherwise on this issue, as set forth below, the court would impose none of the clean-up costs on these parties.

**Gee Co.**

Gee Co. does not dispute its status as a PRP under § 107(a). Gee Co. does, however, dispute that it is liable for Norfolk Southern's response costs in relation to the contaminated site because Gee Co. maintains that Norfolk Southern's response costs were incurred in a manner inconsistent with the National Contingency Plan. CFW Specialties and Mancini have adopted the same argument to bar Norfolk Southern's recovery under CERCLA.[25]

---

[25]     Because the court has concluded that neither CFW Specialties nor Mancini caused a release or threatened release of a hazardous substance, it will not address the arguments made by these Defendants concerning Norfolk Southern's compliance with NCP.

46

"The NCP is EPA's regulatory template for a 'CERCLA-quality cleanup.'" *Public Service Co. of Colorado v. Gates Rubber Co.*, 175 F.3d 1177, 1181 (10th Cir. 1999). The regulations explain that a private party's clean-up effort "will be considered 'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in paragraphs (5) and (6) of this section and results in a CERCLA-quality cleanup." "Immaterial or insubstantial deviations" from 40 C.F.R. part 300 will not be considered inconsistent with the NCP. 40 C.F.R. § 300.700(c)(3)(i) and (c)(4). Gee Co. argues that Norfolk Southern's clean-up effort fails the test of compliance with NCP on two grounds: failure to comply with the community relations requirement, and failure to conduct a cost-effective remediation effort.

The regulations explicitly address a party's responsibility to involve interested community members in decisions concerning clean-up procedures. Specifically, Paragraph 6 of the regulation states: "Private parties undertaking response actions should provide an opportunity for public comment concerning the selection of the response action based on the provisions set out below, or based on substantially equivalent state and local requirements." 40 C.F.R. § 300.700(c)(6). That paragraph goes on to list provisions regarding public participation, specifying that they are "potentially applicable to private party response actions." 40 C.F.R. § 300.700(c)(6).

The central tenet of Defendant Gee Co.'s defense is its argument that Norfolk Southern failed to comply with these community relations requirements.[26] The court considered this issue

_____

[26]    This provision of the NCP states:
Private parties undertaking response actions should provide an opportunity for public comment concerning the selection of the response action based on the provisions set out below, or based on substantially equivalent state and local requirements. The following provisions of this part regarding public participation are potentially applicable to private party response actions, with the exception of administrative record and information repository requirements state therein:
(i)      Section 300.155 (on public information and community relations);
(ii)     Section 300.415(m) (on community relations during removal actions);
(iii)    study] except paragraph (c)(5); Section 300.430(c) (on community relations during [remedial action/feasibility

(continued...)

47

at some length in ruling on Defendants' summary judgment motions and their joint motion for reconsideration. First, in the court's June 25, 2001 order denying Defendants' summary judgment on the CERCLA claims, the court cited the Seventh Circuit's decision in *NutraSweet Co. v. X-L Engineering Co.*, 227 F.3d 776, 881 (7th Cir. 2000) for the conclusion that involvement with the IEPA may serve as a substitute for a party's compliance with the community relations provisions of NCP. *Norfolk I*, 2001 WL 710116, *13 n.13 (N.D. Ill June 25, 2001).

The court addressed the NCP issue at greater length when the Defendants filed a motion for reconsideration on the issue of Plaintiff's compliance with the NCP. *Norfolk Southern Ry. Co. v. Gee Co.*, 158 F. Supp. 2d 878, 882 (N.D. Ill. 2001). In that motion, Defendants cited decisions from other circuits in which courts have read the public comment provisions of the NCP much more strictly than did the court in *NutraSweet*. *Id.* at 882. Defendants are correct that courts in some other circuits have concluded that a failure to meet the letter of the community relations requirements will be a bar to recovery of response costs. In this court's view, as explained earlier, the Seventh Circuit's *NutraSweet* decision "suggests strongly that government agency involvement, similar to that of the IEPA in this case, can provide an adequate substitute for public notice and comment." *Id.* at 883. *See also Bedford Affiliates v. Sills*, 156 F.3d 416, 427-28 (2d Cir.1998).

In addressing the matter yet again, the court acknowledges that "substantial compliance" with the NCP is necessary for a plaintiff to recover under CERCLA. The court also recognizes that the NCP directs before a proposed clean-up is implemented, it is to be submitted for public comment. *PMC v. Sherwin-Williams Co.*, 151 F.3d 610, 616 (7th Cir. 1998) (citing 40 C.F.R. § 300.700(c)(6)). The court disagrees, however, with Defendants' assertions that Norfolk Southern

---

[26](...continued)
(iv)     Section 300.4430(f)(2), (3), and (6) (on community relations during selection of remedy); and
(v)      Section 300.435(c) (on community relations during [remedial design/remedial action] and operation and maintenance).
40 C.F.R. § 300.700(c)(6) (i-v).

has failed to comply with the NCP's community relations requirements and is therefore barred from recovery here. Neither the CERCLA statue or the accompanying regulations mandate that specific community relations measures are an absolute prerequisite to recovering response costs.

The court notes, first, that the language of the provision itself is inconsistent with Defendants' position. The regulation states: "Private parties undertaking response actions *should* provide an opportunity for public comment concerning the selection of the response action based on the provision set out below, or based on substantially equivalent state and local requirements." 40 C.F.R. 300.700(c)(6) (emphasis added). The use of the word "should" suggests that the provision is a suggested or encouraged measure.

Further support for this conclusion appears in the 1990 amendment to the NCP which reduced the necessary standard of compliance with the NCP from strict to substantial. *Gussin Enters., Inc. v. Rockola*, No. 89 C 4742, 1993 WL 114643, at *5 (N.D. Ill. Apr. 13, 1993). The court in *Alcan-Toyo America* stated that:

> [i]n moving to a lower standard, the EPA wanted to encourage more private parties to undertake voluntary activities. By requiring only substantial, rather than strict, compliance, the EPA hoped to make it easier for private parties to recover the costs of their efforts, and therefore more likely that they would clean up contaminated sites themselves.

*Alcan-Toyo America v. Northern Illinois Gas Co.*, 904 F. Supp. 833, 835 (N.D. Ill 1995), *see also* 55 Fed. Reg. 8794 (March 8,1990)("where a governmental or private party undertakes the clean-up (in the face of a lack of action by the responsible party), it would be inequitable to allow the responsible party to use minor procedural discrepancies to defeat reimbursement for an environmentally sound cleanup.") The standard currently applied by courts is that a private party must show only substantial compliance with the provisions of the NCP. *Morrison Enters. v. McShares, Inc.*, ___ F.3d ___, Nos. 98-3219, 98-3229, 2002 WL 1767540, at *7 (10th Cir. Aug. 1, 2002). The reduced standard for compliance encourages responsible parties to act promptly to

address contamination with confidence that response costs can be recovered later.

Defendants suggest that the *Alcan-Toyo* and *Gussin* decisions support their position that compliance with the NCP's public comment provisions is a prerequisite to a party's recovery under CERCLA. In the *Alcan-Toyo* case, the plaintiff sought to recover its response costs from two utility companies under CERCLA. *Id.* The court had already determined the division of responsibility as to future costs but refused to permit plaintiff to recover for past response costs incurred in the excavation of contaminated soil because the action was taken without complying with the NCP's public comment provisions. *Id.* at 837. The plaintiff in that case had admitted, however, that "it did not seek public comment concerning its decision to excavate" and "did not inform the community around the site that the excavation was planned." *Id.* at 836 n.3. The court concluded that plaintiff "did nothing to obtain public input and therefore has not substantially complied with the NCP." *Id.* at 837. Similarly, in the *Gussin* decision, the plaintiff admitted it had allowed no opportunity for public comment prior to the response action. *Gussin*, 1993 WL 114643, at *5. The clean-up effort in *Gussin* was approved by the Illinois EPA but the court noted that "[i]n the instant case, there is no indication that the public had any opportunity to comment on the remedial action undertaken . . . on behalf of plaintiffs." *Id.* In the *Gussin* case, the parties disputed whether the 1985 or 1990 version of the NCP should apply to the plaintiff's CERCLA claim which was filed in 1989. *Id.* at *4-5. The court, however, declined to address which version and standard applied because the court held that the plaintiff failed to meet either a strict or a substantial compliance standard. *Id.*

Far from admitting non-compliance, as in that case, Plaintiff here asserts that it did make an effort to involve the community in two ways. First, Norfolk Southern included the IEPA in the response process. In 1995, Norfolk Southern applied to enroll in the IEPA's pre-notice program and worked with the IEPA throughout the clean-up process. Norfolk Southern continued to work with the IEPA until 1998, when the IEPA issued a "no-further-remediation" letter regarding the St. Rita site. Nor did the IEPA operate as a mere rubber stamp; to the contrary, the agency rejected

several of Norfolk Southern's clean-up proposals as insufficient, ultimately requiring Plaintiff to engage in removal of several inches of soil, an asphalt cap, and restructure of the St. Rita's practice field. The IEPA then supervised the actual clean-up process and inspected the site when the clean-up was complete to insure that Norfolk had met the IEPA's demands. There can be no dispute concerning IEPA's active participation in this clean-up effort, participation that serves arguably as a substitute for the community relations that Defendants emphasize.

In any event, the evidence presented at trial demonstrates that Norfolk Southern did not *fail* to perform community relations efforts. The primary party affected by the contamination was St. Rita's High School. Officials from Norfolk Southern and from its agent, Patrick Engineering, contacted Father O'Connor, the president of St. Rita's, early and often in the remediation process. In September 1995, soon after Norfolk Southern first learned of the possible contamination on St. Rita's property, Norfolk Southern contacted Father O'Connor about the problem and sought his permission to test the soil on the St. Rita property. Jerry Bowden of Patrick Engineering also sent Father O'Connor a letter requesting comments and recommendations regarding the clean-up process, and proposed a meeting to discuss the response process. Patrick Engineering advised Father O'Connor when a "tentative game plan" had been developed for the clean-up effort. Father O'Connor was invited to contact the community relations officer appointed by IEPA to assist the high school; he rejected this offer in favor of handling all communications on his own. In his testimony before this court, Father O'Connor stated that he in fact did notify a large group of individuals at the high school of what was happening at the site.

Because St. Rita High School was the community member most impacted by the contamination, it is reasonable that Norfolk Southern's public notice and community involvement measures would be directed towards St. Rita's chief officer. The court is unmoved by Defendants' implicit suggestion that Norfolk could have or should have gone around Father O'Connor to communicate directly with current and former students. While Norfolk Southern might have done

51

more in the way of providing public notice, this court concludes that Norfolk Southern's involvement with the IEPA during the clean-up process and communications with Father O'Connor are sufficient to meet the substantial compliance standard of the NCP.

Two recent Seventh Circuit opinions support this conclusion. In *PMC Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 616 (7th Cir. 1998), the court observed that the policy of 40 C.F.R. § 300.700(c)(6) "is to make sure that the remedial measures undertaken hopefully at the expense of someone else are not excessive or otherwise improvident." This court believes, as the Seventh Circuit has stated, that the NCP policy is to encourage parties to voluntarily clean up contamination sites and to allow potentially responsible parties an opportunity to comment before costs are incurred. Defendants do not suggest, nor could they, that Norfolk deprived Defendants themselves of the opportunity to comment on clean-up proposals before incurring costs here. To the contrary, Norfolk Southern alerted Gee Co. to its plans regarding response actions. It is undisputed that on May 10, 1996, Norfolk notified Gee Co. and CFW Specialties regarding the pending response actions and demanded reimbursement for costs. These letters estimated the cost at $1.5 million. There is no evidence that any of the Defendants responded.

As this court explained in its earlier rulings, the *NutraSweet* decision also supports a finding in favor of Plaintiff on this issue. There, as in this case, defendants argued that plaintiff was not entitled to contribution for its response costs under CERCLA because the plaintiff did not comply with the NCP. *Id.* at 790-91. Although defendants waived this argument by failing to raise this issue at summary judgment, the Seventh Circuit nevertheless observed:

> [T]he district court did not clearly err in concluding that NutraSweet had satisfied the NCP. The Illinois EPA approved NutraSweet's clean-up plan, and the agency monitored the progress of the remediation. NutraSweet remediated its property until the Illinois EPA advised it that it could stop because NutraSweet's efforts had succeeded to the maximum extent possible. In light of this evidence, we are satisfied that NutraSweet met this requirement for a CERCLA recovery.

*NutraSweet*, 227 F.3d 776, 791 (7th Cir. 2000). Here, similarly, the court concludes that Norfolk

Southern's contacts with Father O'Connor and close involvement with the IEPA constitutes substantial compliance with NCP. [27]

Next, the Defendants attack Norfolk Southern's clean-up efforts as inconsistent with the NCP because the response actions were not the most cost-effective remedy. In support of this argument, the Defendants provide only general references to the NCP and suggest that NCP's requirement that a property owner adopt the most cost-effective remedy is one that goes beyond the requirements imposed by the IEPA Site Remediation Program. Thus, Defendants urge, the IEPA's approval of Norfolk's clean-up does not establish compliance with NCP. Defendants have offered no legal authority for this assertion, however. Nor do they explain how the evidence demonstrates that Norfolk Southern selected a response action that was less than cost-effective. In fact, the evidence shows that Norfolk Southern did propose less expensive clean-up options, but

---

[27]     The parties in this case have spent a significant amount of time attempting to define Norfolk Southern's response action as either a "removal", as defined in 42 U.S.C. § 9601 (23), or a "remedial action", as defined in 42 U.S.C. § 9601 (24). In general terms, a removal action is more emergent and usually involves a short term remedy to protect the health of a community or the environment, 42 U.S.C. § 9601 (23), while a remedial action is one that is longer term, more permanent in nature, and may be "taken instead of or in addition to removal actions . . ." 42 U.S.C. §9601 (24). Gee Co. offered the testimony of Frank Rovers that a removal action is designed to do what is "immediately necessary to remove the public from the contamination," while a remedial action is undertaken "in a much more deliberate fashion with a lot of input from regulatory agencies. . . ." (TT at 2417.) Rovers characterized only one aspect of Norfolk Southern's actions with respect to the wood treatment facility and St. Rita's practice field as removal actions: installing fence around the sites to prevent people from coming into contact with the contamination. According to Rovers, CERCLA's public notice requirements only apply to remedial actions, and that to investigate a site for years and years and then quickly clean it up without informing the public, would be to circumvent those requirements, which Congress enacted when it reauthorized CERCLA in 1985. (TT at 2427.) The apparent significance of this dispute is the parties' understanding that the court's interpretation of the NCP in the case of a removal action would be more lenient than in the case of a long term remedial action. Indeed, in a recent decision the Tenth Circuit has stated that both removal actions and remedial actions have substantial requirements, but the requirements for a remedial action are much more extensive. *Morrison Enters. v. McShares*, Inc., ___ F.3d ___, Nos. 98-3219, 98-3229, 2002 WL 1767540, at *7 (10th Cir. Aug. 1, 2002). Because the court has already determined that the Norfolk Southern has substantially complied with the NCP, regardless of whether its response action is a removal or a remediation, it need not resolve this dispute.

they were rejected by the IEPA. The court notes that Defendants have not suggested what motive Norfolk Southern might have had to proceed with an unnecessarily expensive remediation on its own dime, without any assurance that others would be held accountable to share in the cost. Finally, the court has little enthusiasm for entertaining Defendants' cost-effectiveness argument, in light of their failure to respond in any way in May 1996 when Norfolk Southern advised the Defendants about the need for a clean-up and invited their participation.

For these reasons, the court concludes that Norfolk Southern's response action satisfy the NCP standards and that Norfolk is entitled to seek recovery from other responsible parties in this action.

## RESPONSIBILITY FOR RESPONSE COSTS

In a suit under CERCLA between responsible parties, § 113 of CERCLA provides that the district court should order contribution in relation to a balance of the equities in the case. *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 615 (7th Cir. 1998). Once a party is determined to be liable under CERCLA, courts are not required "to adopt pro rata assessments of contribution." *Environmental Transport. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 509 (7th Cir. 1992). Instead, in determining the proper division of "response costs among the liable parties, a court should employ such equitable factors as it determines appropriate." *Kerr-McGee Chemical*, 14 F.3d at 326; 42 U.S.C. § 113(f)(1).

Among the factors courts may consider in allocating the response costs are the parties' relative fault and any relevant Gore factors.[28] *Kerr-McGee Chem.*, 14 F.3d at 326. The Gore factors include:

(1) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished; (2) the amount of

---

[28] These relevant factors have been dubbed the "Gore factors" because these factors were part of a 1980 House Superfund Bill sponsored by then-congressman Albert Gore. *Ensco*, 969 F.2d at 508.

the hazardous waste involved; (3) the degree of toxicity of the hazardous waste involved; (4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and (6) the degree of cooperation by the parties with the Federal, State, or local officials to prevent any harm to the public health or the environment.

*Id.* at 326 n.4. A court may consider factors it deems appropriate under the totality of the circumstances in balancing the equities of a case, but is not required to make specific findings on any of the suggested factors. *Environmental Transp.Sys.,* 969 F.2d at 509.

In this case, the court first looks to the relative fault among the parties in this case. It is undisputed that Gee Co. was the only party to introduce CCA on the property. The contamination at issue here simply would not have occurred had it not been for the careless operation of the wood treating facility by Gee Co. In addition, there is substantial evidence that Gee. Co. not only used CCA in a reckless manner but then refused to act when alerted to spills. Steven Dooley, one of three managers of the Gee Co. wood treating facility from 1977 to 1990, testified that on a number of occasions he saw the CCA spill out onto the St. Rita property; in fact, Dooley recalled that the CCA would spill out any time there was a hard rain because the rain would mix with the CCA on the drip pad and cause flooding of the CCA. Concerned that a curb beside the drip pad was too low to control the flow of CCA, Dooley raised the matter directly with Gee Sr. and Gee Jr. in 1979. Gee Co. never acted on Dooley's suggestions.

Similarly, Chet Popadzuik of Osmose Wood, Gee Co.'s supplier of CCA, testified that Gee Co. managers were aware of, but failed to adopt, certain safety measures. Popadzuik visited the wood treating facility in March and April of 1988 and suggested equipment and environmental improvements at the facility. Popadzuik recounted his recommendations, many of which were intended to eliminate accidental spills, in a letter to Gee Sr. in April 1998. There is no evidence that Gee Co. ever acted on these recommendations.

James Angsten, a coach at St. Rita's, described a green puddle near the wood treating

facility property around 1990. According to Angsten, this puddle would overflow with any hard rain and would then spill over onto the St. Rita property. The puddle was so common that it became a joke among the St. Rita students. Gee Co.'s apparent recognition that its discharge was killing the grass is reflected by the fact that on at least a handful of occasions, Gee Co. employees replaced the sod on a portion of the field.

As noted previously, Norfolk has failed to meet its burden regarding CERCLA liability as to defendants Mancini and CFW Specialities. In the event that Norfolk had met that burden, however, the result would not be any different. Mancini and CFW Specialties had very little involvement with CCA at the facility. They purchased CCA from Gee Co. as part of the sale of the wood treating business but never used CCA at that facility after purchasing it in August 1991 and abandoned the property completely in May 1993. The limited time frame in which CFW Specialities and Mancini operated the facility leads the court to believe that their responsibility for the contamination is insignificant when compared to Gee co., which operated the facility from 1965 to 1991.

For the reasons explained earlier, Norfolk Southern also carries some of the blame for the contamination of the St. Rita site, but its involvement is limited when compared to that of Gee Co. Norfolk Southern could have been more aggressive in addressing the contamination after learning of it in 1993. The court does not condone Norfolk's three-year delay in moving forward with a clean-up, but recognizes that Norfolk itself did not use CCA or introduce it in the property, and that at least some portion of Norfolk Southern's delay in initiating a clean-up related to its efforts to work with IEPA in the process.

In considering the issue of relative fault, the court has already addressed certain relevant Gore factors, including the parties' ability to distinguish their own contributions to the CCA release; their comparative involvement in generation, storage, and disposal of the contaminants; and the degree of care exercised by the parties with respect to the hazardous waste concerned. The final Gore factor addresses the level of cooperation demonstrated by the parties with government

56

officials to protect the public health and environment. The evidence here shows that once Norfolk Southern initiated its clean-up effort, it demonstrated great care in working with IEPA to insure that the clean-up met relevant regulatory standards.

Based on a balancing of these factors, the court concludes that Gee Co. should be responsible for 100 percent of the response costs related to the CCA clean up from the contaminated site. Such a division of responsibility has been endorsed by the Seventh Circuit in *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610 (7th Cir. 1998). In *PMC*, the district court considered a claim for contribution between responsible parties under § 113(f)(1). In 1985, PMC purchased property located in Chicago from Sherwin-Williams. *Id.* at 613. For 100 years prior to PMC's taking ownership of this property in 1985, Sherwin-Willliams used the property as a plant to manufacture paints, insecticides, and other chemicals. *Id.* In 1992, the IEPA required PMC to clean up all contamination at the site. *Id.* Between 1985 and 1993, the year PMC brought the litigation for recovery of costs from Sherwin-Williams, PMC admitted "it dumped toxic waste at the site on a number of occasions." *Id.* at 616. Even though plaintiff admitted it had partially contributed to the contamination of the site, the court ordered defendant to reimburse plaintiff for 100 percent of the clean-up costs. *Id.* The defendant appealed, arguing that the judge had abused his equitable discretion in allocating 100 percent of the liability to the defendant, but the Seventh Circuit disagreed. The Court of Appeals noted that the plaintiff's "spills may have been too inconsequential to affect the cost of cleaning up significantly, and in that event a zero allocation to PMC would be appropriate." *Id.* Thus, the Seventh Circuit determined the district court's distribution and rationale to be reasonable.

The court is comfortable adopting the same reasoning here. After reviewing all of the evidence, the court concludes that any spills or discharge that resulted after Gee Co. relinquished the property were inconsequential in comparison to the 26 years in which Gee Co. operated the facility in a careless manner. The evidence supports a finding that Gee Co. used CCA on a regular

basis in its business and did so without taking proper precautions. CFW Specialities and Mancini owned the property but never used CCA there; thus, the only CCA that could have contaminated the St. Rita facility was left there by Gee Co. The equities satisfy the court that Gee Co., which was responsible for the initiating all of the contamination and carrying out most of it, should be 100 percent responsible for the cost of Norfolk Southern's response effort.

## CERCLA § 113(g)(2)

Count three of Norfolk Southern's complaint seeks a declaratory judgment against all defendants under CERCLA § 113(g)(2). Norfolk Southern seeks a declaratory judgment to resolve any future response costs or damages related to the contaminated site. At the outset, the court notes that if a defendant is found liable under CERCLA § 107, the court is required to grant a declaratory judgment in the plaintiff's favor. *American Nat'l Bank and Trust Co. v. Harcoss Chems. Inc.*, 95 C 3750, 1997 WL 281295, at *12 (N.D. Ill May 20, 1997) (quoting 42 U.S.C. § 9613(g)(2)). In actions under CERCLA § 113, the court has discretion to enter a declaratory judgment. *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1191 (9th Cir. 2000).

In this case, the court declines to enter a declaratory judgment. Norfolk Southern has not offered evidence of the likelihood (or even the possibility) that it will face further response costs in the future. Further, the issuance of a "no-further-remediation-letter" from the IEPA signifies the complete remediation of the site.

## Damages

The court now turns to the damages portions of Norfolk Southern's claim. Norfolk Southern is claiming total damages in the amount of $1,603,441.96 plus prejudgment interest and costs. (Tr. Ex. 199). The court has determined that Gee Co. is liable for 100 percent of the response costs related to the CCA clean-up of both the wood treating facility and St. Rita High School. Gee Co. contests $594,023.60 of plaintiff's claimed damages, arguing that these costs are not related to the

CCA contamination clean-up.

Gee Co. first contests the $318,605.66 that Norfolk Southern paid to Loyalty Environmental Services, the contractor Norfolk Southern hired to carry out the work of grading and paving the wood treating facility with asphalt. Gee Co. argues that Loyalty paved parts of the Norfolk Southern property that exceeded the boundaries of the contaminated portion of the former wood treating facility (referred to as "Property A"). In fact, William Harris acknowledged that Norfolk Southern paved more than Property A at the wood treating facility and was unable to identify how much of the $318,605.66 was spent on the Property A paving in contrast to the rest of the property. (TT at 1633.) For this reason, the court concludes that no more than half of the $318,605.66 ($159,302.83) paid for paving is properly attributable to the CCA response action.

Gee Co. next contests the $28,290.29 that Norfolk Southern paid to Patrick for the initial site assessment because it included indoor asbestos screening and petroleum activities. At trial, Harris acknowledged that this amount included $3,369.70 that was not a cost incurred in response to the CCA contamination but was instead related to asbestos. (TT at 1631.) Thus, the amount Norfolk Southern seeks for the initial site assessment is reduced to $24,920.59. Defendants further maintain that this $24,920.59 is not all attributable to the CCA clean-up. This court disagrees and finds that Norfolk Southern has demonstrated this it incurred $24,920.59 in relation to the CCA clean-up. At the time of the Phase I and Phase II investigations, Norfolk was trying to determine the full extent of contamination at the site and did not know the full extent of the CCA contamination. Thus, the court is not willing to limit Norfolk's recovery for this investigative work because it was a necessary step in a successful response action.

Gee Co. also contest $17,406 that Norfolk Southern paid to Clean Harbors related to the clean up of the trailer left at the wood treating facility. Gee Co. maintains that it was not responsible for the trailer and that it belonged to CFW Specialities, but the court concludes otherwise. Adam Jung, Gee Co.'s employeé, testified that Gee Co. used the truck to hold excess

59

waste. (TT at 1306.) In fact, Jung testified that the trailer was hooked up to the pits, when Gee Co. operated the wood treating facility, to extract excess water. (TT 1306.) Furthermore, Mancini's testimony that CFW Specialities never used the trailer was not contradicted. Thus, Gee Co. is also liable for this $17,406.

Gee Co. next contests Norfolk Southern's claimed $158,361 expense to re-engineer the practice field for St. Rita High School. The court recognizes that some improvements were made to the practice field as part of the remediation effort. The court will nevertheless allow recovery of these costs; Norfolk Southern explained that many of the improvements were an effort to avoid erosion, and Gee Co. did not rebut this environmentally-based explanation for the action. Furthermore, in light of the lengthy inconvenience to St. Rita's imposed by the clean-up, the court concludes that Norfolk's decision to provide St. Rita's with sod rather than re-seeding was reasonable and properly related to the clean-up effort. The court notes, further, that Gee Co. offered no evidence from which the court is able to determine the money Norfolk could have saved, had it opted to re-seed rather than to lay fresh sod on the field.

The court will, however, reduce the plaintiff's recovery by $12,529[29], the expense of resodding the St. Rita football field. The football field was used to a greater extent by the high school because the school no longer had a practice field. The additional use resulted in the grass being worn down at a faster rate. Norfolk Southern is to be commended for its efforts to assist St. Rita High School but these costs are not related to the CCA contamination and therefore not recoverable.

Gee Co. contests the $6,000 that Norfolk Southern paid for a security fence around the Norfolk Southern property towards the end of the remediation process. Bowden testified on cross

---

[29]     Gee Co. claims that $24,000 of Norfolk's damages are a result of resodding the St. Rita football field. However, Norfolk only seeks recovery of $12,529 for resodding. (Norfolk Exhibit 199.)

examination that the purpose of the fence was to keep trespassers out and prevent property from being stolen. (TT at 1101.) Because the court believes that this fence was not related to the CCA contamination clean-up, it concludes this cost is not recoverable by Norfolk.

Gee Co. next contests the $41,362.82 Norfolk Southern paid Weinberg Consultants as duplicative of Patrick Engineering's work. Although Weinberg's results were never submitted to IEPA, these costs were directly related to the CCA contamination. The fact that hindsight would possibly find the measures unnecessary is not enough to prevent Norfolk Southern's recovery of this amount. Bowden testified for Norfolk Southern that Weinberg Consulting Group was hired to review and check Patrick Engineering's methodologies. (TT at 666.) The court does not view this as unnecessary but as prudent. The court finds, further, that it is not unreasonable for Norfolk to consider the opinions of more than one environmental consultant before engaging in an extensive and expensive clean-up effort.

Gee also contests $1,240 of Norfolk's claimed damages because Gee claims Norfolk decided to store snow on Property A, which caused a delay in the clean-up work, resulting in an unnecessary increase in Norfolk's clean-up costs and one not caused by Gee. While this may or not be true, Gee has failed to sufficiently demonstrate that the snow caused this $1,240 increase in the clean-up costs.

Finally, Gee contests an unidentified amount of Norfolk's damages that were related to the installation of flowering pear trees and landscaping as part of the response action. In this instance, the plaintiff fails to state how much of Norfolk's damages were attributable to these actions on the part of Norfolk. In addition, given the length of time St. Rita was prevented from using its property the court feels these costs are recoverable as part of the response action.

Gee disputes $594,023.60 of Norfolk's Damages and Norfolk is seeking damages of $1,603,441.96. Of the disputed amounts, the court has determined that Norfolk is entitled to recover:

1. $24,920.59    (The adjusted amount for Patrick's initial site assessment. Norfolk originally sought $28,290.29 for Patrick's initial site assessment but at trial reduced this amount by $3,369.70 because this amount was not incurred in response to the CCA contamination.)

2. $17,406.00    (The amount Norfolk paid to Clean Harbors.)

3. $1,174,084.39    (The amount Norfolk paid for Patrick's services throughout the clean-up process.)

4. $41,362.62    (The amount Norfolk paid to Weinberg Consulting.)

5. $11,164.00    (IEPA's regulatory oversight and administrative costs)

6. $153,302.83    (The adjusted amount recoverable by Norfolk for Loyalty's services during the clean-up process. Norfolk originally sought $318,605.66 for Loyalty's work at the contaminated site. However, because part of this amount was not attributable to the CCA clean-up at the contaminated site, the court limited Norfolk's recovery by one-half. This amount of $159,302.83 was further reduced by $6,000 because the court did not believe that the security fence installed by Loyalty was an expense incurred in response to the CCA contamination.)

Norfolk Southern is entitled to recovery of those portions of its damages claims that are not excluded in this opinion. In accordance with this opinion, Norfolk is awarded $1,422,240.43 to be recovered from the defendant Gee Co.

In light of its determination on Norfolk's federal claims and because Gee Co. and CFW Specialities' post-trial briefs make no mention of the cross claims between them, the court concludes those claims are waived.

## CONCLUSION

Gee Co. is liable under CERCLA § 113(f) and responsible to pay 100 percent of Norfolk Southern's response costs related to the CCA contamination site. The court concludes that Norfolk Southern incurred its costs consistent with the NCP and is thus entitled to recovery of 1,422,240.43.

The court enters judgment for the Plaintiff and against Defendant Gee Co. and awards damages of $1,422,240.43 to be paid by Gee Co. Claims against CFW Specialties and Vincent

Mancini are dismissed. The motions of Defendants CFW Specialities and Vincent Mancini for judgment in their favor (Docs. No. 134-1 and 137–1) are granted. Defendant Gee Co.'s motions for partial judgment pursuant to Rule 52(c) (Docs. No. 135-1 and 140-1) are denied. Cross-claims between the Defendants are also dismissed.

                                          ENTER:

Dated: September 30, 2002

                                          REBECCA R. PALLMEYER
                                          United States District Judge